UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RANDY ZORNBERG, Individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 1:23-cv-06465-BMC |
| v. | CLASS ACTION |
| NAPCO SECURITY TECHNOLOGIES, INC., RICHARD L. SOLOWAY, KEVIN S. BUCHEL, PAUL STEPHEN BEEBER, RICK LAZIO, DONNA SOLOWAY, ROBERT UNGAR, ANDREW J. WILDER, NEEDHAM & COMPANY, LLC, and WILLIAM BLAIR & COMPANY, L.L.C., | **Oral Argument Requested** |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ..........................................................................................4

     A.    NAPCO is Impacted by the Worldwide Supply Chain Crisis ..............................6

     B.    NAPCO Restates Its Financials After Discovering An Accounting Error .............7

     C.    Revenue is Recognized When Products Are Shipped ...........................................8

     D.    The Secondary Public Offering ...........................................................................9

ARGUMENT ................................................................................................................9

I.     THE EXCHANGE ACT CLAIMS MUST BE DISMISSED BECAUSE THE
      COMPLAINT FAILS TO SUFFICIENTLY PLEAD SCIENTER.................................10

     A.    The FE Allegations Do Not Plead a Strong Inference of Scienter .......................11

     B.    The Stock Sales Do Not Support a Strong Inference of Scienter .........................14

     C.    Plaintiffs' Additional Allegation Do Not Plead a Strong Inference of
         Scienter ............................................................................................................17

     D.    Plaintiffs Have Not Plead An Inference of Scienter That is as Compelling
         as Any Opposing Inference...............................................................................18

     E.    Scienter Is Not Adequately Plead Against The Company .....................................19

II.    THE EXCHANGE ACT AND SECURITIES ACT CLAIMS MUST BE
      DISMISSED BECAUSE THERE IS NO LOSS CAUSATION .......................................20

III.   THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED BECAUSE THE
      ADDITIONAL PLAINTIFF FAILED TO COMPLY WITH THE PSLRA....................21

IV.   THE SECTION 12(a)(2) CLAIM SHOULD BE DISMISSED FOR LACK OF
      STANDING ..................................................................................................22

V.    THE SECTION 11 CLAIM SHOULD BE DISMISSED AGAINST
      INDIVIDUAL DEFENDANTS BECAUSE THE EFFECTIVE DATE OF THE
      REGISTRATION STATEMENT WAS BEFORE THE CLASS PERIOD....................25

CONCLUSION.............................................................................................................255

## TABLE OF AUTHORITIES

**Cases**

*Acito v. IMCERA Grp.*,
  47 F.3d 47 (2d. Cir. 1995) ...................................................................................... 16

*Amorosa v. AOL Time Warner, Inc.*
  409 Fed. Appx. 412 (2d. Cir. 2011) ........................................................................ 20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir 2007) ........................................................................................ 5

*Bd. of Tr. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011) ...................................................................... 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................. 10

*Boluka Garment Co. v. Canaan Inc.*,
  547 F. Supp. 3d 439 (S.D.N.Y. 2021) ................................................................ 20, 21

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...................................................................... 13

*City of Brockton Ret. Sys. v. Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................................. 16, 17

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...................................................................... 15

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012) ...................................................................... 18

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ...................................................................................... 10

*Fed. Hous. Fin. Agency v. Stanley*,
  2012 WL 5868300 (S.D.N.Y. Nov. 19, 2012) .......................................................... 24

*Ford v. VOXX Int'l Corp.*,
  2016 WL 3982466 (E.D.N.Y. July 22, 2016) .......................................................... 14

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) ........................................................................ 5

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013) ...................................................................................... 23

i

*Hachem v. Gen. Elec. Inc.*,
   2018 WL 1779345 (S.D.N.Y. Apr. 12, 2018) ..................................................... 21

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018) ............................................................... 19

*In New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ............................................................................. 24

*In re Citigroup Bond Litig.*,
   723 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................................... 23

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ............................................................... 14

*In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*,
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) ............................................................ 25

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009) ......................................................... 10, 14

*In re Henry Schein Secs. Litig., Inc.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ................................................... 15

*In re Lottery.com, Inc. Sec. Litig.*,
   2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) ........................................................ 18

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................................... 9, 10

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   616 F. App'x 442 (2d Cir. 2015) ...................................................................... 10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ............................................................................. 23

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008) ............................................................... 12

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................... 10

*In re Sandridge Energy, Inc. Sec. Litig.*,
   2015 WL 3652526 (W.D. Okla. May 11, 2015) ................................................. 22

*In re Select Comfort Corp. Sec. Litig.*,
   2000 WL 35529101 (D. Minn. Jan. 27, 2000), *aff'd* 2000 WL 36097395 (D. Minn. May 12,
   2000) ............................................................................................................... 22

*In re Thornburg Mortg., Inc. Sec. Litig.,*
629 F. Supp. 2d 1233 (D.N.M. 2009) ........................................................ *21*

*In re Travelzoo Inc. Sec. Litig.,*
2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) .......................................... 16

*In re Turquoise Hill Res. Ltd.,*
2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .......................................... 18

*Jackson v. Abernathy,*
960 F.3d 94 (2d Cir. 2020) (per curiam) ................................................. 19

*Li Hong Cheng v. Can. Goose Holdings Inc.,*
2021 WL 3077469 (S.D.N.Y. Jul. 19, 2021) ........................................... 16

*Lozada v. TaskUs, Inc.,*
2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) .............................. 15, 16, 21, 24

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.,*
518 F. Supp. 3d 772 (S.D.N.Y. 2021) ...................................................... 13

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ........................................................... 12, 18

*Reilly v. U.S. Physical Therapy, Inc.,*
2018 WL 3559089 (S.D.N.Y. July 23, 2018) .......................................... 15

*Risley v. Universal Navigation Inc.,*
2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ......................................... 24

*Schiro v. Cemex, S.A.B. de C.V.,*
396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...................................................... 18

*Slayton v. Am. Express Co.,*
604 F.3d 758 (2d Cir. 2010) .................................................................... 10

*Tellabs, Inc. v. Makor,*
551 U.S. 308 (2007) ......................................................................... 10, 18

*VanLeeuwen, v. Keyuan Petrochems., Inc.,*
2013 WL 2247394 (C.D. Cal. May 9, 2013) ........................................... 21

*Venkataraman v. Kandi Techs. Grp., Inc.,*
2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) .......................................... 18

*Winter v. Stronghold Digit. Mining, Inc.,*
2023 WL 5152177 (S.D.N.Y. Aug. 10, 2023) .................................... 22, 23

iii

**Other Authorities**

Roman L. Weil, et. al., Financial Accounting: An Introduction To Concepts, Methods, and Uses (14th ed. 2020)..................................................................................................... 7

**Statutes and Rules**

15 U.S.C. § 77z-1(a)(3)............................................................................................... 21

15 U.S.C. § 78u-4(a)(3) ............................................................................................. 25

17 C.F.R. § 230.430B(f)(1)........................................................................................ 25

17 C.F.R. § 230.430B(f)(4)........................................................................................ 25

Federal Rule of Civil Procedure 8 .............................................................................. 1

Federal Rule of Civil Procedure 9(b)...................................................................... 1, 10

Federal Rule of Civil Procedure 12(b)(6) ................................................................... 1

Defendants NAPCO Securities Technologies, Inc. ("NAPCO" or the "Company"), Richard L. Soloway and Kevin S. Buchel (the "Officer Defendants"), and Paul Stephen Beeber, Rick Lazio, Donna Soloway, Robert Ungar, and Andrew J. Wilder (the "Director Defendants" and, together with the Officer Defendants, the "Individual Defendants"), and Needham & Company, LLC and William Blair & Company, L.L.C. (the "Underwriter Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint ("Complaint"), pursuant to Federal Rules of Civil Procedure 8, 9(b) , and 12(b)(6)  and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

This case concerns an inadvertent accounting error, timely disclosed following its discovery. As a result of the COVID-19 pandemic, NAPCO, a designer and manufacturer of electronic security devices, disclosed in its quarterly and annual SEC filings that it was impacted by worldwide supply chain shortages. In order to continue manufacturing its products, NAPCO had to pay much higher prices to buy necessary component parts. This increased the reported value of the Company's inventory. By the second half of calendar 2022, however, prices began to normalize as the supply chain crisis abated. Nonetheless, when NAPCO calculated its financial results for fiscal 2023 (which began on July 1, 2022), it used inventory values from its audited year-end financials as of June 30, 2022. These amounts though were too high—they did not account for the decreasing prices of component parts in fiscal 2023. As such, NAPCO's quarterly reports for the first three quarters of 2023 overstated inventory, leading to the understatement of cost of goods sold ("COGS") and, in turn, the overstatement of net income.

NAPCO internally discovered its mistake while preparing its consolidated year-end financial results for the fiscal year ended 2023. Following this discovery, on August 18, 2023, the Company timely announced that it had made an accounting error and, accordingly, would restate

1

its results for the first three quarters of fiscal 2023, which it did on September 1, 2023 when it filed amended Form 10-Qs for the first three quarters of fiscal year 2023. There was no fraud. Instead, the obvious and more compelling explanation for the Restatement was the reason provided. NAPCO inadvertently failed to account for price decreases as the global supply shortage abated—an explanation fully consistent with its statements regarding the supply chain crisis incorporated by reference in the Complaint. For this reason and as set forth below, dismissal is required.

**First**, Plaintiffs' Exchange Act claims must be dismissed because Plaintiffs fail to plead scienter. As a threshold matter, Plaintiffs' theory of fraud is based entirely on an incorrect, unsupported premise. Plaintiffs allege that the Restatement was not due to an accounting error—as disclosed—but instead to a fraudulent scheme to improperly inflate the Company's income-related metrics. The scheme as plead goes like this: At the end of various quarters, employees at the Company's warehouse were directed to halt the shipment of "sold" products. That way, the Company could account for these sold products as unsold inventory (which concomitantly understated the cost of goods sold and inflated net income) while simultaneously recognizing the revenue from these sales. But, significantly—as SEC filings incorporated by reference in the Complaint make clear—for accounting purposes, products are not deemed sold and revenue is not recognized until they are shipped. In other words, a product in a warehouse is (correctly) accounted for as inventory. When shipped, it is then accounted for as sold, revenue is recognized and, in accordance with established accounting principles, the corresponding COGS (*i.e.*, costs in connection with producing the sold products) are accounted for during the same reporting period.

Plaintiffs' fraud claims also fail because they are based entirely on uncorroborated statements by three anonymous former employees (the "FEs"), who, at best, vaguely allege that the Company had a practice of withholding an unknown number of product shipments at quarter

end (or otherwise), which they (and Plaintiffs) characterize as "sold." There are no allegations regarding the accounting treatment for such products nor are the FEs alleged to have any knowledge of NAPCO's accounting practices, or any accounting for that matter, or have had any contact with the Officer Defendants. Further, even if taken at face value, that management may have halted the shipment of some products at quarter end does not plead accounting fraud—there could be multiple business reasons to do so (including resource allocation decisions, customer shipping requirements and staffing)—and halting product shipments is not in and of itself fraudulent or nefarious in any way. Plaintiffs' other scienter allegations similarly fall short. That the Officer Defendants sold stock nine months and six months before the Restatement (and end of the Class Period) does not plead scienter, especially where, as here, there is no credible theory of fraud. Further, the fact of a restatement does not create an inference of scienter nor do allegations regarding the Officer Defendants' high level positions or that, months following the Class Period, the Company replaced its auditor with a larger firm.

**Second,** Plaintiffs' Exchange Act and Securities Act claims must be dismissed because, on the face of the Complaint, there is no loss causation. Plaintiffs allege that NAPCO's stock price declined following the Restatement because the "nature and extent of the Exchange Act Defendants' fraud" was finally revealed. ¶ 128. However, the Restatement says nothing about the alleged fraud as Plaintiffs admit. ¶ 8 ("Although NAPCO attempted to characterize the restatement as stemming from innocent accounting 'errors,' in fact, it was the product of a fraudulent scheme[.]"). Plaintiffs cannot have it both ways. On the one hand they assert a fraudulent scheme, when revealed, caused the stock price to decline, while on the other they admit that no such scheme was ever disclosed. Thus, their contradictory complaint, on its face, fails to plead loss causation.

**Third,** the Securities Act claims brought by the City of Warren Police and Fire Retirement

System ("Additional Plaintiff") in connection with the Secondary Public Offering, which closed on February 15, 2023 (the "SPO"), should be dismissed because those claims are not asserted by any "lead plaintiff" appointed pursuant to the PSLRA. Although several candidates applied to be lead plaintiff, the "Additional Plaintiff" that asserts Securities Act claims did not; it had insubstantial alleged losses, and was chosen by counsel, not the Court. Additional Plaintiff cannot be permitted to end-run the lead plaintiff process that is mandated by the PSLRA in this way.

**Fourth**, the Section 12(a)(2) claim should be dismissed because Additional Plaintiff does not properly plead that it purchased any shares in the SPO. Nor does it plead that any particular Defendant is a statutory seller—*i.e.*, that they either (1) sold or passed title to Additional Plaintiff or (2) successfully solicited Additional Plaintiff— as required for liability under 12(a)(2). The SPO was a firm commitment underwriting and, as such, neither the Company nor the Individual Defendants sold shares to Additional Plaintiff. The conclusory allegation that "Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered" (¶ 197) must be disregarded. Generic allegations regarding the Underwriter Defendants in the preparation of the prospectus and activities in connection with the SPO also do not suffice.

**Fifth,** Additional Plaintiff's Section 11 claim against the Individual Defendants must be dismissed because the Complaint does not allege any misstatements or omissions in the Registration Statement, which was filed on September 12, 2022 (before the Class Period), and the Individual Defendants cannot be liable for later filings in connection with the SPO.

## **FACTUAL BACKGROUND**[1]

NAPCO, a Delaware corporation headquartered in New York, was founded by Richard

---

[1] Non-conclusory allegations in the Complaint are deemed true solely for the purposes of this motion, but only if not inconsistent with the publicly available documents incorporated by reference in the Complaint. Unless otherwise stated, citations and quotations are omitted.

Soloway, its CEO and Chairman, in 1969 and went public in 1972. ¶ 20; Ex. 1 (Aug. 29, 2022 10-K) at 7.[2] The Company is a leading manufacturer and designer of high-tech electronic security devices and leading provider of cellular communication services for alarm systems and school safety systems. ¶¶ 20, 36; Ex. 1 (Aug. 29, 2022 10-K) at 2. The Company, which has four subsidiaries: NAPCO Security Systems, Alarm Lock, Continental Access, and Marks USA, Ex. 1 (Aug. 29, 2022 10-K) at 2, E-18, manufacturers its products in the Dominican Republic, ¶¶ 36, 38. To do so, it purchases components from outside sources—mainly U.S. and Asian suppliers—or fabricates these components itself, which are then shipped to the Dominican Republic. Ex. 1 (Aug. 29, 2022 10-K) at 7. The Company generally maintains inventories of its critical components. *Id.* It "sells its products primarily to independent distributors, dealers, and installers of security equipment." ¶ 36.

This lawsuit, which stems from the Company's Restatement of certain financial results announced on August 18, 2023 (the "Restatement"), brings claims under Section 10(b) and Rule 10b5 promulgated thereunder (the "Section 10(b)" claim) and Section 20 of the Exchange Act of 1934 (together the "Exchange Act" claims) and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (together the "Securities Act" claims). The suit is brought on behalf of a purported class of shareholders who purchased or otherwise acquired NAPCO's common stock during the Class Period of November 7, 2022 through August 18, 2023. ¶ 2. Lead Plaintiff and Additional Plaintiff bring Exchange Act claims against NAPCO and the Officer Defendants and Additional Plaintiff

---

[2] Citations to the Complaint are " ¶_" and citations to "Ex. _" refer to Exhibits attached to the Declaration of Jonathan K. Youngwood, which, where applicable, includes the paragraphs of the Complaint that incorporate the documents cited. The Court may consider such documents as well as documents filed with the SEC and documents relied upon by plaintiffs. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). Courts also take notice of "transcripts of companies' earnings calls" in securities cases involving misrepresentation claims. *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018).

alleges Securities Act claims against all Defendants in connection with the SPO. ¶¶ 136, 145, 149.

### A.    NAPCO is Impacted by the Worldwide Supply Chain Crisis

As a result of the COVID-19 pandemic, NAPCO, like companies worldwide, contended with a significant supply chain shortage. NAPCO disclosed in its quarterly SEC filings that, by the end of 2021, it was experiencing ongoing shortages of component parts which could only be purchased at higher prices. *See* Ex. 2 (Nov. 7, 2021 Form 8-K) at 3. NAPCO's strategy, in the face of these shortages, was to buy as many components as possible, regardless of price (and including from brokers who charged more), in order to ensure that it could continue to manufacture its products. *Id.*; Ex. 3 (Nov. 7, 2022 Earnings Tr.) at 5, 7-8 ("[W]e do whatever we have to do to get those hard to get [parts]. And that means paying much higher prices . . . [w]e can't wait around. So, we go to brokers . . . .); Ex. 4 (May 8, 2023 Earnings Tr.) at 7 ("[D]uring the supply chain crisis, if we could get our hands on parts, we would buy in, we'd buy a lot of them and we'd fly them. We don't want to run out."). In part, as a result of this strategy, NAPCO's inventory value increased significantly—from $31.7 million in June 2021 to $49.8 million in June 2022. Ex. 1 (Aug. 29, 2022 10-K) at 22 ("The increase [in inventories] was also due to the ongoing shortages of certain component parts and the Company purchasing large quantities of these hard to source component parts when they become available.").

By late-2022/early-2023, the supply shortage began to dissipate and the price of components parts decreased. Ex. 5 (Aug. 29, 2023 Earnings Tr.) at 5 ("The company purchased these higher-priced components at a significant premium during the supply chain interruptions during the latter part of fiscal 2022 . . . The price of these components began decreasing during fiscal 2023[.]"). As NAPCO disclosed, although there were still some "pockets of parts" that were hard to get, the crisis was "nowhere near what it used to be." Ex. 4 (May 8, 2023 Earnings Tr.) at 8 ("Remember we bought a lot of components at very high costs . . . [n]ow we have solutions to

get away from [that]. We don't have to buy parts from brokers.").

**B.      NAPCO Restates Its Financials After Discovering An Accounting Error**

On August 18, 2023, NAPCO announced that it would restate its financials for the first three quarters of fiscal 2023 (NAPCO's fiscal year ends on June 30). ¶ 159. The Company explained that, in preparing its audited fiscal year-end 2023 consolidated financial statements, it "identified certain errors related to the Company's calculation of [COGS] and inventory for each of the first three quarters of fiscal 2023," constituting a previously unidentified material weakness. Ex. 6 (Aug. 18, 2023 Form 8-K) at 2. Specifically, "although the costs of several components fluctuated substantially during fiscal 2023, the Company's costing procedures did not appropriately account for such fluctuations. As a result, inventories were overstated and COGS was understated[,]" resulting in the overstatement of net income. *See id;* ¶ 105 (estimating that for Q1, Q2 and Q3, net income was overstated by $3.5 million, $ 4.7 million, and $ 1.3 million).

COGS, which is the costs and expenses directly related to the production of goods that the Company sells, can be calculated as follows: COGS = Beginning Inventory (the value or cost of the inventory at the start of a financial period ) + Purchases (the value or cost of additional inventory purchased during the financial period) – Ending Inventory (the value or cost of the remaining inventory that was not sold during the financial period).[3] And Net income = Revenue – COGS – other expenses (e.g., taxes and operating costs). *Id.* at 795. When the Company initially calculated COGS for the first three quarters of fiscal 2023 (as reported on the original Form 10-Q's), the value of its Ending Inventory was based on the cost of its components as calculated in its audited fiscal year-end June 30, 2022 numbers as opposed to the reduced costs as component prices

---

[3] ROMAN L. WEIL, ET. AL., FINANCIAL ACCOUNTING: AN INTRODUCTION TO CONCEPTS, METHODS, AND USES 757 (14th ed. 2020).

normalized after the supply chain crisis abated. *See* p. 6, *supra* . By using the June 2022 inventory numbers, the Company overstated the value of its inventory and also understated the COGS. Ex. 6 (Aug. 18, 2023 8-K) at 2.[4] The understated total for COGS, when subtracted from the Company's gross revenue, led to an overstatement of the Company's net income. *See id*; ¶¶ 10, 64-65. Mr. Buchel explained the error on NAPCO's August 29, 2023 earnings call:

> The inventory was valued using values from the 6/30/22 audited numbers. What that means is take as an example, if a component was valued at $50 at June 30, 2022. That same $50 was used to value the inventory for the first quarter, and let's say, the second quarter and let's say, the third quarter. The cost of that component was coming down, no longer $50, $5 using this one example. You value the inventory at $50, you're overstating your inventory when you put a valuation on your balance sheet. If you're overstating your inventory and your balance sheet, that means the other side of the equation is you're understating your cost of goods sold.

Ex. 5 (Aug. 29, 2023 Earnings Tr.) at 10. As Mr. Buchel further noted, this was a non-cash, accounting book entry issue; cash flow from operations were not affected. *Id*.

### C. Revenue is Recognized When Products Are Shipped

GAAP provides that the primary accounting objective is the proper determination of income through the process of matching appropriate costs against revenues. ¶ 62. Further, for accounting purposes, expenses are to be recorded in the same period in which the corresponding benefit is recognized. ¶ 61 (citing FASB Concept No. 8). Consistent with these accounting principles, for product sales, NAPCO disclosed in SEC filings incorporated into the Complaint that it recognizes revenue from the point in time when the product is shipped or delivered. *See, e.g.*, Ex. 7 (Nov. 7, 2022 10-Q) at 9 ("Revenue is recognized upon transfer of control of promised products . . . [and] [f]or product sales, the Company typically transfers control at a point in time

---

[4] For accounting purposes, older inventory (in this case the higher priced inventory) is deemed sold first. This is known as "FIFO." *See* Ex. 1 (Aug. 29, 2022 10-K) at FS-11.

upon shipment or delivery of the product."). In other words, for accounting purposes, a product that is included as inventory is not deemed "sold" and revenue is not recognized until *after* the product leaves NAPCO's warehouse and is shipped to a customer (*i.e.,* a distributor or dealer). *See id.* at 8 ("The reported net value of inventory includes finished saleable products, work-in-process and raw materials that will be sold or used in future periods."). Therefore, in accordance with "basic accounting precept[s]" (¶¶ 61, 62), the revenue (the benefit) and the expense (the cost of producing the product or COGS) are both recognized in the same quarter that the product is shipped. *See* Ex. 4 (May 8, 2023 Earning Tr.) at 7-8 (explaining that gross margin will continue to improve for subsequent quarters as components purchased for cheaper prices are used in products sold within those quarters).

### D. The Secondary Public Offering

On September 12, 2022, NAPCO filed a Form S-3 Automatic Shelf Registration Statement pursuant to which the Officer Defendants could sell 3,830,449 shares of common stock. *See* Ex. 8 (Sept. 12, 2022 Form S-3) at 3. On February 8, 2023, the Company filed a Preliminary Prospectus Supplement and, on February 10, 2023, the Company filed a subsequent Prospectus Supplement disclosing that selling stockholders (the Officer Defendants) were offering a combined 2,100,000 shares for $31.50 a share, $4 below the closing price on February 7, 2023. Ex. 9 (Feb. 10, 2023 Prosp. Suppl.) at S-10. The Underwriter Defendants acted as underwriters for the SPO, which was a firm commitment offering. *Id.*

### ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014). While a court must accept as true all well-plead factual allegations, "labels and conclusions," and "formulaic recitation[s] of the elements of a cause of

action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must allege facts sufficient to establish a right to relief "above the speculative level," and "[t]hreadbare recitals of the elements of a cause of action" are insufficient. *In re Lululemon*, 14 F. Supp. 3d at 555, 570. Securities fraud claims must also meet the heightened pleading standard of the PSLRA and Rule 9(b) and "stat[e] with particularity the circumstances constituting fraud" and the "facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009).

## I.   THE EXCHANGE ACT CLAIMS MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO SUFFICIENTLY PLEAD SCIENTER

For Plaintiffs to plead a strong inference of scienter under the PSLRA, they must plead an inference that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor*, 551 U.S. 308, 314 (2007). The Court "must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA & Local 134*, 553 F.3d at 198. If a fraudulent inference is not "at least as compelling" as a non-fraudulent one, it must be rejected, even in "a close case." *Slayton v. Am. Express Co.,* 604 F.3d 758, 777 (2d Cir. 2010). Courts in this Circuit hold that, to plead scienter, Plaintiffs must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015). These requirements are "exacting," as they are meant to protect "against abusive litigation by private parties." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 269 (S.D.N.Y. 2009). "When fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007). Here,

none of Plaintiffs' allegations, viewed either individually or holistically, creates a strong inference of scienter with respect to either of the two Officer Defendants, Mr. Soloway or Mr. Buchel.

### A.       The FE Allegations Do Not Plead a Strong Inference of Scienter

Plaintiffs' Section 10(b) claim relies exclusively on allegations based on statements made by three FEs to plead fraud. These allegations—which lack the requisite specificity to plead securities fraud—fail because Plaintiffs do not allege that any of the FEs had, or was in a position to have, actual knowledge of the alleged fraud, and none of the statements attributed to the FEs, even if true, allege any conscious misbehavior or recklessness by the Officer Defendants.

**First**, as set forth below, no FE is alleged to have any involvement with NAPCO's accounting or financial reporting practices (or even general knowledge), let alone the Company's accounting for inventory, COGS, when, for accounting purposes, a product is deemed sold, recognition of revenue from such sold products, or its internal financial controls. For example:

- FE1 is alleged to be a midlevel manager within Continental Access, one of NAPCO's four subsidiaries. There are no allegations, at all, regarding who or what he managed, what his job or responsibilities entailed, or whether it had anything to do with Company-wide accounting, internal controls or financial reporting. ¶ 42.

- FE2, who only worked at NAPCO for part of the Class Period (through fiscal 2Q23) allegedly had responsibilities "including acquiring and shipping inventory within his business division" and "access to inventory levels at NAPCO." *Id.* Neither his title nor business division is alleged and it is unclear what having "access to inventory levels at NAPCO" means vis-à-vis the alleged fraud. Further, there are no allegations that he was involved in accounting for inventory, COGS, or would have any reason to know when a product is deemed sold for accounting purposes. *Id.*

- FE3, who left NAPCO at some unspecified point early in the Class Period ("early 2023") is alleged to be a midlevel manager at NAPCO. Like FE1, there are no allegations about who or what he managed, what his job entailed or why he would have any reason to know about the Company's accounting, financial reporting or internal controls. It is also unclear if he worked for a particular business division of NAPCO. *Id.*

As none of the FEs are alleged to have been in a position to have knowledge relevant to company-wide accounting practices (including when for accounting purposes a product is deemed

"sold" and revenue is recognized)[5], financial reporting or internal controls, Plaintiffs' allegations based on their statements should be rejected. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (rejecting allegations that "lack[] [the] detail that might suggest that [the CWs] had personal knowledge.").

**Second**, none of the FEs are alleged to have had contact or any communications with the Officer Defendants and the FE allegations do not plead that either acted with the requisite scienter. The FE allegations make no mention of Mr. Soloway at all. As to Mr. Buchel, the allegations are nothing more than vague, second-hand references regarding the shipment of inventory. ¶46 (alleging FE1 was indirectly informed by unidentified "insiders at NAPCO" that the directive to halt shipments of inventory came from Mr. Buchel); ¶47 (alleging that although FE3 "personally received directives not to ship out inventory" these directives came from the Vice President of Operations who "he understood" received the directive from Mr. Buchel); ¶48 (alleging that "FE3 identified two sales directors at NAPCO who were told by NAPCO's executive team to stop shipping inventory."). As a threshold matter, these statements are too vague and speculative to plead that Mr. Buchel, let alone Mr. Soloway who is not even mentioned, did, in fact, direct inventory shipments to be halted. But, regardless, even if they had, the FE allegations provide no basis for alleging fraud—they do not plead that Mr. Buchel or Mr. Soloway halted inventory shipments in order to misstate the Company's financials, rather than for a legitimate, non-fraudulent business reason. Nor do they plead that either Mr. Buchel or Mr. Soloway knew at the

---

[5] FE3 allegedly confirmed that "the warehoused inventory had already been sold to customers," ¶ 43, but that says nothing about whether for accounting purposes the warehoused inventory was considered sold such that revenue from that revenue would be recognized.

time that there was an error causing certain financial metrics to be incorrectly reported, or that the internal controls with respect to inventory and COGS had material weaknesses (as later disclosed in the Restatement). For these reasons, the FE allegations should be disregarded. *Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 780-81 (S.D.N.Y. 2021) (discounting allegations of confidential witness managers who "held relatively junior positions within the company" and did not have "any personal interaction with" the top executives).

**Third**, FE allegations should be disregarded because they are too vague and conclusory to plead scienter under either Rule 9(b) or the PSLRA. *See Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (finding that allegations from a confidential witness regarding the fraudulent overvaluation of shipping containers were inadequate because, in part, the witness failed to "specify the amount by which the containers were overvalued, and at what times"). Here, although the FE allegations plead that the Company would "halt[] shipments of sold inventory to customers before the close of a fiscal quarter" (¶ 42), they do not allege if the inventory was sold (and revenue recognized) for accounting purposes, how much purportedly sold inventory was withheld or how doing so may have impacted the accounting for COGS and Net Income.[6] Nor, taken together, do they plead with specificity when this alleged practice occurred. FE1 alleged withholding shipments occurred "frequently" and that he "believed it likely occurred during 1Q23, 2Q23, and 3Q23," whereas FE2 gave no time period other than to allege that "NAPCO had been engaging in the practice for years," and FE3 said it occurred the quarter before the Class Period as well as 1Q23 and 2Q23, without any additional specific information provided. *See* ¶ 44.

---

[6] Although FE3 allegedly confirmed that "the warehoused inventory had already been sold to customers" (¶ 43) this allegation, which is vague and raises numerous questions (*e.g.,* how did he know? what customers? what quantity?), says nothing though about whether, for accounting purposes, the warehoused inventory was considered sold such that revenue would be recognized.

Other FE allegations also amount to nothing more than vague, unsupported characterizations or speculation which should be discounted. *See Ford v. VOXX Int'l Corp.*, 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016). For instance, the Complaint alleges that FE3 relayed that sold inventory was withheld in order to "sandbag the numbers," but there are no facts plead which support this unwarranted characterization or why FE3, who worked "acquiring and shipping inventory within his business division" (¶ 42), would know anything about "the numbers" in the first place. Similarly, Plaintiffs allege that FE3 identified two sales directors who were told to stop shipping inventory, one of whom was told to keep the practice "quiet." There are no allegations, however, that FE3 ever communicated with this sales director, how FE3 knows what this unnamed sales director said, the context in which it was said, or, for that matter, why keeping the practice "quiet" constitutes fraud. Finally, allegations by FE1 and FE3 that the practice of withholding sold inventory "was well-known within the Company" (¶ 49) do not plead scienter. *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010).

### B.   The Stock Sales Do Not Support a Strong Inference of Scienter

Plaintiffs' allegations regarding stock sales by Mr. Soloway and Mr. Buchel fail to plead motive or opportunity to commit fraud.[7] Regardless of the amount, the "mere fact that insider stock sales occurred does not suffice," and Plaintiff must actually allege particular facts indicating that "the sales were unusual or suspicious." *In re Gildan Activewear, Inc*., 636 F. Supp. 2d at 270-71; *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 420 (S.D.N.Y. 2020) ("executive stock sales, standing alone, are insufficient to support a strong

---

[7] The Complaint includes a chart that shows stock sales by Paul Stephen Beeber, a Director, and Michael Carrieri, a Senior Vice President of Engineering. Other than a passing reference to Mr. Carrieri (¶ 123), there are no allegations that their sales supports an inference of scienter and neither is named as a defendant in connection with the Exchange Act claims.

inference of fraudulent intent"). Here the stock sales were neither unusual nor suspicious.

**First**, the stock sales occurred early in the Class Period—on November 15, 2022 and February 13/15, 2023—nine and six months, respectively, before the purported corrective disclosure. Numerous courts have found that this type of timing "weighs against a finding of scienter . . . ." *See Lozada v. TaskUs, Inc.*, 2024 WL 68571, at *22 (S.D.N.Y. Jan. 5, 2024); *In re Henry Schein Secs. Litig., Inc.*, 2019 WL 8638851, at *20 (E.D.N.Y. Sept. 27, 2019) ("delay of approximately nine and six months between Defendants' last sale during the Class Period and the date of the first purported corrective disclosure is too long to support an inference of scienter"); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) ("[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure."). As the *Reilly* Court explained, trades occurring early into the Class Period rather than "in the final 100 days of the class period" the exact time at which " insiders would have rushed to cash out," demonstrates that the timing of the sales was not "calculated to maximize the personal benefit from undisclosed inside information." 2018 WL 3559089, at *14.

**Second**, the February 2023 stock sales (approximately two-thirds of the alleged total gross proceeds received by Mr. Soloway and Mr. Buchel during the Class Period) were made pursuant to a Form S-3 Registration Statement that was filed and effective on September 12, 2022. ¶¶  117, 151; Ex. 10 (Feb. 15, 2023 Soloway Form 4); Ex. 11 (Feb. 15, 2023 Buchel Form 4). The Registration Statement publicly disclosed that Mr. Soloway and Mr. Buchel may offer and sell up to 3,830,449 shares of their NAPCO stock in one or more offering. ¶ 151. That this public disclosure—indicating an intent by the Officer Defendants to sell stock—was made ***prior*** to the Class Period, cuts against an inference of scienter. *Acito v. IMCERA Grp.*, 47 F.3d 47, 54 (2d. Cir.

1995) (disclosure of plan to sell shares cuts against director's "intent to deceive the public."). Moreover, courts find that sales made pursuant to a "pre-planned secondary equity offering" are not "unusual or suspicious" but rather "suggest[] a [personal profit] motive that is generally possessed by most corporate directors and officers." *Li Hong Cheng v. Can. Goose Holdings Inc*., 2021 WL 3077469, at *11 (S.D.N.Y. Jul. 19, 2021).

**Third**, it is also hardly surprising (and not unusual or suspicious) that the sales were made shortly after the Company's earnings releases in November 2022 and February 2023. ¶¶ 118, 121. NAPCO, like most public companies, has a trading window which opens after earnings and it is only during the open window period when insiders are allowed to sell stock. Ex. 12 (Exhibit 14.1 to May 6, 2021 Form 8-K) at 3. *See City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (sales made in the trading window that opened after earnings, which was defendant's first stock sale in five years, were not suspicious or unusual).

**Fourth**, following the November and February stock sales, Mr. Soloway and Mr. Buchel still each retained 51.5% and 54.5% of their shares, respectively. *See* ¶ 117. The fact that they both retained a majority of their shares cuts against a finding of scienter. *See, e.g., In re Travelzoo Inc. Sec. Litig*., 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) ($186 million worth of sales was not suspicious because defendant retained the majority of his total stockholdings). Furthermore, even after these sales, Mr. Soloway continued to hold 10% of the Company, thereby "maintain[ing] [a] significant ownership stake[] in the Company," which weighs against scienter. Ex. 9 (Feb. 10, 2023 Prospectus) at S-9; *Lozada*, 2024 WL 68571, at *22-23 ("Any inference of fraudulent motive is undercut by the fact that [defendants] retained significant ownership stakes in the company after the two offerings.").

Indeed, rather than engage in a fraudulent scheme (which itself is not credibly plead) in

order to sell stock at artificially inflated prices, the much more compelling inference is that Mr. Soloway, who founded NAPCO in 1969 and took it public in 1972, is now 76 years old and unsurprisingly may have chosen to sell a large portion of his holdings at this stage in his career.[8] Ex. 1 (Aug. 29, 2022 10-K) at 7, 12. The same can be said for Mr. Buchel who joined NAPCO as CFO almost thirty years ago (in 1995) and is now 69 years old. That NAPCO stock mainly traded below $1.00 for its first forty years (prior to 2010) and has progressively increased in price since also supports a non-fraudulent motive for insiders to sell stock.[9] *See* Ex. 15 (Yahoo Finance); *City of Brockton*, 540 F. Supp. 2d at 476 (the stock price rising "shortly after the insider stock sales, [] further rebuts plaintiffs'" scienter allegations).

### C.    Plaintiffs' Additional Allegation Do Not Plead a Strong Inference of Scienter

Plaintiffs' additional allegations taken separately or together do not suffice to plead scienter. As an initial matter, conclusory allegations that the Officer Defendants acted with scienter because of their positions or their receipt of confidential information should be disregarded. ¶¶ 112, 114. "[C]ourts in this District have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Bd. of Tr. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011).

Plaintiffs also cannot rely on the fact of the Restatement itself to impute scienter onto the Director Defendants. Courts have routinely found that merely alleging that a restatement of previously reported financials occurred is insufficient to plead any scienter regarding that restatement. *Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting

---

[8] In fact, Mr. Soloway recently sold 2,000,000 shares in another SPO, furthering bolstering the inference. Ex. 13 (Mar. 7, 2024 Prospectus Supp.) at S-4; Ex. 14 (Mar. 8, 2024 Soloway Form 4).

[9] NAPCO's stock price generally trended up from about $28 on November 15, 2022 (the first sale) to $39 on August 18, 2023 (the end of the class period). *See* Ex. 15 (Yahoo Finance).

irregularities, standing alone, are insufficient to state a securities fraud claim."); *In re Lottery.com, Inc. Sec. Litig.,* 2024 WL 454298, at *33 (S.D.N.Y. Feb. 6, 2024) (dismissing claims where complaint relied on allegations "that Defendants had leadership roles at [the company] and that the [restatement contained] actionable statements or omissions"); *In re Turquoise Hill Res. Ltd.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014). The Complaint here fails to allege "any contemporaneous basis to believe that the information they [disclosed] was incorrect that would be sufficient to allege the requisite conscious recklessness." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012). There are no non-conclusory or particularized allegations at all that the Exchange Act Defendants knew (or were reckless in not knowing) of the accounting errors prior to their year-end discovery and subsequent correction, let alone that they engaged in a fraudulent scheme to inflate and then later restate the Company's financials.

Plaintiff also cannot plead scienter based on the Company's replacement of its "long-standing auditor, Baker Tilly, shortly after the Restatement." ¶ 116. Baker Tilly was replaced approximately three months after the Restatement, not shortly after as Plaintiffs' allege. *See* Ex. 16 (Nov. 3, 2023 Form 8-K) at 2. And courts routinely find that the departure of those involved in the alleged fraud from a company following the corrective disclosure does not support allegations of scienter. *See Venkataraman v. Kandi Techs. Grp., Inc.,* 2021 WL 4952260, at *5 (S.D.N.Y. Oct. 25, 2021); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019).

### D. Plaintiffs Have Not Plead An Inference of Scienter That is as Compelling as Any Opposing Inference

Taken together, Plaintiffs' allegations fail to plead an inference of scienter that is more cogent or compelling than the opposing highly plausible (and obvious) non-fraudulent inference. *Tellabs*, 551 U.S. at 314. The reason for the Restatement was the reason disclosed by the Company. Simply put, due to price fluctuations—*i.e.,* the decreasing price of components as the

unprecedented post-COVID supply crisis abated in fiscal 2023—the Company erroneously used too high of an inventory number that led to the understatement of COGS and overstatement of Net Income. Ex. 6 (Aug. 18, 2023 Form 8-K) at 2-3. When the error was discovered, it was timely disclosed, the financials were restated and controls were put in place to mitigate similar errors going forward. *Id.* This explanation is fully consistent with and supported by the Company's statements throughout (and after) the class period that supply chain shortages prior to fiscal 2023 led it to buy components at very high costs, which began to significantly decrease in fiscal 2023. *See* p. 6, *supra.* And it is much more plausible than Plaintiffs' rank speculation that, in connection with their quarterly financial reporting, the Exchange Act Defendants orchestrated a scheme to deem products as sold (and recognize revenue) while, at the same time, withholding shipment of such products to improperly inflate the quarter end inventory levels and net income. This is especially true as the sole bases plead are vague allegations, based on FEs with no knowledge of the accounting or financial reporting for products sold, revenue recognition or inventory, *see* pp. 11-12, *supra.* Thus, this Court should reject Plaintiffs' ill pled scienter-related allegations in favor of the "plausible alternative nonculpable explanation" for the Restatement. *See Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 120 (S.D.N.Y. 2018).

### E.    Scienter Is Not Adequately Plead Against The Company

When a corporation is a defendant, a plaintiff must plead "facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (per curiam). The Complaint fails to adequately plead scienter as to the Officer Defendants, *see* Sections I.A-D, *supra* , and Plaintiffs' conclusory allegations that "officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth", ¶115, is plainly insufficient to carry their

burden.

## II.    THE EXCHANGE ACT AND SECURITIES ACT CLAIMS MUST BE DISMISSED BECAUSE THERE IS NO LOSS CAUSATION

Plaintiffs' Exchange Act and Securities Act claims must be dismissed because, from the face of the Complaint, it is apparent that Plaintiffs cannot satisfy loss causation. To plead loss causation for their Section 10(b) Claim, Plaintiffs must allege a disclosure that "reveal[ed] to the market some part of the truth regarding the alleged fraud." *Boluka Garment Co. v. Canaan Inc.*, 547 F. Supp. 3d 439, 445-46 (S.D.N.Y. 2021) (plaintiff must allege the alleged misstatement "concealed something from the market that, when disclosed, negatively affected the value of the security"). Here, the purported corrective disclosure did not disclose any fraud—instead it disclosed an accounting error. Yet, Plaintiffs allege "[t]he precipitous decline in NAPCO common stock was a direct result of the nature and extent of the Exchange Act Defendants' fraud being revealed . . . ." ¶ 128. However, Plaintiffs do not plead that the alleged fraud—*i.e.* the withholding of purportedly sold inventory shipments to inflate financials—was disclosed. Instead, Plaintiffs plead the opposite—that, in the August 18 disclosure, NAPCO "attempted to characterize the restatement as stemming from innocent accounting 'errors,' [when], in fact, it was the product of a fraudulent scheme to inflate NAPCO's income related metrics." ¶ 8. Thus, the Complaint, on its face, belies finding loss causation—*i.e.*, it pleads that there was no fraud revealed and therefore it could not have caused the stock drop—and the Exchange Act claims should be dismissed.

For the same reason, the Securities Act claims should also be dismissed. Where, as here, it is "apparent from the face of the complaint" that there is no loss causation, courts will dismiss Securities Act claims based on the affirmative defense of negative causation on a motion to dismiss. *See Amorosa v. AOL Time Warner, Inc.* 409 Fed. Appx. 412, 417 (2d. Cir. 2011) (affirming the dismissal of Section 11 claim on a motion to dismiss where lack of causation was

"apparent from the face of the complaint."); *Boluka Garment Co*, 547 F. Supp. 3d at 446-47.[10]

## III.   THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED BECAUSE THE ADDITIONAL PLAINTIFF FAILED TO COMPLY WITH THE PSLRA

The Court-appointed Lead Plaintiff did not assert the Securities Act claims included in the Complaint. Instead, those claims are brought solely by Additional Plaintiff, handpicked by counsel and never appointed "lead plaintiff" after the notice and application process mandated by the PSLRA. For this reason, the Securities Act claims should be dismissed.

The PSLRA requires a plaintiff to publish notice of the action, "the claims asserted therein, and the purported class period," so that putative class members can compete to be appointed lead plaintiff with a presumption favoring appointment of the person or group with the largest financial interest in the relief sought. *See* 15 U.S.C. § 77z-1(a)(3); 15 U.S.C. § 78u-4(a)(3). The PSLRA added these notice and lead plaintiff requirements "to encourage the most capable representatives of the plaintiff class to participate in the class action litigation and to exercise supervision and control of the lawyers for the class." *VanLeeuwen*, *v. Keyuan Petrochems., Inc.*, 2013 WL 2247394, at *6 (C.D. Cal. May 9, 2013). Given these statutory goals, courts must be attentive to attempts to use an amended complaint "to smuggle a new lawsuit in past the PSLRA's notice requirement." *In re Thornburg Mortg., Inc. Sec. Litig.*, 629 F. Supp. 2d 1233, 1239 (D.N.M. 2009). Courts therefore examine whether an amended complaint alters "the class period or the nature of the claims asserted" such that potential lead plaintiff candidates may have disregarded the original notice. *Hachem v. Gen. Elec. Inc.*, 2018 WL 1779345, at *1 (S.D.N.Y. Apr. 12, 2018).

---

[10] It does not matter that the Securities Act claims are plead separately. Both the Exchange Act and Securities Act claims are based on the Restatement, and for the Exchange Act claims plaintiffs allege the cause of the Restatement was the purported fraud. Their disclaimer does not provide a basis to ignore these allegations for the Securities Act claims because a plaintiff cannot separate itself from its own allegations. *See Lozada*, 2024 WL 68571, at *9.

Here, the original plaintiff (Randy Zornberg) filed a complaint alleging claims under the Exchange Act; his counsel published a notice that the lawsuit had been filed and summarized the Exchange Act allegations. It made no reference to the SPO or Securities Act claims. Thereafter, five plaintiffs submitted lead plaintiff applications—none purchased shares in the SPO. *See, e.g.,* Docs. 18, 21. This Court ultimately chose plaintiff Donald Hutchings, determining he would be most the most capable representative for the putative class. *See* Doc. 31. Although Additional Plaintiff did not participate in this process at all, it now purports to represent an entirely new putative class of persons who acquired shares pursuant or traceable to the SPO. ¶ 149. But "[t]he PSLRA does not contemplate the unapproved addition of new claims or new classes of plaintiffs after . . . a lead plaintiff or plaintiffs are appointed." *In re Select Comfort Corp. Sec. Litig.*, 2000 WL 35529101, at *7 (D. Minn. Jan. 27, 2000), *aff'd* 2000 WL 36097395 (D. Minn. May 12, 2000).

Indeed, if the Court were to dismiss the Exchange Act claims but not the Securities Act claims, the only plaintiff for the continuing case would be Additional Plaintiff—purporting to represent a Securities Act putative class—even though it never has been found most capable to represent that class as the PSLRA requires. Given that Additional Plaintiff purchased only 248 shares on February 9, 2024 (before the final prospectus), *see* Compl. Sched. A, there is substantial doubt it would have been appointed lead plaintiff in a compliant PSLRA process. This end-run around the PSLRA should not be allowed, and the Securities Act claims should be dismissed. *See In re Sandridge Energy, Inc. Sec. Litig.*, 2015 WL 3652526, at *5, 11 (W.D. Okla. May 11, 2015) (dismissing Securities Act claims "grounded on new factual and legal allegations" not included in PSLRA notice); *In re Select*, 2000 WL 35529101, at *7; *VanLeeuwen,* 2013 WL 2247394, at *5.

## IV.   THE SECTION 12(a)(2) CLAIM SHOULD BE DISMISSED FOR LACK OF STANDING

To bring a Section 12(a)(2) claim, a plaintiff must have "directly purchase[d] securities

from the defendant in a public offering" rather than on the secondary market. *Winter v. Stronghold Digit. Mining, Inc.*, 2023 WL 5152177, at *11 (S.D.N.Y. Aug. 10, 2023). Additionally, Plaintiff may only seek recovery from "statutory sellers," *i.e.*, someone who: (1) "pass[es] title, or other interest in the security, to the buyer for value;" or (2) "successfully solicits the purchase [of a security]" through the use of a prospectus containing materially false statements or omissions. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). The Additional Plaintiff does not allege that it purchased shares in the IPO or that any of the Defendants are statutory sellers; for these reasons its 12(a)(2) claim should be dismissed.

Additional Plaintiff never alleges that it purchased shares in the SPO; instead, it offers vague and contradictory allegations that it purchased stock "pursuant and traceable to the Offering" (¶ 19), "pursuant or traceable to the Registration Statement for the Offering" (¶ 191), or "pursuant to the Offering" (¶ 197), and purports to assert claims on behalf of a class who purchased or otherwise acquired stock "pursuant or traceable to the Offering" (¶¶ 3, 30, 149). Courts routinely find that pleading purchases that may be "traceable" (*e.g.*, pursuant and/or traceable to an offering) warrants dismissal. *See Freidus v. Barclays Bank PLC,* 734 F.3d 132, 141 (2d Cir. 2013); *Winter*, 2023 WL 5152177, at *11. Thus, Additional Plaintiff's failure to plead that it purchased shares *in* the SPO requires dismissal of the Section 12 claims.

Additional Plaintiff also has failed to allege that any Defendant is liable under Section 12 as a statutory seller under either prong 1 (passed title) or prong 2 (solicitation). The only allegation that the Company or Individual Defendants sold (*i.e.,* passed title) to the Additional Plaintiff is the conclusory pleading that "Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered" in the SPO. ¶ 197. This "sole, cursory allegation . . . is, by its terms, insufficient" because it does not "identify a particular purchase from a particular defendant." *In re*

*Citigroup Bond Litig.*, 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010). Regardless, there is no dispute that neither the Company nor the Individual Defendants passed title to Additional Plaintiff because the SPO was a firm commitment underwriting and neither the Company nor Individual Defendants sold shares to the public. *See* Ex. 9 (Feb. 10, 2023 Prospectus) at S-10.

Nor does the Complaint allege that any of these Defendants "successfully solicited" the Additional Plaintiff's purchases. Additional Plaintiff's single, conclusory allegation that all Defendants were "solicitors of purchasers" in the SPO (¶ 197) "offer[s] nothing more than a conclusory allegation" and is "independently fatal" for failure to allege that the "solicitation was successful." *Risley v. Universal Navigation Inc.*, 2023 WL 5609200, at *18 (S.D.N.Y. Aug. 29, 2023). There are no allegations of solicitation activities, *e.g.*, participating in a road show or direct communications, *see Lozada*, 2024 WL 68571, at *19, and neither the Company nor Individual Defendants are statutory sellers as required to bring a claim under Section 12(a)(2).

Additional Plaintiff similarly fails to allege that either Underwriter Defendant was a statutory seller. As set forth above, Additional Plaintiff fails to allege it purchased shares in the SPO and conclusory allegations that all "Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered" (¶ 197), are insufficient to plead that the Underwriter Defendants are statutory sellers.[11] Additional Plaintiff also fails to plead that either Underwriter engaged in successful solicitation. Allegations that, for example, the Underwriter Defendants "participated in the preparation and dissemination" of the Prospectus or "conceived and planned the Offering and orchestrated all activities necessary to affect the sale" of stock (¶ 198) generically recite the role of any underwriter in any offering and do not plead solicitation. *See Fed. Hous. Fin.*

---

[11] Unlike in *New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158 (2d Cir. 2023), Additional Plaintiff does not allege that it purchased shares "pursuant to" the prospectus, but instead offers only vague and contradictory allegations. *See* p. 23, *supra*.

*Agency v. Stanley*, 2012 WL 5868300, at *4 (S.D.N.Y. Nov. 19, 2012).

**V.  THE SECTION 11 CLAIM SHOULD BE DISMISSED AGAINST INDIVIDUAL DEFENDANTS BECAUSE THE EFFECTIVE DATE OF THE REGISTRATION STATEMENT WAS BEFORE THE CLASS PERIOD**

Plaintiff's Section 11 claim against the Individual Defendants must be dismissed because Plaintiff has not alleged that the Registration Statement—an automatic shelf registration statement, filed on Form S-3—contains any material misstatements or omissions. ¶¶ 151, 152. Although prospectus supplements were filed on February 8 and 10, 2023, respectively, the Registration Statement itself was filed on September 12, 2022, prior to the start of the Class period. ¶¶ 151-154. Under SEC regulations, for the issuer and the underwriters information in the prospectus supplements is "deemed to be part of and included in the registration statement" such that the "new effective date" is when the prospectus supplement is first "used" or "the date of the first sale of securities occurs." 17 C.F.R. § 230.430B(f)(1). However, for any director of the issuer or "[a]ny person signing any report or document incorporated by reference into the registration statement," the effective date (subject to three exceptions that do not apply here) is the date the registration statement was filed. *See id.* § 230.430B(f)(4). Therefore, for purposes of Section 11 liability, the effective date of the Registration Statement for the Individual Defendants is September 12, 2022 and Plaintiff's Section 11 claim against these Defendants must be dismissed. *In re Countrywide Fin. Corp. Mortg.-Backed Secs. Litig.*, 932 F. Supp. 2d 1095, 1119 (C.D. Cal. 2013).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the action with prejudice.

Dated:    April 26, 2024
           New York, New York

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: */s/ Jonathan K. Youngwood*

Jonathan K. Youngwood
Janet A. Gochman
425 Lexington Avenue
New York, NY 10017
Phone: (212) 455-3539
Fax: (212) 455-2502
jyoungwood@stblaw.com
jgochman@stblaw.com

*Counsel for Defendants NAPCO Securities Technologies, Inc., Richard L. Soloway, Kevin S. Buchel, Paul Stephen Beeber, Rick Lazio, Donna Soloway, Robert Ungar, and Andrew J. Wilder*

DLA PIPER LLP (US)

John R. Loftus*
2000 Avenue of the Stars
Los Angeles, California 90067
Phone: (310) 595-3000
jake.loftus@us.dlapiper.com

*Of Counsel*

* *Pro hac vice* application to be filed

DLA PIPER LLP (US)

By: */s/ John J. Clarke, Jr.*
1251 Avenue of the Americas
New York, New York  10020
Phone: (212) 335-4500
john.clarke@us.dlapiper.com

*Counsel for Defendants Needham & Company, LLC, and William Blair & Company, L.L.C.*

26