UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

RANDY ZORNBERG, Individually and on
Behalf of All Others Similarly Situated,

                   Plaintiff,

    vs.

NAPCO SECURITY TECHNOLOGIES, INC.,
RICHARD L. SOLOWAY, and KEVIN S.
BUCHEL,

                   Defendants.

———————————————————— x

Civil Action No. 1:23-cv-06465-BMC

<u>CLASS ACTION</u>

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT**

**Oral Argument Requested**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................................1

II.   STATEMENT OF FACTS ........................................................................................3

III.   ARGUMENT ............................................................................................................7

    A.   The Court Should Disregard Defendants' Alternative Factual Narrative................8

    B.   The AC Pleads a Strong Inference of Scienter ......................................................8

        1.   Conscious Misbehavior or Recklessness ......................................................9

        2.   Motive and Opportunity................................................................................14

        3.   Defendants Have Not Presented a More Compelling Inference ...............16

    C.   The AC Adequately Pleads Causation..................................................................18

    D.   City of Warren Is a Proper Plaintiff.....................................................................20

    E.   City of Warren Has §12(a)(2) Standing................................................................22

    F.   The Individual Defendants Are Liable Under §11 ...............................................23

IV.   CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ...........................................................................................7

*Amorosa v. AOL Time Warner Inc.*,
  409 Fed. Appx. 412 (2d Cir. 2011).........................................................................19, 20

*Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*,
  2009 WL 536517
  (S.D.N.Y. Mar. 4, 2009) ................................................................................................23

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007).............................................................................12, 13

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014).........................................................................................18

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008).........................................................................16

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020).................................................................10, 11, 15, 17

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010).........................................................................10

*Dube v. Signet Jewelers Ltd.*,
  2017 WL 1379385
  (S.D.N.Y. Apr. 14, 2017)...............................................................................................20

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).......................................................................................................18

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).................................................................................12, 14

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
  987 F. Supp. 2d 369 (S.D.N.Y. 2013).........................................................................25

*Ford v. VOXX Int'l Corp.*,
  2016 WL 3982466
  (E.D.N.Y. July 22, 2016) ...............................................................................................13

**Page**

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)............................................................................8

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)..........................................................................19

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........................................................................12

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062
    (S.D.N.Y. Aug. 8, 2012) ...............................................................................................15

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).......................................................................................................23

*Hachem v. Gen. Elec. Inc.*,
    2018 WL 1779345
    (S.D.N.Y. Apr. 12, 2018) ..............................................................................................21

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)..........................................................................14

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)...........................................................................................20

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823
    (E.D.N.Y. Mar. 30, 2012) .............................................................................................15

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021)..........................................................................15

*In re Am. Realty Cap. Properties, Inc. Litig.*,
    2016 WL 11110435
    (S.D.N.Y. Aug. 5, 2016) ...............................................................................................25

*In re APAC Teleservice, Inc. Sec. Litig.*,
    1999 WL 1052004
    (S.D.N.Y. Nov. 19, 1999) .............................................................................................23

*In re AppHarvest Sec. Litig.*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)............................................................................9

**Page**

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ..........................................................13

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  932 F. Supp. 2d 1095 (C.D. Cal. 2013) .......................................................24

*In re Crocs, Inc. Sec. Litig.*,
  306 F.R.D. 672 (D. Colo. 2014) ..................................................................21

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
  2023 WL 5538218
  (E.D. Va. Aug. 28, 2023) .............................................................................15

*In re Lehman Brothers Sec. & ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011)......................................................23, 24

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ..........................................................14

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)...........................................................................8

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)...........................................................11

*In re Pall Corp.*,
  2009 WL 3111777
  (E.D.N.Y. Sept. 21, 2009)............................................................................13

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779
  (S.D.N.Y. Aug. 11, 2021) .............................................................................22

*In re Raytheon Sec. Litig.*,
  157 F. Supp. 2d 131 (D. Mass. 2001) ..........................................................17

*In re Sandridge Energy, Inc. Sec. Litig.*,
  2015 WL 3652526
  (W.D. Okla. May 11, 2015) ..........................................................................21

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...........................................................................14

**Page**

*In re Select Comfort Corp. Sec. Litig.*,
  2000 WL 35529101
  (D. Minn. Jan. 27, 2000) ..................................................................................21

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ............................................................................17

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020) ............................................................18

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  629 F. Supp. 2d 1233 (D.N.M. 2009) .........................................................20, 21

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .............................................................23

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ..............................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .............................................................................8

*Kusnier v. Virgin Galactic Holdings*, *Inc.*,
  639 F. Supp. 3d 350 (E.D.N.Y. 2022) ............................................................14

*Lozada v. TaskUs, Inc.*,
  2024 WL 68571
  (S.D.N.Y. Jan. 5, 2024) ...............................................................................10, 19

*Lumen v. Anderson*,
  2011 WL 3794144
  (W.D. Mo. Aug. 24, 2011) ..............................................................................21

*Lynch v. City of N.Y.*,
  952 F.3d 67 (2d Cir. 2020) ................................................................................7

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) .............................................................11

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020) .............................................................13

**Page**

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ...............................................................22, 23

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018).......................................................14

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ........................................................................8

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).................................................................10, 11

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019).........................................................13

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
   2020 WL 3268531
   (S.D.N.Y. June 17, 2020)..........................................................................19

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Ind. Ltd.*,
   2020 WL 1181366
   (D. Conn. Mar. 10, 2020)..........................................................................20

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   2020 WL 5757628
   (S.D.N.Y. Sept. 27, 2020).........................................................................19

*Pinter v. Dahl*,
   486 U.S. 622 (1988)..................................................................................22

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................10

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942
   (S.D.N.Y. Mar. 4, 2019) ...........................................................................15

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007).......................................................................8

*S.E.C. v. Egan*,
   994 F. Supp. 2d 558 (S.D.N.Y. 2014).......................................................13

**Page**

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   2024 WL 1898512
   (S.D.N.Y. May 1, 2024)................................................................................10, 13

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020)....................................................................................9

*Slack Techs., LLC v. Pirani*,
   143 S. Ct. 1433 (2023)............................................................................................8

*Steamship Trade Assoc. of Baltimore-Int'l Longshoreman's Assoc. Pension Fund v. Olo Inc.*,
   2023 WL 8287681
   (S.D.N.Y. Nov. 30, 2023).......................................................................................17

*Swanson v. Interface, Inc.*,
   2022 WL 2003990
   (E.D.N.Y. June 6, 2022).........................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................9, 17, 18

*VanLeeuwen v. Keyuan Petrochemicals, Inc.*,
   2013 WL 2247394
   (C.D. Cal. May 9, 2013).........................................................................................21

*Xiang v. Inovalon Holdings, Inc.*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017)....................................................................19

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b)....................................................................................................................7, 8
   §77k................................................................................................................ *passim*
   §77k(a)(1)................................................................................................................24
   §77k(a)(2)................................................................................................................24
   §77l(a)(2)............................................................................................................8, 22
   §78n(a)....................................................................................................................20

**Page**

17 C.F.R.
§210.4-01(a)(1) ........................................................................................................2
§229.512(a)(1)(ii) ...................................................................................................24
§230.430B ..............................................................................................................24
§230.430B(f)(1) ......................................................................................................25
§230.430B(f)(4) ...............................................................................................23, 25

Federal Rules of Civil Procedure
Rule 9(b) .......................................................................................................7, 9, 12

Private Securities Litigation Reform Act of 1995 ("PSLRA")
Pub. L. No. 104-67, 109 Stat. 737 (1995) .................................................. *passim*

**OTHER AUTHORITIES**

Shelf Registration, SEC Release No. 6499,
1983 WL 408321 (Nov. 17, 1983) .....................................................................16

Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 75,
2005 WL 1692642 (Aug. 3, 2005) ................................................................23, 24

Jacobs, DISCLOSURE & REMEDIES UNDER THE SEC. LAWS
§3:16 (2012) .......................................................................................................24

Lead Plaintiff Donald W. Hutchings, individually and as trustee of several trusts ("Lead Plaintiff") and additional plaintiff City of Warren Police and Fire Retirement System ("City of Warren" and, together with Lead Plaintiff, "Plaintiffs"), respectfully submit this memorandum in opposition to Defendants'[1] motion to dismiss the AC.

## I.    INTRODUCTION

By virtue of its September 1, 2023 restatement (the "Restatement"), NAPCO acknowledged that its interim financial statements provided to investors and filed with the SEC for the first three quarters of fiscal 2023 were presented in violation of Generally Accepted Accounting Principles ("GAAP") and were materially false and misleading. This was no small matter. NAPCO's net income had been overstated by as much as 115%, its income per share by as much as 112.5%, and its operating income by as much as 118%. NAPCO's stock price crashed when investors learned of the massive Restatement, falling 45%, and resulting in hundreds of millions of dollars in investor losses.

Defendants did not fare so badly. NAPCO's overstated financials had allowed the Company to meet Wall Street's quarterly earnings expectations—which it would have otherwise missed—keep its impressive growth streak alive (reaching ten consecutive quarters), and maintain its narrative of repeatedly reporting record breaking results. Better still, with the wildly inflated financials came a burgeoning stock price. NAPCO's top executives, defendants Soloway and Buchel, took full advantage. After not selling any of their NAPCO stock the previous year, Soloway and Buchel unloaded 48.5% and 45.5% of their respective holdings for proceeds exceeding $108 million.

---

[1] "Defendants" refers to Napco Security Technologies, Inc. ("NAPCO" or the "Company"); the "Officer Defendants": Richard L. Soloway (CEO) and Kevin S. Buchel (CFO) (¶¶8 n.2, 21-22); the "Director Defendants" (¶24) (together with Soloway and Buchel, the "Individual Defendants"); and the "Underwriter Defendants": Needham & Company, LLC and William Blair & Company, L.L.C. (¶¶25-28). References to "¶" or "¶¶" are to the Amended Complaint for Violations of the Federal Securities Laws (ECF 40, the "AC"). "MTD" refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss (ECF 53). Capitalized terms are as defined in the AC. "Ex. __" refers to exhibits to the Declaration of Jonathan K. Youngwood (ECF 54), which are cited by their ECF-stamped pagination. Emphasis is added and citations and alternations are omitted.

Their fortuitous timing had nothing to do with luck.  Unbeknownst to investors, the Restatement was the result of a deceptive scheme, whereby Buchel directed NAPCO employees to halt shipments of already-sold inventory at quarter-end, and to instead ship the product after the beginning of the next quarter.  By withholding the shipments, NAPCO improperly counted sold product as inventory at the end of the quarter, and thereby understated its cost of the cost of goods sold ("COGS").  Because COGS has a direct bearing on a company's income metrics, this financial manipulation allowed NAPCO to inflate its reported net income and related results between November 7, 2022 and August 18, 2023 (the "Class Period").

In seeking dismissal of Plaintiffs': (i) fraud claims under the Securities Exchange Act of 1934 ("Exchange Act"); and (ii) strict liability and negligence claims under the Securities Act of 1933 ("Securities Act"), Defendants concede—as they must—that Plaintiffs have pleaded material misrepresentations, since NAPCO's GAAP violations and its Restatement are *admissions* that the Company's quarterly financials were materially false and misleading.  *See* 17 C.F.R. §210.4-01(a)(1) (financials not prepared in compliance with GAAP are "presumed to be misleading or inaccurate").

Having conceded falsity, NAPCO and the Officer Defendants are left to argue that Plaintiffs have not pleaded a strong inference that the misstatements were the product of intentional or reckless misconduct.  But Plaintiffs have.  Three former employees ("FEs") provided corroborative accounts of how, before the end of the quarter, employees were directed to halt shipments of already-sold inventory that was in NAPCO's warehouse, and were warned to keep quiet about it.  Defendant Buchel personally directed the Vice President ("VP") of Sales and the VP of Operations to engage in this misconduct.  Soloway and Buchel's highly unusual, coordinated sales of nearly half of their stock—while NAPCO's share price was artificially inflated by false financials—adds to the strong inference of scienter.  While Defendants claim the quarter-end inventory scheme never happened,

- 2 -

these allegations, taken as true and considered collectively, paint a picture of the Officer Defendants' intentional or reckless misconduct that is at least as plausible as any innocent inference.

For the Securities Act claims—which disclaim fraud and instead plead strict liability and negligence claims in the alternative—Defendants' liability is virtually certain, given their concession of falsity.  Defendants therefore resort to various technical arguments, all of which lack merit.

Because Plaintiffs have satisfied all of the applicable pleading requirements, Defendants' motion to dismiss should be denied and this action should proceed to discovery.

## II.   STATEMENT OF FACTS

Defendant NAPCO designs and manufactures security solutions, including access control devices, intrusion and fire alarm systems, and video surveillance products.  ¶¶4, 20, 36.  The Company is headquartered in Amityville, New York, and manufactures its products in the Dominican Republic.  ¶¶4, 20, 38.  Its fiscal year begins on July 1 and ends on June 30.  ¶¶4, 38.

On August 18, 2023, NAPCO announced that it would need to restate its financial statements for the first three quarters of fiscal 2023, ended September 30, 2022 ("1Q23"), December 31, 2022 ("2Q23"), and March 31, 2023 ("3Q23"), and that its previously-issued financials for those quarters "should no longer be relied upon."  ¶¶5, 39, 105, 159.  The Company explained that, for those quarters, its inventories had been overstated and COGS had been understated, "resulting in *overstated gross profit, operating income and net income*," and gave preliminary estimates of its overstatement of net income.  ¶¶5, 105, 160.  NAPCO also admitted that a previously-undisclosed material weakness existed in its internal controls over financial reporting.  ¶¶5, 56, 106, 165.  Despite NAPCO's efforts to characterize the situation as the result of innocent "errors" in calculating inventory and COGS, these announcements caused its share price to plummet more than 45%, from $38.41 per share on August 18, 2023, to $21.11 per share on August 21, 2023.  ¶¶8, 107-108.

On September 1, 2023, NAPCO confirmed the severity of its financial misstatements, when

it filed with the SEC amended quarterly reports on Form 10-Q/A that restated its financial results for 1Q23, 2Q23, and 3Q23.  ¶¶6, 39, 109, 159.  For 1Q23, NAPCO's net income had been overstated by 107.59%, income per share had been overstated by 112.5%, operating income had been overstated by 98.71%, and gross profit and gross margins had each been overstated by 24.72%.  ¶¶65, 72, 173. For 2Q23, NAPCO's net income had been overstated by 114.97%, income per share had been overstated by 109.1%, operating income had been overstated by 118.02%, and gross profit and gross margins had been overstated by 35.59%.  ¶¶66, 80, 177.  For 3Q23, NAPCO's: net income had been overstated by 13.52%; income per share had been overstated by 11.5%; operating income had been overstated by 13.21%; and gross profit and gross margins had been overstated by 6.54%.  ¶¶68, 93.

When NAPCO announced the need for the Restatement, it acknowledged that the overstated income metrics the Company had reported for 1Q23, 2Q23, and 3Q23 stemmed from the improper overstatement of the inventory NAPCO possessed at the end of each affected quarter.  ¶40.  This overstatement of inventory resulted in a concomitant: (i) understatement of the equipment inventory the Company had sold—*i.e.*, COGS; and (ii) overstatement of NAPCO's income-related metrics.  *Id*.

With respect to the Exchange Act claims only, the AC alleges that the Restatement was the product of a fraudulent scheme to inflate NAPCO's income-related metrics, orchestrated by the Exchange Act Defendants: NAPCO, Soloway and Buchel.  ¶¶8, 41-49.  Three FEs who worked at NAPCO during the Class Period provided consistent accounts of the fraud:

- FE1 was midlevel manager within NAPCO's Continental Access business for over a decade, including throughout the Class Period.  ¶42.

- FE2 worked at NAPCO for a number of years, including during NAPCO's 1Q23 and 2Q23.  *Id*.  FE2's responsibilities included acquiring and shipping inventory within his business division, and he had access to inventory levels at NAPCO.  *Id*.

- FE3 was a midlevel manager at NAPCO for several years, until early 2023.  *Id*.[2]

---

[2]  The AC does not describe the FEs' positions and dates of employment with greater specificity because they did not grant counsel permission to do so, given concerns about revealing their

Each of the FEs described a practice whereby NAPCO halted shipments of sold inventory to customers before the close of a fiscal quarter.  ¶¶9, 42.  According to the FEs, during certain quarters, NAPCO employees were directed to delay shipping sold inventory to customers until after the beginning of the next quarter.  ¶¶9, 41.  On these occasions, the sold inventory remained warehoused at the Company's facilities.  *Id*.  FE1 and FE2 both reported that NAPCO would stop shipping out inventory, and would instead ship that inventory during the following quarter.  ¶¶9, 43.  They further stated that in many of these instances, the inventory was already sitting in the Company's warehouse facilities.  *Id*.  FE1 explained that in those situations, the warehoused inventory had already been prepared for shipment to customers.  *Id*.  FE3 similarly stated that in such instances, the warehoused inventory had already been sold to customers.  ¶43.

The FEs collectively conveyed that NAPCO's practice of withholding shipments occurred during each of the restated quarters.  ¶44.  FE1 reported that it occurred frequently during his employment, and believed that it likely occurred during 1Q23, 2Q23, and 3Q23.  *Id*.  FE3 stated that this practice occurred during the quarter before the Class Period (ended June 30, 2022), 1Q23 and 2Q23.  *Id*.  FE2 and FE3 also stated that NAPCO had been engaging in the practice for years.  *Id*.

The FEs further conveyed that the directive to withhold shipments of sold inventory was *issued by defendant Buchel*, and was given to the VP of Sales and the VP of Operations, and in turn, to sales directors.  ¶¶9, 46-48.  Specifically, FE1 reported that he was informed by insiders at NAPCO that the directive to halt shipments prior to quarter-end came from Buchel.  ¶¶9, 46.  As FE1 explained, Buchel gave the directive to the VP of Sales, and to the VP of Operations.  *Id*.

FE2 corroborated this chain of command.  He personally received directives not to ship out inventory from NAPCO's VP of Operations.  ¶¶9, 47.  And he understood that the VP of Operations

---

identities—particularly since NAPCO is a relatively small company.  *See* ¶42 n.3; Ex. 1 at 7 (NAPCO had 258 full-time U.S.-based employees as of June 30, 2022).

had received the directives to stop shipping inventory from Buchel.  *Id.*  FE3 provided additional corroboration.  He identified two sales directors who were told by NAPCO's executive team to stop shipping inventory.  ¶¶9, 48.  According to FE3, one of these sales directors was instructed to keep the practice "quiet."  ¶48.  The other sales director personally told him about the practice.  *Id.*

FE1 and FE3 both reported that NAPCO's practice of withholding shipments of sold inventory was well-known within the Company.  ¶49.  FE3 stated that employees openly discussed the practice, but were afraid to raise it with upper management.  *Id.*  FE3 recounted being told by co-workers, "It is what it is."  *Id.*  FE3 characterized the practice as intentional, and as being done to "sandbag the numbers"—*i.e.*, to manipulate NAPCO's financial results.  ¶45.

By withholding the shipment of sold product, the Exchange Act Defendants were able to improperly count sold product as inventory at the end of the quarter, and thereby overstate NAPCO's reported inventory.  ¶¶10, 50.[3]  This understated the cost of the equipment inventory NAPCO had sold during the quarter—*i.e.*, COGS.  *Id.*  Because COGS has a direct bearing on a company's income-related metrics, the Exchange Act Defendants' financial manipulation allowed them to inflate NAPCO's reported net income and related results—and thereby reverse-engineer and artificially manage the Company's financial results during the Class Period.  ¶¶10, 51.

As the Exchange Act Defendants intended, the fraud enabled NAPCO to meet—and exceed––market expectations, when it otherwise would not have.  ¶¶11, 51, 70.[4]  It also allowed defendants

---

[3]  Defendants stress that NAPCO's SEC filings say that product is not deemed sold and revenue is not recognized until the product is shipped.  MTD at 2, 8-9.  Plaintiffs, however, allege that Defendants purposefully contravened NAPCO's stated policies.  *See, e.g.*, ¶¶43-50.

[4]  For example, when discussing NAPCO's results for 1Q23, Soloway highlighted that NAPCO had "easily exceed[ed] published street consensus estimates" by reporting EPS of $0.17.  ¶¶11, 70.  In truth, NAPCO would not have met—let alone exceeded—analysts' consensus estimate of EPS of $0.13—because its actual EPS was just $0.08.  *Id.*  Likewise, when discussing NAPCO's results for 2Q23, Soloway stated that NAPCO had been "able to beat published Street consensus estimates" by reporting EPS of $0.23.  ¶70.  As with 1Q23, NAPCO would not have met or exceeded analysts'

- 6 -

Soloway and Buchel to cash out nearly half of their NAPCO stock at artificially inflated prices, with Soloway selling *48.5%* of his shares for proceeds of approximately *$104 million*, and Buchel selling *45.5%* of his shares for proceeds of approximately *$4.5 million*.  ¶¶12, 117, 122.

On September 12, 2022, NAPCO filed a shelf registration statement—signed by each of the Individual Defendants—providing that defendants Soloway and Buchel may, in the future, sell up to 3,830,449 shares of their NAPCO common stock in public offerings.  ¶¶21-22, 24, 151-152.  On February 8 and 10, 2023, NAPCO filed prospectus supplements, which together with the registration statement, formed the "Offering Materials."  ¶¶153-154.  The Offering Materials incorporated by reference NAPCO's 1Q23 and 2Q23 Form 10-Qs—which the Company has admitted materially overstated its net income and related financial results, and failed to disclose an internal control weakness.  ¶¶153-154, 156, 158.  The Offering closed on February 13, 2023, with Soloway and Buchel receiving more than $74 million from their sales.  ¶155.  The Securities Act claims are based solely in strict liability and negligence for the false and misleading Offering Materials, and the AC expressly disclaims all allegations of fraud as to these claims.  ¶¶13, 149-150.

## III.   ARGUMENT

In deciding a motion to dismiss, the court must "'accept[] as true all factual claims in the complaint and draw[] all reasonable inferences in the plaintiff's favor.'"  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 147 (2d Cir. 2021).  A "court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).  Although claims under §10(b) of the Exchange Act are subject to the particularity requirements of Rule 9(b), and to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), courts "'must be careful not to mistake heightened pleading standards for impossible ones.'"  *Qihoo 360 Tech*, 19 F.4th at 150.

consensus estimate of 2Q23 EPS of $0.14, since its actual EPS was $0.11.  *Id.*

To state a §10(b) claim, "a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022). Issuers such as NAPCO "are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *see also Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1437 (2023) (§11 "imposes *strict liability* on issuing companies").

## A.   The Court Should Disregard Defendants' Alternative Factual Narrative

Defendants offer a counter-narrative based on documents outside of the AC (many not even referenced therein), which is improper on a motion to dismiss. MTD at 5-9, 17-19. Even where the court may take judicial notice of extrinsic materials, it may do so "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis in original); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 206 (S.D.N.Y. 2018) ("*Roth* has been reaffirmed time and again by courts in this district"). Because Defendants have clearly submitted their extrinsic exhibits for the purpose of urging the Court to accept as true their alternative set of facts, the Court should disregard or strike Defendants' exhibits 1-16, and all of Defendants' assertions and arguments based on those exhibits.[5]

## B.   The AC Pleads a Strong Inference of Scienter

A plaintiff may plead scienter—*i.e.*, "'an intent to deceive, manipulate or defraud'"—by "'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud

---

[5] *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("If defendants are permitted to present their own version of the facts at the pleading stage . . . it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief. . . . Such undermining of the usual pleading burdens is not the purpose of judicial notice[.]").

or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).  The Court must evaluate all of the complaint's factual allegations "*collectively*," and conduct a "comparative assessment of plausible inferences, while *constantly assuming the plaintiff's allegations to be true[.]*" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 326-27 (2007).  The inference "need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "*at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 324.

###### 1.    Conscious Misbehavior or Recklessness

Plaintiffs plead a strong inference of scienter by alleging that the Restatement was the product of a fraudulent scheme to inflate NAPCO's income metrics, orchestrated by Soloway and Buchel, and facilitated by defective internal controls.  ¶¶8, 41-49, 56.  "As a general matter, courts consider and take as true the statements of confidential witnesses at [the motion to dismiss] stage, even when applying the heightened standards of Rule 9(b) and the PSLRA."  *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023).  The three FEs provided consistent accounts of how, before the end of a quarter, employees were directed to pause shipments to customers of product that had been sold—and which was already prepared for delivery—until the subsequent quarterly accounting period.  ¶¶9, 41-43.  *See AppHarvest*, 684 F. Supp. 3d at 263 (consistent allegations from several FEs "collectively support[ed] an inference" that problems existed).

They further corroborated that the directive to withhold shipments of sold inventory was given by defendant Buchel, to the VPs of Sales and Operations, and in turn, to sales directors.  ¶¶9, 46-48.  FE1 reported that defendant Buchel directed the VPs of Sales and Operations to engage in this quarter-end misconduct.  ¶46.  This was corroborated by FE2—who received the directive from the VP of Operations, and understood that it came from Buchel.  ¶47.  FE3 identified two sales directors who were told by NAPCO's executive team to stop shipping inventory—one of whom told

him about it.  ¶48.  *See Lozada v. TaskUs, Inc*., 2024 WL 68571, at *25 (S.D.N.Y. Jan. 5, 2024)

("corroboration from" multiple FEs supported scienter).  And FE1 and FE3 said that the practice was

well-known within NAPCO.  ¶49.  *See Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38

(S.D.N.Y. 2010) (crediting FE allegations that "everyone knew" of problems in evaluating scienter).

The AC's allegation that Buchel "orchestrated the . . . [inventory] scheme" pleads his "actual

knowledge" of the fraud, and thus his scienter.  *San Antonio Fire & Police Pension Fund v. Dentsply*

*Sirona Inc.*, 2024 WL 1898512, at *7 (S.D.N.Y. May 1, 2024).  "Although there is no smoking gun"

evidence of Soloway's involvement, the inference that NAPCO's top executive was "blissfully

unaware" of the fraud—despite selling massive amounts of stock at coordinated times with Buchel—

"is neither cogent nor compelling."  *Id*. at *11.  "And even if [Soloway] simply turned a blind eye

to" NAPCO's inventory manipulations, "willful blindness is also enough" to plead scienter.  *Id*.

Defendants contend that the FE accounts are not probative of scienter because the FEs did

not personally speak with Soloway or Buchel, or have "actual knowledge" of "company-wide

accounting practices[.]" MTD at 11-13.  But these arguments disregard the salient test "[f]or a

complaint to rely on information provided by confidential sources," which is whether the source is

"'described in the complaint with sufficient particularity to support the probability that a person in

the position occupied by the source would possess the information alleged.'"  *City of Warren Police*

*& Fire Ret. Sys. v. World Wrestling Ent. Inc*., 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (quoting

*Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  "[T]here is no baseline requirement" that FEs

deal directly with defendants.  *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89

F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015).  And courts "may properly take account of" information

provided by the FEs that "is based on hearsay and indirect knowledge."  *World Wrestling Ent.*, 477

F. Supp. 3d at 132.  "This liberal standard make sense; the heightened demands of the PSLRA will

often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible." *Id.*

Here, as long-time midlevel managers (FE1 & FE3), and an FE responsible for acquiring and shipping inventory (FE2), the FEs were each in a position to know of management directives to hold back sold inventory to manipulate quarter-end results. ¶¶42-49. Although FE1's understanding that Buchel directed the misconduct via the VPs of Operations and Sales (¶46) was indirect, he had firsthand knowledge *of the practice* (¶¶42-44), as did FE2, who received the directive from the VP of Operations, and corroborated that it came from Buchel. ¶47. FE3's description of the practice and his statement that it was well-known provide additional corroboration. ¶49. The FEs' consistent descriptions of both the inventory manipulation and the fact that it emanated from Buchel make their accounts not just plausible, but probable. *See Novak*, 216 F.3d at 314.[6]

The FEs were appropriately-positioned to possess the information they provided—Buchel's instruction to NAPCO employees to halt shipments of sold inventory—and they need not *also* have knowledge of NAPCO's accounting practices. The AC appropriately relies on NAPCO's admission that during the Class Period, it overstated inventories and understated COGS, resulting in grossly inflated income metrics (¶105) to allege, upon information and belief, that the *conduct* described by the FEs was done for the *purpose* of inflating NAPCO's income. ¶¶50-51, 72, 80, 93.

The FEs enhance the plausibility of this allegation by confirming that NAPCO's practice of keeping sold product in inventory through quarter-end was *not* done for a legitimate reason. FE3

---

[6] By contrast, in the cases cited by Defendants, the FEs simply were not positioned to possess the information they provided. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 780 & n.5 (S.D.N.Y. 2021) (MTD at 13) (acknowledging FEs need not have personal interactions with the defendants, but finding the "relatively junior" FEs were not in positions to show defendants knew an inventory shortage was negatively affecting sales); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008) (MTD at 12) (rejecting allegations from "an analyst who followed [the company]" because it was unclear how she would have known the relevant facts).

stated that it was done to "sandbag the numbers"—*i.e.*, to manipulate quarterly financial results. ¶¶45, 48-51. And tellingly, FE3 revealed that employees were "afraid" to complain to upper management, and sales directors were instructed to keep this shady practice "quiet." ¶¶48-49. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (crediting former employees' accounts that management "discouraged questions" about suspect inventory practices).

Defendants challenge the FE accounts as "vague and conclusory," claiming the AC does not say: (i) "if the inventory was sold . . . for accounting purposes"; or (ii) the amount of misstatement. MTD at 13-14. But the AC alleges that the "held" product was improperly recognized as sales and inventory (¶¶10, 43, 45, 50-51), this was done during at least 1Q23, 2Q23, and 3Q23 (¶44), and the Officer Defendants halted shipping at quarter-end, such that the Restatement reflected product withheld (¶¶72, 80, 93). And Defendants' contention that the AC does not adequately allege "when" the misconduct "occurred" is simply incorrect. NAPCO's admission that its inventory—and income—were overstated in 1Q23, 2Q23, and 3Q23—is consistent with the FE's allegations that the practice of pausing shipments of sold inventory: (i) was frequent and likely occurred during 1Q23, 2Q23, and 3Q23, as FE1 stated; (ii) occurred during the quarter before the Class Period, 1Q23, and 2Q23, as FE3 stated; and (iii) had been ongoing for years, as both FE2 and FE3 stated. ¶44.

The balance of Defendants' criticisms of the FE accounts demand a level of particularity not required at the pleading stage. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018) ("even with the heightened pleading standards of Rule 9(b) and the PSLRA," courts do "'not require the pleading of detailed evidentiary matters in securities litigation'").[7] Finally,

---

[7] For example, the series of questions regarding the FE accounts (MTD 13 at n.6) is not accompanied by authority showing that pleading such evidence is required. Defendants' reliance on *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007), to argue otherwise is misplaced. MTD at 13. There, the complaint's reliance on FEs to allege that a write-down should have been taken earlier was insufficient because the FEs merely stated that defendants "may" have been overvaluing inventory, and the complaint did not allege that reports received by management

Defendants' speculation that NAPCO may have "halted inventory shipments . . . for a legitimate . . . business reason" (MTD at 12) is impermissibly premised on a competing factual narrative (as discussed above), and is not more compelling (as discussed below).

The AC's additional circumstantial evidence of recklessness reinforces the strong inference of scienter. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020) ("The testimony of the [FE]s . . . must be 'taken collectively' with other alleged evidence of scienter."). The magnitude of the Restatement, whereby NAPCO admitted that its net income was overstated by as much as *114.97%*, its income per share was overstated by as much as *112.5%*, and its operating income was overstated by as much as *118.02%* (¶¶6, 65-66), "suggests more than a careless mistake or trivial miscalculation[.]" *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019). So too does the fact that it involved violations of straightforward income accounting principles. ¶¶61-63; *see S.E.C. v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014).

In connection with the Restatement, Defendants admitted to an additional internal control weaknesses that existed during the Class Period, which is also indicative of recklessness. *See Dentsply Sirona*, 2024 WL 1898512, at *10 ("Courts in this district have repeatedly held that . . . poor internal controls support an inference of scienter."). And Soloway and Buchel's failure "to ensure that the SEC filings they signed were truthful and accurate" is likewise probative of recklessness. *In re Pall Corp.*, 2009 WL 3111777, at *8 (E.D.N.Y. Sept. 21, 2009).

Further, the AC's allegation that NAPCO provided a pretext "for its need to restate its financials . . . [suggests] the Company was seeking to conceal a conscious or reckless practice of

---

suggested inventory was overvalued. *Caiafa*, 525 F. Supp. 2d at 411 n.10, 413. *See also Ford v. VOXX Int'l Corp.*, 2016 WL 3982466, at *6-*7 (E.D.N.Y. July 22, 2016) (MTD at 14) (no admission or restatement, such that vague FE allegation that the "[c]ompany began losing market share in 2012" was insufficient to establish falsity); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (MTD at 14) (scienter inadequately alleged because misconduct was never "presented" to defendants, whereas here, FEs stated that Buchel directed the misconduct).

violating GAAP and falsely reporting financial figures." *In re MicroStrategy, Inc. Sec. Litig*., 115 F. Supp. 2d 620, 641 (E.D. Va. 2000).  And the replacement of NAPCO's long-standing auditor, Baker Tilly, shortly after the Restatement "add[s] to the overall pleading of circumstantial evidence of fraud." *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008).

### 2.      Motive and Opportunity

The already-strong inference of scienter is enhanced by Soloway and Buchel's highly-suspect Class Period stock sales—which occurred at two separate, coordinated times, after neither had sold any shares during the prior year.  ¶123.  "'[I]nsider trading is considered a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud.'" *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 383 (E.D.N.Y. 2022).

Soloway and Buchel collectively received nearly $33 million from their November 15, 2022 sales, which took place merely a week after NAPCO reported its 1Q23 financial results with net income, operating income, and gross profit overstated by 107%, 98%, and 24%, respectively. ¶¶117-119.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (unusual sales at the time of withholding of negative information supports an inference of scienter).[8]  Notably, had NAPCO accurately reported its 1Q23 results, instead of exceeding analysts' $0.13 EPS expectations by 31% ($0.04 per share), *it would have missed expectations by 38%* ($0.05 per share).  ¶70.  *See Swanson v. Interface, Inc.*, 2022 WL 2003990, at *2 (E.D.N.Y. June 6, 2022) (Cogan, J.) (allegations that defendants "knew [the company] was not going to make the consensus forecasts for EPS, so they repeatedly took actions that they knew violated . . . [GAAP] to meet those targets"—as here,

---

[8]  Defendants contend that scienter is undermined because the sales took place months before NAPCO's Restatement.  MTD at 15.  But the sales' proximity to NAPCO's issuance of false earnings is far more indicative of suspicious timing.  *See Blanford*, 794 F.3d at 308 (stock sales suspicious when they occurred shortly after misrepresentations); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018) (finding scienter where defendants sold stock "two weeks" and "about a month and a half after" misstatements, long before any corrective disclosure).

inflating EPS by understating certain costs—pled a strong inference of scienter).

Similarly, Soloway and Buchel's stock sales on February 15 and 17, 2023, for proceeds of $75.7 million, occurred just days after the announcement of NAPCO's 2Q23 results, which were overstated by even larger amounts than in 1Q23.  ¶¶117, 120-121.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *5 (S.D.N.Y. Mar. 4, 2019) (timing of sales was unusual where sales occurred "within days of the company's positive earnings announcements").  Had NAPCO correctly reported these results, its earnings would have *missed analyst expectations by 23%* ($0.03 per share) (¶70)—upending the Company's growth narrative and causing its stock price to crash, as it later did when the Restatement was announced.  ¶¶105-108.

In total, Soloway sold *48.5%* of his stock for proceeds of approximately *$104 million*, and Buchel sold *45.5%* of his stock for proceeds of approximately *$4.5 million*, during a three-month period when NAPCO's income metrics were grossly inflated.  ¶¶117-122.  Courts have found motive and opportunity based on insider sales in similar (and less suspicious) situations.  *See, e.g.*, *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2 (E.D.N.Y. Mar. 30, 2012) (finding scienter where defendant sold 9.4% of his holdings); *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *23 (E.D. Va. Aug. 28, 2023) (defendant's sale of 20% of stock probative of scienter); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173-74 (S.D.N.Y. 2021) (CFO's "decision to trade . . . on the same day that [the CEO] sold over 20% of [his] . . . stock qualifies the trade as 'unusual.'"); *World Wrestling Ent.*, 477 F. Supp. 3d at 137 (defendant's sale of 10% of stock probative of scienter); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012) (finding scienter where three of seven defendants sold more than 25% of holdings).

Defendants suggest that the timing of the shelf registration statement for the February 2023 sales is exculpatory because it was filed before the Class Period, on September 12, 2022.  MTD

at 15. But the shelf registration process is designed to give sellers "procedural flexibility" to "time [an] offering" to take advantage of "advantageous market" prices on "short notice." Shelf Registration, SEC Release No. 6499, 1983 WL 408321, at *4 (Nov. 17, 1983). That is exactly what Soloway and Buchel did here. Two days after NAPCO reported inflated 2Q23 results on February 6, 2023, it announced that Soloway and Buchel planned to sell stock in an offering. ¶¶120-121.[9]

Finally, the fact that Soloway purportedly sold additional shares in March 2024 (MTD at 17 n.8), after the AC was filed, does nothing to undercut scienter. And whether or not Soloway and Buchel had an overall plan to sell part of their holdings "at this stage in [their] career[s]" (*id.* at 17), they could have done so at any time. Their decision to sell so many shares immediately following the issuance of NAPCO's false financials—*on two separate occasions*—is highly suspicious.

### 3.    Defendants Have Not Presented a More Compelling Inference

Defendants say the most compelling inference from the facts alleged is that Soloway and Buchel could not have acted fraudulently or recklessly because the quarter-end inventory manipulation never happened and shipments were halted (if at all) for legitimate business reasons, such as "resource allocation decisions, customer shipping requirements and staffing." MTD at 3, 12, 18-19. They contend that NAPCO told the truth about the reasons for the Restatement, and that Soloway and Buchel's highly-suspect stock sales were the product of happenstance. MTD at 17.

Defendants' claim that the Restatement was not due to fraud, but was instead the result of the "obvious" and "compelling" "reason disclosed by the Company" (MTD at 2, 18-19), must be

---

[9] Defendants argue the sales were not suspiciously-timed because they were made shortly after insider trading blackout periods expired. MTD at 16. If that were so, no sale could ever be suspicious unless an insider also violated corporate policies. In any event, in a clear conflict of interest, Buchel, as NAPCO's Insider Trading Compliance Officer, was tasked with "pre-clearing" both Soloway's and his own sales. ¶124. Nor does *City of Brockton Retirement System v. Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) assist Defendants. There, insider sales made "immediately after the issuance of the [quarterly] financial statements" were not suspicious because "[t]hose financial statements are not alleged to have been false"; "were never restated"; and defendant "sold his stock before any alleged misrepresentations were made." *Id*. at 475.

rejected because the Court is "obligated to credit" Plaintiffs' allegations regarding the inventory manipulation "at this stage." *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021); *c.f. Tellabs*, 551 U.S. at 324 (requiring comparative assessment "from the facts alleged"). In urging the Court to credit their explanation, Defendants improperly advocate for an alternative set of facts, rather than a competing inference. *See Steamship Trade Assoc. of Baltimore-Int'l Longshoreman's Assoc. Pension Fund v. Olo Inc.*, 2023 WL 8287681, at *11-*12 (S.D.N.Y. Nov. 30, 2023) (refusing to credit alternative explanation); *World Wrestling Ent.*, 477 F. Supp. 3d at 137 ("[T]his alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat th[e] inference of scienter."); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001) (plaintiff's allegations of GAAP violations were "at least as plausible," and it was improper to "prefer the defendants' explanation" on a motion to dismiss).

Despite submitting over 300 pages of extraneous exhibits, Defendants never explain *why* they applied outdated "costing procedures" for three quarters in a row. MTD at 7-8; Ex. 5 at 11 (Buchel stating: "[t]he inventory was valued using values from the [6/30/22] audited numbers," but providing no further explanation). Indeed, it makes little sense that Soloway and Buchel were paying close attention to the prices of component parts (and thus, the value of inventory)—as evidenced by their frequent discussions of component prices in SEC filings and during investor calls (MTD at 6-7, citing Exs. 1-5)—yet somehow inadvertently failed to consider those prices when valuing NAPCO's inventory. Defendants' suggestion that Soloway and Buchel may have halted quarter-end inventory shipments for some "legitimate, non-fraudulent business reason" (MTD at 12) is also not compelling given the AC's allegations of deceitful conduct that employees were told to keep quiet. ¶¶48-49.

Considering the AC's allegations "collectively" and taking them "to be true," the facts alleged present an inference of intentional or reckless misconduct that is "cogent and at least as

compelling as any opposing [innocent] inference." *Tellabs*, 551 U.S. at 323-24, 326-27.  Knowing they would soon be selling nearly half of their NAPCO shares, and under pressure to meet analysts' expectations and continue NAPCO's streak of increasing earnings, Soloway and Buchel knowingly or recklessly directed sold product to be improperly counted as inventory, thus overstating inventory and understating COGS, which allowed them to inflate NAPCO's income metrics.  ¶¶10, 50-51.  Once the massive financial misstatements came to light, Soloway and Buchel realized they would come under scrutiny for their well-timed $108 million windfall, so they concocted a nonculpable story to explain the Restatement.  When compared to Defendants' opposing inference, these allegations give rise to an equally compelling (really, more compelling) inference that Soloway and Buchel intentionally or recklessly misled investors about NAPCO's financial results.[10]

### C.   The AC Adequately Pleads Causation

The AC also pleads loss causation for the Exchange Act claims, by providing "some indication of the loss and the causal connection" alleged.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Loss causation may be shown by alleging either: "'[i] that the market reacted negatively to a corrective disclosure of the fraud;' or [ii] that [] '"the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."'"  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).

The AC alleges that NAPCO's stock price fell 45% when the Company announced that its financial results for 1Q23, 2Q23, and 3Q23 needed to be restated (¶¶7-8, 105-108), which suffices to plead a corrective disclosure.  NAPCO's effort to pin the Restatement on innocent accounting errors (MTD at 20) is inconsequential because a "corrective disclosure need not be . . . tantamount to a confession of fraud.'"  *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 164 (E.D.N.Y. 2020).  The

---

[10]  Because the AC pleads a strong inference of Soloway and Buchel's scienter, it also adequately pleads NAPCO's scienter.  *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (corporate scienter may be imputed from an individual defendant who made the misstatement).

announcement of the Restatement disclosed the *fact* of NAPCO's false financials.  That Defendants "continu[ed] to conceal" the *reason* they were false—*i.e.*, the inventory manipulation—"should not shield [them] from liability."  *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *19 (S.D.N.Y. June 17, 2020).  Alternatively, the risk that NAPCO would need to correct inflated financial results—which had been concealed by the fraud—materialized at the end of the Class Period, when it announced precisely that.  Either way, "[t]he chain of alleged causation here is clear[.]"  *Id.* (loss causation adequately alleged because stock drop from disclosure of "pipeline and manufacturing problems" was "the precise and foreseeable consequences of Teligent's [undisclosed] regulatory compliance failures").

To prevail on an affirmative defense of negative causation for the Securities Act claims, Defendants bear the "high burden" of proving that the absence of loss causation is "apparent on the face of the complaint[.]"  *Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 645 (S.D.N.Y. 2017).  The AC's "well-pleaded allegation[s] of" loss causation "preclude Defendants from meeting their 'heavy' burden" of demonstrating "this affirmative defense, particularly on a motion to dismiss."  *Panther Partners Inc. v. Jianpu Tech. Inc*., 2020 WL 5757628, at *16 (S.D.N.Y. Sept. 27, 2020).  And while the AC's Exchange Act claims are based on NAPCO *fraudulently* manipulating its results, the Securities Act claims are not.  ¶¶1-3, 150.  For these claims, Plaintiffs need not—and did not—allege what caused the Restatement.  ¶¶149-181.  Thus, even if Defendants ultimately prove it was caused solely by a failure to account for inventory price fluctuations, the Securities Act claims will continue.  The absence of causation is therefore *not* apparent from the face of the AC.[11]

---

[11] Defendants' assertion that Plaintiffs cannot separate their Securities Act claims from their Exchange Act claims and disclaim allegations of fraud is incorrect.  MTD at 21 n.10.  Plaintiffs are "allowed to 'plead claims in the alternative.'"  *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 558 (S.D.N.Y. 2017).  And the "careful structure" of the AC, including its segregation of the Exchange Act and Securities Act claims (*id.*), distinguishes this case from *Lozada*, 2024 WL 68571, at *9.  *Amorosa v. AOL Time Warner Inc*., is also unhelpful to Defendants because

### D.   City of Warren Is a Proper Plaintiff

The Second Circuit has recognized that additional plaintiffs are not subject to the PSLRA's lead plaintiff-appointment provisions. *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class"). The addition of City of Warren to represent class members with Securities Act claims (for which Lead Plaintiff lacks standing) is therefore entirely appropriate. MTD at 21-22.

Nor does the addition of City of Warren to the AC warrant reopening the PSLRA's lead plaintiff-appointment process. Courts order this only where "in light of the amendments, 'entire classes of potential lead plaintiffs [were] left out of the notice procedure.'" *Dube v. Signet Jewelers Ltd.*, 2017 WL 1379385, at *1 (S.D.N.Y. Apr. 14, 2017). Where newly-added claims are based on the same general facts, restarting the lead plaintiff process is unwarranted. *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Ind. Ltd.*, 2020 WL 1181366, at *11-*12 (D. Conn. Mar. 10, 2020) (no reopening despite expansion of class period by two years and addition of state law claims because "the factual underpinnings of the FAC and SAC are substantially the same" and "the state common law claims . . . and the federal securities claims . . . depend on the same facts"); *In re Thornburg Mortg., Inc. Sec. Litig.*, 629 F. Supp. 2d 1233, 1241, 1243 (D.N.M. 2009) (addition of Securities Act claims and defendants did not require new notice because "the underlying conduct alleged" was "more relevant" than "whether a lawsuit is brought under rule 10b-5 or under 14(a)").

Here, Plaintiffs have not expanded the Class Period in the original PSLRA notice. *Compare* ECF 1 *with* ¶2. Indeed, class members with Securities Act claims (purchasers pursuant or traceable to the Offering) were already part of the original class (¶¶2-3), and were informed that they could seek appointment as lead plaintiff. *See* ECF 22-1. Moreover, the categories of alleged

---

in that case, there could be no loss causation—or any losses at all—because the stock price had *increased* at relevant times. 409 Fed. Appx. 412, 416-17 (2d Cir. 2011); MTD at 20.

misstatements described in the PSLRA notice (internal control weaknesses and misstated financial results) (*id.*) are also the predicate for the Securities Act claims.  *See* ¶¶159-160, 165, 173, 177. "The new claims are [therefore] closely related to the initial claims expressly covered in the notice, and requiring further notice for the amendments here would serve only to delay the progress of this case . . . .'" *Thornburg Mortg.*, 629 F. Supp. 2d at 1242.[12]

Finally, Defendants speculate that if the Court dismisses only the Exchange Act claims, City of Warren would not have been "appointed lead plaintiff in a compliant PSLRA process."  MTD at 22.  In cases where a lead plaintiff's claims are dismissed, however, courts have permitted the lead plaintiff to continue in that role.  For instance, in *Lumen v. Anderson*, 2011 WL 3794144 (W.D. Mo. Aug. 24, 2011), the court permitted the lead plaintiff to continue overseeing the litigation, stating:

> The Lead Plaintiffs are still Lead Plaintiffs, and thus are still "in the case" even if they are not asserting the only remaining claim.  The Lead Plaintiffs' claims have been dismissed, and at the appropriate point in time they may opt to appeal the decision . . . .  Under these circumstances, the PSLRA does not require that the case "start over" at the beginning of the party-approval process.

*Id.* at *2; *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 683-85 & n.17 (D. Colo. 2014) (allowing lead plaintiffs and additional "named plaintiffs" to settle PSLRA class action where lead plaintiffs likely lacked standing to assert claims).  Should the Exchange Act claims be dismissed while the Securities Act claims are upheld, the same result would be warranted here.  Lead Plaintiff would remain in the

---

[12]  Defendants' cases are distinguishable.  MTD at 21-22.  *See Hachem v. Gen. Elec. Inc.*, 2018 WL 1779345, at *1-*2 (S.D.N.Y. Apr. 12, 2018) (new factual underpinnings for new types of misstatements and expansion of class period by nearly *six years*); *In re Sandridge Energy, Inc. Sec. Litig.*, 2015 WL 3652526, at *10-*11 (W.D. Okla. May 11, 2015) (plaintiffs added claims for entirely new security from a different issuer, that were "grounded on new factual . . . allegations," such that the PSLRA notice would not have alerted the new class members of an action involving their securities); *VanLeeuwen v. Keyuan Petrochemicals, Inc.*, 2013 WL 2247394, at *5-*6 (C.D. Cal. May 9, 2013) (plaintiffs added new factual allegations on behalf of a new class of investors who purchased before the class period in the PSLRA notice); *In re Select Comfort Corp. Sec. Litig.*, 2000 WL 35529101, at *6-*7 (D. Minn. Jan. 27, 2000) (plaintiffs violated a court order allowing amendment of existing claims by adding a claim from well before the class period in the notice).

case to oversee City of Warren and the class litigation, and would continue to make litigation decisions, including whether to amend the pleadings or appeal the adverse Exchange Act ruling.

### E.    City of Warren Has §12(a)(2) Standing

Defendants contend that City of Warren fails to plead §12(a)(2) standing because the AC alleges its purchases were "pursuant and/or traceable to" the Offering Documents.  MTD at 23.  But they cite only paragraphs of the AC that group the §11 and §12(a)(2) claims (¶¶3, 19, 30, 149), and ignore the §12(a)(2) Counts, which allege the purchases were "*pursuant to*" the prospectus.  ¶¶197, 199, 201.  "[A]lleging that [plaintiff] purchased securities pursuant to the 'pertinent offering documents' or in the relevant offerings underwritten by the defendants" suffices to plead §12(a)(2) standing. *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 180 (2d Cir. 2023).[13]

The Underwriter Defendants further challenge City of Warren's "statutory seller" allegations for not "identify[ing] a particular purchase from a particular defendant" or pleading that either underwriter "engaged in successful solicitation."  MTD at 23-24; *see Pinter v. Dahl*, 486 U.S. 622, 642 (1988) (§12(a)(2) seller liability extends to those who "passed title . . . to the buyer for value"). In *DeCarlo*, however, the Second Circuit stated that it is unnecessary to plead a purchase from a particular defendant.  80 F.4th at 180.  Instead, the Court "can reasonably infer" from allegations that City of Warren purchased securities "pursuant to the Prospectus" that it "acquired securities from . . . Defendants" such that standing is sufficiently alleged. *Id.*

Additionally, all Defendants are liable under §12(a)(2) because they solicited City of Warren's purchases and were motivated by their own financial interest. *See Pinter*, 486 U.S. at 647.

---

[13]  City of Warren's certification, showing it purchased at the offering price of $31.50 on February 9, 2023 (ECF 40 at 65-66), the day after NAPCO issued its final prospectus supplement dated February 8, 2023 (¶154; Ex. 9 at 2), provides "additional facts supporting the plausibility of" the standing allegations. *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *20 n.6 (S.D.N.Y. Aug. 11, 2021).

NAPCO satisfies this standard because it filed and disseminated the Offering Materials, and those documents "'solicit[ed] the public to acquire securities.'" *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995)) (issuer qualified as seller in secondary offering); ¶¶151-154, 197.[14]

As for the Individual Defendants, "[n]umerous courts in this circuit hold that on a motion to dismiss, officers or directors of the stock issuer who signed its registration statement"—as each did here—"are deemed to have solicited the purchase of the offered stock." *Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009). *See* ¶¶21-22, 24. In addition to signing the Offering Materials, Soloway and Buchel are statutory sellers because they: (i) caused NAPCO to undertake the Offering for their own benefit, receiving more than $75 million in proceeds; and (ii) made the false statements incorporated into the Offering Materials, by signing the misstated Form 10-Qs. ¶¶21-22, 155, 187; Ex. 7 at 31; *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186-87 (S.D.N.Y. 2003) (defendants were "sellers" based on signing registration statement, "tout[ing] the [issuer's] financial vitality," working to "increase the share price of those securities," and "st[anding] to financially benefit from the increased . . . share price").

## F.    The Individual Defendants Are Liable Under §11

Finally, the Individual Defendants argue that only NAPCO and the Underwriter Defendants may be held liable under §11 for the misstatements incorporated by reference into the September 12, 2022 registration statement. MTD at 25. But the SEC regulation they cite—17 C.F.R. §230.430B(f)(4)—"did not change the liability rules for registration statement signers." *In re Lehman Brothers Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 316 n.399 (S.D.N.Y. 2011); *see also* Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 75, 2005

---

[14]  The AC pleads the Underwriter Defendants' solicitation efforts, which led to the sales, and which were undertaken for financial gain. *DeCarlo*, 80 F.4th at 179; ¶¶25-28, 154-55, 198.

WL 1692642, at *86 (Aug. 3, 2005) (for persons other than the issuer and underwriters, "including directors, signing officers, and experts, the filing of a form of prospectus should not result in a later Section 11 liability date than that which applied prior to our new rules"). Thus, in *Lehman Brothers*, a director at the time of the initial shelf registration statement faced §11 liability for false statements in subsequent SEC filings that were incorporated by reference (which she signed), since "each of those filings is 'deemed a new registration statement.'" 799 F. Supp. 2d at 315-16.

Here, the Individual Defendants each signed the September 12, 2022 registration statement. ¶¶21-22, 24. The registration statement incorporated NAPCO's "future filings . . . with the SEC" (Ex. 8 at 15), which ultimately included the 1Q23 10-Q (filed November 7, 2022) and 2Q23 10-Q (filed February 6, 2023). ¶¶156, 172-181, 187. Accordingly, the Individual Defendants are liable under §11 for the misstatements in those filings which they expressly incorporated by reference and, in the case of Soloway and Buchel, directly signed. ¶¶21-22; *Lehman Brothers*, 799 F. Supp. 2d at 316; 5 Jacobs, DISCLOSURE & REMEDIES UNDER THE SEC. LAWS §3:16 at 5 (2012) (directors are liable under §11 for an incorporated Form 10-Q as of the date it is filed, because "on that date [they] have an opportunity to review the . . . report . . . and to require its correction.").[15]

Even if §230.430B applies, the Individual Defendants are still liable under the "fundamental change" exception—§229.512(a)(1)(ii)—which prevents the registration statement's effective date from reverting to the September 2022 filing date. Under that exception, "[w]here the prospectus

---

[15] *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, 932 F. Supp. 2d 1095, 1119 (C.D. Cal. 2013) (MTD at 25), did not involve future financial statements signed by defendants and incorporated by reference. At most, §230.430B provides that if an individual *who did not sign a registration statement* signs an incorporated report, that person is not liable under §11 *solely by virtue of that report later being incorporated*. *See* Securities Offering Reform, 2005 WL 1692642, at *86 ("Any person signing any report or document incorporated by reference in the prospectus that is part of the registration statement . . . is deemed not to be a person who signed the registration statement *as a result*."). Here, the Individual Defendants are liable as: (i) registration statement signers (15 U.S.C. §77k(a)(1)) and/or (ii) NAPCO directors "at the time of the filing of the part of the registration statement with respect to which his liability is asserted" (15 U.S.C. §77k(a)(2)).

supplement represents a 'fundamental change' to the information in the registration statement, then, even for directors, it is 'deemed part of and included in the registration statement on . . . the date such subsequent . . . prospectus is first used or the date . . . of the first contract of sale of securities in the offering . . . .'" *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 987 F. Supp. 2d 369, 375 (S.D.N.Y. 2013) (quoting 17 C.F.R. §230.430B(f)(1) and (f)(4)). "Thus, a prospectus supplement containing information representing a fundamental change in the information provided in the registration statement creates Section 11 liability for directors based on that new information." *Id.*

NAPCO's September 12, 2022 shelf registration statement provided only a bare-bones template for the issuance of future securities. It said, "[t]his prospectus provides you with a general description of the shares of common stock the selling stockholders may offer. . . . [W]e may provide a prospectus supplement that will contain specific information about the terms of a particular offering . . . ." Ex. 8 at 5. The later supplements did just that, including by incorporating NAPCO's admittedly false financials for 1Q23 and 2Q23. ¶156; Ex. 9 at 20. *See In re Am. Realty Cap. Properties, Inc. Litig.*, 2016 WL 11110435, at *1 (S.D.N.Y. Aug. 5, 2016) (applying fundamental change exception to uphold §11 claims against individual defendants where misstated financials were incorporated into offering materials via later-filed prospectus supplements).

## IV.  CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety. If the Court grants Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend.

DATED: June 24, 2024                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                                    SAMUEL H. RUDMAN
                                                    DAVID A. ROSENFELD
                                                    ERIN W. BOARDMAN
                                                    AVITAL O. MALINA

                                                    */s/ Erin W. Boardman*
                                                    ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
amalina@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com

JOHNSON FISTEL, LLP
RALPH M. STONE
620 Fifth Avenue, 2nd Floor
New York, NY  10020
Telephone: 212/292-5690
ralphs@johnsonfistel.com

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.,
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Counsel for City of Warren Police and Fire
Retirement System*