UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                      :

RANDY ZORNBERG, *individually and on behalf*    :
*of others similarly situated, et al.*,              :
                                      :
                         Plaintiffs,    :      **MEMORANDUM DECISION**
                                      :      **AND ORDER**
- against -                              :      23-cv-6465 (BMC)
                                        :

NAPCO SECURITY TECHNOLOGIES, INC., *et*    :
*al.*,                                           :
                                        :
                         Defendants.    :
------------------------------------------------------------- X

**COGAN**, District Judge.

        Plaintiffs brought this putative class action against NAPCO Security Technologies, Inc.

("NAPCO"), and related persons and entities, asserting claims under Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 and under Sections 11, 12(a)(2), and 15 of the Securities

Act of 1933. This action arises out of NAPCO's restatement of its financial results for the first

three quarters of fiscal year 2023. Plaintiffs allege that NAPCO, seven current directors

(together, the "individual defendants"), and two underwriters for a secondary public offering (the

"underwriter defendants") made materially false or misleading statements regarding NAPCO's

inventory levels, cost of goods sold, and profitability. The alleged misstatements appeared in

NAPCO's quarterly reports and offering materials of the secondary public offering. NACPO's

stock price dropped over 45% on the trading day after NAPCO announced the need to restate

financials and acknowledged inflated earnings. Defendants have moved to dismiss.

        Their motion is granted in part. Plaintiffs have adequately stated Exchange Act claims by

pleading scienter through defendants' unusual stock sales and by plausibly alleging loss

causation between the corrective announcement and stock price drop.  Plaintiffs have also stated Securities Act claims against NAPCO and the underwriter defendants.  However, plaintiffs have not established standing to bring Section 12(a)(2) claims against the individual defendants.  And plaintiffs cannot bring an action against the individual defendants under Section 11 of the Exchange Act because the shelf registration statement signed by the individual defendants took effect before the class period.

## BACKGROUND

NAPCO is a Delaware corporation that designs and manufactures electronic security devices and provides cellular communication services for alarm systems and school safety systems.  The company purchases components from outside sources, mainly U.S. and Asian suppliers, or fabricates these components itself, and then ships the components to its manufacturers in the Dominican Republic.  It sells products primarily to independent distributors, dealers, and installers of security equipment.

Impacted by the global supply chain shortage due to the COVID-19 pandemic, NAPCO disclosed an ongoing shortage of component parts and thus higher prices in its quarterly SEC filing at the end of 2021.  In face of the shortages, NAPCO purchased as many components as possible, regardless of price, to ensure it could continue to manufacture its products.  According to its Form 10-K in 2022, this strategy partially resulted in a significantly increased inventory value – from $31.7 million in June 2021 to $49.8 million in June 2022.  By late 2022, the supply shortage began to dissipate, and the price of component parts decreased.

On September 12, 2022, NAPCO filed an automatic shelf registration statement for a secondary public offering ("SPO"), pursuant to which the CEO, Richard Soloway, and the CFO,

Kevin Buchel (together, the "officer defendants"), could sell around 3.8 million shares of common stock.

On February 2023, NAPCO filed two prospectus supplements (together with the registration statement, the "offering materials") disclosing that the officer defendants were offering a combined 2.1 million shares for $31.50 per share. The offering closed on February 13, 2023.

During the class period, between November 7, 2022, and August 18, 2023, Soloway and Buchel each sold 48.5% and 45.5% of the shares they held. On the first day of the class period, NAPCO announced the quarterly report for the first quarter of fiscal 2023 ("1Q23"). Eight days after NAPCO announced the 1Q23 financial results, Soloway sold approximately 1.3 million shares at $24.79 per share, and Buchel sold 52,977 shares at the same price. Similarly, around one week after NAPCO announced financial results for the second quarter of fiscal 2023 ("2Q23"), Soloway sold a total of 2.3 million shares at $31.50 per share, and Buchel sold a total of 100,000 shares at the same price. The total proceeds from the stock sales were around $103 million for Soloway and $4.5 million for Buchel. Notably, the officer defendants did not sell any stock during the year before the class period, nor have they sold any stock since the class period ended.

On the final day of the class period, NAPCO announced that it would restate its financials for the first three quarters of fiscal 2023: the quarters ending September 30, 2022 ("1Q23"), December 31, 2022 ("2Q23"), and March 31, 2023 ("3Q23"). Specifically, NAPCO stated that, due to material weaknesses in its internal control over financial reporting, the quarterly reports for 1Q23, 2Q23, and 3Q23 overstated the inventories NAPCO possessed at the end of each affected quarter. The overstatement of inventory resulted in a concomitant understatement of the

equipment inventory NAPCO had sold – *i.e.*, cost of goods sold – and overstatement of NAPCO's net income and gross margin.  The two disclosed weaknesses in internal control were (1) "related to ineffective information technology general controls in the area of user access and lack of effective program change-management over certain information technology systems that support NAPCO's financial reporting process"; and (2) "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over forecasted sales and usage data."

According to the amended quarterly reports, NAPCO had overstated its net income by 107.59%, 114.97%, and 13.52% for 1Q23, 2Q23, and 3Q23, respectively.  In response to the press release, the price of NAPCO common stock fell more than 45%, from a closing price of $38.41 per share on August 18, 2023, to a closing price of $21.11 per share on Monday, August 21, 2023 (the next trading day), on more than 40 times the previous day's trading volume.

Plaintiffs subsequently filed the current action against NAPCO, the individual defendants, including Richard Soloway and Kevin Buchel, and the underwriter defendants.  The amended complaint asserts two sets of claims.  First, lead plaintiff Donald W. Hutchings brought securities fraud claims under Sections 10(b) and 20 of the Exchange Act against NAPCO and the officer defendants.  Second, plaintiff City of Warren Police and Fire Retirement System, representing those who purchased or acquired NAPCO's shares pursuant to or traceable to the offering materials of the SPO, brought non-fraud claims under Sections 11, 12(a)(2), and 15 of the Securities Act against all defendants.  Both sets of claims seek to hold defendants liable for misstatements and misleading omissions made throughout the class period.  Defendants have moved to dismiss the action.

## DISCUSSION

### I.    Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In addition to the allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Comms. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

### II.    Exchange Act Claims

Rule 10b-5 implements the prohibition on securities fraud in Section 10(b).  "To support a claim for material misrepresentation under Rule 10b-5, a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation."  Noto v. 22nd Century Grp., Inc., 35 F.4th 95, 102 (2d Cir. 2022).  The two requirements relevant here are the scienter requirement and the loss causation requirement.  "Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA) and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."  Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015).

A. *Scienter*

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights Ltd., 551 U.S. 308, 319 (2007). To meet the scienter pleading requirement in a 10b-5 action under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). There are two methods for plaintiffs to plead scienter: by alleging facts "showing either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). "Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference that 'someone whose intent could be imputed to the corporation acted with the requisite scienter.'" Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195-96 (2d Cir. 2008) (citation and internal quotation marks omitted)).

Because I conclude that plaintiffs have adequately pled motive and opportunity, I need not address the strong circumstantial evidence prong.

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunities would entail the means and likely prospect of achieving concrete benefits by the means alleged." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). To raise a strong inference of scienter based on "motive and opportunity," plaintiffs must allege that the company or its officers "benefitted in some concrete and personal way from the purported fraud," typically by alleging that corporate

insiders "made a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). As an initial matter, courts "assume that corporations, corporate officers and directors would have the opportunity to commit fraud if they so desired." See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006). Thus, the sole inquiry is whether the plaintiffs have adequately pled motive.

To establish motive, a plaintiff bears the burden of "establish[ing] that the sales were 'unusual' or 'suspicious'" – the "mere fact that insider stock sales occurred does not suffice." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009); see also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001). Courts look to seven factors when determining whether sales are unusual or suspicious:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750, 772-73 (S.D.N.Y. 2019). Each factor answers one of two questions: (1) whether the stock sales were made "at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information;" and (2) whether trading was otherwise "dramatically out of line with prior trading practices." City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd., 565 F. Supp. 3d 478, 487 (S.D.N.Y. 2021).

Taking the well-pleaded facts as true, there is no question that plaintiffs have adequately pled scienter. First, the stock sales were highly unusual in timing and amount. As to amount, the total proceeds of over $108 million from stock sales by the officer defendants weigh in favor of a motive. In re Oxford Health Plans, Inc., 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("The $78 million

profit from sales by the Individual Defendants during the Class Period is . . . massive by any measure.").  And the officer defendants sold hefty percentages of their holdings – 48.5% for Soloway and 45.5% for Buchel.  The Second Circuit has held that stock sales of more than 40% of holdings are sufficient to establish a motive.  See Stevelman v. Alias Research Inc., 174 F.3d 79, 85-86 (2d Cir. 1999).

As for timing, courts have found that timing is an indicia of fraud when sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations.  See, e.g., In re Axis Cap. Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006).  Here, the November 2022 and February 2023 sales occurred within days of NAPCO's positive earnings announcements.  See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc., 17-cv-5753, 2019 WL 2360942, at *5 (S.D.N.Y. March 4, 2019) (timing was unusual when the sales were within days of the company's positive earnings announcement).

Second, the stock sales were highly out of line with the officer defendants' trading practices.  They sold no stock during the year before the class period or since the class period. Of course, this might have been a coincidence, but one could make the at least equally compelling inference that the officers sold their shares to capitalize on the overinflated financial reports.  See In re Gildan Activewear, 636 F. Supp. 2d at 270.

Defendants respond with a bevy of counterarguments, but none persuade.  They first argue that the timing was not unusual because the stock sales occurred nine and six months before the corrective disclosure.  In support, they cite to In re Henry Schein, Inc. Securities Litigation, No. 18-cv-01428, 2019 WL 8638851, at *20 (E.D.N.Y. Sept. 27, 2019), in which the court found that the nine and six-month gaps between stock sales and corrective disclosure

supported an inference of scienter when the individual defendants sold twenty percent and five percent of holdings, respectively.  Here, however, defendants were wrong because together with the percentages of holdings sold by the officer defendants, which were double or even multiple times higher than the twenty percent and five percent in In Re Henry Schein, the time gaps between stock sales and the corrective disclosure could hardly weigh against the finding of motive.

Defendants also rely on Reilly v. U.S. Physical Therapy, Inc., No. 17-cv-2347, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018), in which the court found that the stock sales timing was not suspicious when "none of the defendants sold any stock in the final 100 days of the class period.".  However, in Reilly, the stock sales were not close enough to the SEC letter that allegedly could have enabled the defendants to anticipate incorrect financial treatments because those frequent stock sales spread over two years after the SEC letter.  Here, the stock sales were concentrated within several days after NAPCO announced the overstated quarterly financial results.

Defendants next point to the fact that the officer defendants' shares were sold pursuant to a pre-planned shelf registration of the SPO.  "The court found that the desire to inflate the stock price to maximize revenue from a secondary offering was, among other allegations, sufficient to allege motive at the pleading stage."  In re Axis, 456 F. Supp. 2d at 594 (citing In re Twinlab Corp. Sec. Litig., 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000)).  Moreover, "trades made pursuant to a Rule 10b5-l trading plan do not give rise to a strong inference of scienter" because the plan fixes the defendant's quantities of stock sales on pre-scheduled dates.  See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015).

A shelf registration is importantly different from a Rule 10b5-1 trading plan. These offerings are more discretionary because securities can be registered to be offered or sold on a delayed or continuous basis. See 17 C.F.R. § 230.415(a). "The purpose of shelf registration is to afford the issuer the 'procedural flexibility' to vary 'the structure and terms of securities on short notice' and 'time its offering to avail itself of the most advantageous market conditions.'" Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc., 987 F. Supp. 2d 369, 373 (S.D.N.Y. 2013) (citing Shelf Registration, SEC Release No. 6499, 1983 WL 408321, at *4 (Nov. 17, 1983)). However, a shelf registration statement can cut against a finding of an intent to deceive the investing public if courts treat it purely as a public disclosure for selling securities. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (sales of stock by a retired outside director did not give rise to a strong inference of an intent to deceive the public because the outside director notified the public of his plan to exercise stock options in November, and exercised options and sold stocks in the following two months).

Defendants argue that the shelf registration statement for SPO filed before the class period cut against an inference of scienter because it is a pre-determined trading plan and has been publicly disclosed. See Acito, 47 F.3d at 54. Defendants are wrong for several reasons. First, the SPO itself indicates a desire to inflate the stock price. See In re Axis, 456 F. Supp. 2d at 594. Second, unlike a pre-scheduled Rule 10b5-l trading plan, the shelf registration statement is discretionary and gives defendants flexibility in the amount, price, and timing of stock sales. Third, unlike the retired outside director in Acito, Soloway and Buchel are the CEO and CFO of NAPCO, and they have more access to the financial information of NAPCO than an outside director. See Acito, 47 F.3d at 54. Thus, a public disclosure of stock selling that is not a Rule

10b5-1 trading plan, without more details, cannot weigh against the idea that the stock sales were unusual.

Finally, defendants argue that there was no motive and opportunity because they were about to retire. This argument fails. Of course, an upcoming retirement can sometimes explain unusual stock sales and therefore cut against a finding of scienter. See In re Lululemon, 14 F. Supp. 3d at 586. But the defendant in In re LuluLemon had announced her retirement. Here, by contrast, the amended complaint does not allege and nothing in the public record suggests that the officer defendants were retiring. That Soloway was 76 years old and Buchel was 69 years old in 2024, without any evidence that Soloway and Buchel had publicly announced or privately planned resignation, cannot indicate that the stock sales were in preparation for their retirement and weigh against a strong inference of scienter.

Taking their allegations together, plaintiffs have sufficiently pled that the officer defendants had motive and opportunity to commit fraud and therefore a strong inference of scienter. And, because the liability of officer defendants can be imputed to NAPCO, see Loreley Fin. (Jersey) No. 3 Ltd., 797 F.3d at 177, plaintiffs have adequately pled scienter.

### B. Loss Causation

Assured of plaintiffs' scienter allegations, I move to the next contested element of the Section 10(b) claim: loss causation. Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005). "[T]o establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173.

Loss causation "may be achieved by alleging that the market reacted negatively to a 'corrective disclosure', which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007). To meet this standard, the corrective disclosure need not be a "'mirror image' tantamount to a confession of fraud." In re Tenaris S.A. Sec. Litig., 493 F. Supp. 3d 143, 164 (E.D.N.Y. 2020); see also Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 229-30 (5th Cir. 2009) ("a corrective disclosure does not need to contain 'fact-for-fact' disclosure that fully corrected earlier misstatements").

Defendants contend that plaintiffs have failed to plead the requisite corrective disclosure because the August 2023 press release, which plaintiffs contend was the corrective disclosure, stated that the previously issued interim financial statements need to be restated and did not specify the actual error in the alleged misstatement. I disagree. "A corrective disclosure need not be a full recount of the alleged fraud. It only needs to reveal the 'alleged misstatement falsity.'" In re Insys Therapeutics, Inc. Sec. Litig., 17-cv-1954, 2018 WL 2943746, at *7 (S.D.N.Y. June 12, 2018); accord, In re Lululemon, 14 F. Supp. 3d at 575.

The "alleged misstatement's falsity" was sufficiently revealed in the August 2023 press release. The press release stated that the 1Q23, 2Q23, and 3Q23 quarterly reports "should no longer be relied upon" because "management of the Company identified certain errors related to the Company's calculation of the cost of goods sold and inventory for each of the first three quarters of fiscal 2023." "As a result, inventories were overstated and cost of goods sold was understated, resulting in overstated gross profit, operating income and net income for each period." The press release clearly revealed the falsity of the financial statements by suggesting the overstatement of gross profit. Upon the announcement, the stock price dropped 45%, from

12

$38.41 per share on August 18, 2023, to $21.11 per share on August 21, 2023, the next trading day.  This is sufficient to establish the loss causation.  Thus, plaintiffs have alleged sufficient facts to plausibly state a claim under Section 10(b) of the Exchange Act against defendants.

### III.    Securities Act Claims

#### A.  PSLRA Class Action Notice Requirement

As a preliminary matter, I address defendants' contention that plaintiffs failed to comply with the PSLRA's class action notice requirements.  For a claim to be asserted on behalf of a putative class under the PSLRA, at least one of the named plaintiffs must have standing to sue on each cause of action.  In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 122 (S.D.N.Y. 2002).  That is, the lead plaintiff need not have standing to sue on every cause of action in the complaint; additional named plaintiffs can be added to the action to bring additional claims.  Hevesi v. Citigroup Inc., 366 F.3d 70, 83 (2d Cir. 2004); In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 380-81 (S.D.N.Y. 2000) ("The Court believes on reflection that it probably has the power to designate a Class Representative under Rule 23 who is not a Lead Plaintiff, simply because there is nothing in the statute which prevents it.").

The PSLRA also states that "not later than 20 days after the date on which the complaint is filed, the plaintiff . . . shall cause to be published . . . a notice advising the members of the purported plaintiff class."  15 U.S.C. § 78u-4(a)(3)(A)(i).  "The statute does not mandate, nor does it suggest, that a court-approved lead plaintiff must re-publish a notice of the purported class after an amended complaint is filed."  Greenberg v. Bear Stearns & Co., 80 F. Supp. 2d 65, 69 (E.D.N.Y. 2000).  Also, addition of new defendants does not require republication under the PSLRA.  Id. (holding that new notice unnecessary when new defendant was added).  Further, no second notice is required when new claims are sufficiently related to the earlier claims.  In re

<u>Thornburg Mortg., Inc. Sec. Litig.</u>, 629 F. Supp. 2d 1233, 1240 (D. N.M. 2009).  However, a court may require the publication of a new notice when the amended complaint adds new claims if the possibility exists that potential lead plaintiffs would have disregarded the first notice. <u>Kaplan v. S.A.C. Cap. Advisors, L.P.</u>, 947 F. Supp. 2d 366, 367 (S.D.N.Y. 2013).

Here, defendants allege that the additional plaintiff, The City of Warren Police and Fire Retirement System, failed to comply with the PSLRA because it did not publish a new notice for the new Securities Act claims in the amended complaint.  But the City of Warren Police and Fire Retirement System is a named plaintiff which represents those who purchased NAPCO common stock pursuant to or traceable to the offering materials of the SPO and were damaged thereby. Despite lead plaintiff having no standing for the Securities Act claims because it did not purchase NAPCO's common stock under the SPO, the additional plaintiff can bring the claims as long as it can establish standing for those Securities Act claims.

Given that the additional plaintiff can bring new claims in the amended complaint, no second notice was required under PSLRA for the amended complaint.  In addition to the original complaint, the amended complaint adds claims under the Securities Act of 1933 and adds individual defendants who are not officer defendants and underwriter defendants.  However, the amended complaint did not add additional new plaintiffs because the alleged new putative class of plaintiffs, share purchasers of the SPO, was part of the original class.  Moreover, the new claims are sufficiently related to the earlier Exchange Act claims because the new claims share the same underlying inventory misstatement facts.  Because all plaintiffs of the newly added Securities Act claims have been notified of this action by the first notice as part of the original class, no potential lead plaintiffs of the new claims would have disregarded the first notice.

### B. Section 12(a)(2) Claim

I can now assess whether plaintiffs have stated a plausible Section 12 claim. Section 12(a)(2) of the Securities Act affords relief to any person (1) who was offered or purchased a security "by means of a prospectus or oral communication," or in other words, was a "qualified purchaser"; (2) from a statutory seller; (3) when the prospectus or oral communication "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading"; and (4) the plaintiff did not "know of such untruth or omission" at the time of sale. 15 U.S.C. § 77l(a)(2); see In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010). Scienter, reliance, and loss causation are not *prima facie* elements of a Section 12(a)(2) claim. See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 98 (2d Cir. 2017). Relevant here are the qualified purchaser and statutory seller elements.

### 1. The additional plaintiff is a qualified purchaser

To have standing to bring an action against the seller of a security, a plaintiff must have purchased securities directly from the defendants. 15 U.S.C. § 77l(a); see Freidus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013). "Courts have been appropriately wary of allegations that a plaintiff purchased a security 'pursuant or traceable to' an offering, as compared to simply 'pursuant to an offering,' because it is ambiguous whether the plaintiff is alleging they were a direct or indirect purchaser." In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 745 (S.D.N.Y. 2015); see, e.g., Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 391 (S.D.N.Y. 2010) (finding standing where plaintiff purchased security "pursuant to an offering" and suggesting in *dicta* that plaintiff "likely would not have standing had they alleged only that they purchased the Certificates 'pursuant or traceable to' the

15

offering"); In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 589 (S.D.N.Y. 2005) (dismissing Section 12(a)(2) claim where plaintiff purchased security "pursuant or traceable" to the offering);

Here, defendants argue that the additional plaintiff has no standing for a Section 12(a)(2) claim because the additional plaintiff alleged that it purchased stock "pursuant and traceable to" the registration statement of the offering. Defendants are wrong because, for the Section 12(a)(2) claim, the additional plaintiff only alleges that it purchased stocks "pursuant to" the registration statement. It alleges that it purchased shares "pursuant and/or traceable to" only when the amended complaint groups Section 11 and Section 12(a)(2) claims together. The "pursuant or traceable to" allegation is sufficient to establish standing for Section 11 claims. See In re WRT Energy Sec. Litig., 75 F. App'x 839, 840 (2d Cir. 2003). Thus, the additional plaintiff is a qualified purchaser.

### 2. NAPCO and the underwriter defendants are statutory sellers

An entity is a statutory seller if it "(1) 'passed title, or other interest in the security, to the buyer for value,' (passed-title prong) or (2) 'successfully solicited the purchase of a security, motivated at least in part by a desire to serve [its] own financial interests or those of the securities' owner (purchase-solicitation prong).'" Morgan Stanley, 592 F.3d at 359 (citing Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988)). SEC Rule 159A provides that an issuer is a statutory seller for the purposes of Section 12(a)(2) regardless of the form of underwriting. See 17 C.F.R. § 230.159A; Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010).

Under the passed-title prong, underwriters are statutory sellers in a "firm commitment" underwriting. In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000). In a firm commitment underwriting, the underwriters agree that they will purchase the shares being offered for the purpose of resale to the public. Because, then, the

underwriters are directly selling to public investors, the underwriters are statutory sellers under the passed-title prong of the Pinter test. See id.; Akerman v. Oryx, 810 F.2d 336, 343 (2d Cir. 1987).

Courts in this circuit have looked to several factors when determining whether a complaint has sufficiently alleged solicitation to withstand a motion to dismiss. Relevant here, first, "[t]he signing of a registration statement is significant for purposes of finding that a [person] is a seller, even in the context of a firm commitment underwriting." In re Opus360 Corp. Sec. Litig., 01-cv-2938, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002). Second, courts will consider whether the complaint alleges that a person participated in the preparation of the registration statement. See id. The term "seller" in the Securities Act "applies not only to seller who is in privity with investor-plaintiff, but also with other persons, not in privity, who solicited sales in question for financial gain." In re Scot. Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 399 (S.D.N.Y. 2007).

Here, NAPCO and the underwriter defendants are statutory sellers. First, NAPCO is a statutory seller as an issuer because a firm commitment underwriting wouldn't impact NAPCO's seller status as required by SEC Rule 159A. See 17 C.F.R. § 230.159A. Second, the underwriter defendants are statutory sellers because they underwrote the SPO in a firm commitment underwriting. See In re Am. Bank Note Holographics, Inc., 93 F. Supp. 2d at 438.

By contrast, the individual defendants are not statutory sellers. The individual defendants fail to meet the passed-title prong because the SPO was sold through a firm commitment underwriting, in which the title passed to the underwriters before passing to the ultimate purchasers. Further, the additional plaintiffs failed to allege that the individual defendants solicited sales because purely the allegation that "the individual defendants signed the

17

prospectus", without more allegations regarding the individual defendants' participation in preparing for those the prospectus supplements, is insufficient for the purchase-solicitation prong.  See Citiline Holdings, 701 F. Supp. 2d at 512.  Thus, the additional plaintiff has not alleged that the individual defendants were sellers under either prong of Pinter.  See Morgan Stanley, 592 F.3d at 359.

Therefore, I conclude that the additional plaintiff has properly pled and established standing to bring claims pursuant to Section 12(a)(2) against NAPCO and the underwriter defendants, but not the individual defendants.  The Court will accordingly deny defendants' motion for NAPCO and the underwriter defendants, and grant the motion for the individual defendants on this ground.

*C.  Individual Defendants Are Not Liable under Section 11*

The final issue I must address is whether the individual defendants are liable under Section 11 of the Securities Act.  To determine this issue, I must decide when the registration statement became effective for the individual defendants.  To decide the effective date of the registration statement, I must decide whether the prospectus supplements changed the effective date of the registration statement for the individual defendants.  I conclude that the prospectus supplements did not change the effective date of the registration statement for the individual defendants, which is before the class period.  Thus, the individual defendants are not liable for untrue statements in the prospectus supplement filed after the effective date.

Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make

18

the statements therein not misleading."  15 U.S.C. § 77k(a); see also Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011).

When the shelf-registration process is employed, securities will generally be bona fide offered to the public on the date the SEC declares the registration statement effective, rather than when a prospectus supplement is filed.  See P. Stolz Family P'ship v. Daum, 355 F.3d 92, 104 (2d Cir. 2004) (the Securities Act's three-year repose period "is triggered by the effective date of the registration statement"); Gaynor v. Miller, 273 F. Supp. 3d 848, 863 (E.D. Tenn. 2017).  Specifically, "the offering date for a shelf registration is (i) the date of the prospectus supplement for issuers and underwriters, and (ii) the date of the registration statement for directors and signing officers."  Gaynor, 273 F. Supp. 3d at 864; see also 17 C.F.R. § 230.430B(f)(2); Footbridge Ltd. Tr. v. Countrywide Finan. Corp., 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011) ("For issuers and underwriters, but not as to directors and officers, Rule 430B of the Securities Offering Reform changed the bona fide offering date for shelf offerings issued pursuant to registration statements filed on or after December 1, 2005 to the date of the prospectus supplement.").

There is, however, an exception potentially germane here: the fundamental change exception.  Under this exception, new prospectus supplements will stand as new effective dates with regard to directors and signing officers when they are "incorporated by reference for purposes of including information required by section 10(a)(3) of the Act or pursuant to Item 512(a)(1)(ii) of Regulation S-K."  17 C.F.R. § 230.430B(f)(4)(ii).  If a prospectus supplement encompasses a "fundamental change in the information set forth in the registration statement," then the prospectus supplement is deemed to be the initial bona fide offering of those shares as to

the directors and signatory officers as well.  17 C.F.R. § 229.512(a)(1)(ii); see Gaynor, 273 F.

Supp. 3d at 864.

"When evaluating whether a prospectus supplement represents a fundamental change on

a motion to dismiss, courts must determine 'whether it is plausible to infer' that the amendments

were made in response to a fundamental change."  Gaynor, 273 F. Supp. 3d at 864.  The SEC has

noted that "[w]hile many variations in matters such as operating results, properties, business,

product development, backlog, management and litigation ordinarily would not be fundamental,

major changes in the issuer's operations, such as significant acquisitions or dispositions, would

require the filing of a post-effective amendment."  Id.; see Delayed or Continuous Offering and

Sale of Securities, 46 Fed. Reg. 42001, 1981 WL 119423, at *42007-08 (Aug. 18, 1981).

"[M]ateriality is not the test.  The test is fundamental change; and the latter is more demanding

than the former.  In other words, a change may be material without being fundamental."  In re

Metro. Sec. Litig., cv-04-25-FVS, 2010 WL 537740, at *2 (E.D. Wash. Feb. 8, 2010).

In Gaynor, the court held that prospectus supplements did not fundamentally change a

registration statement when the prospectus supplement contained new misrepresentations that

merely repeated the alleged false valuations of the defendant company's assets.  See Gaynor, 273

F. Supp. 3d at 864.  In HSBC, by contrast, the court held that prospectus supplements constituted

fundamental changes because they contained "virtually all of the detail about the underlying

collateral and the ability of borrowers to repay the loans that would have been material to

investors."  HSBC, 987 F. Supp. 2d at 376.

Here, the individual defendants allege that they are not liable under Section 11 of the

Securities Act because the prospectus supplements do not change the effective date for directors

under Rule 430B(f)(4).  The additional plaintiff contends that the prospectus supplements

establish a new effective date because the prospectus supplement fall under the "fundamental change exception" by incorporating NAPCO's admittedly false financials for 1Q23 and 2Q23.

The additional plaintiff does not explain in what manner the prospectus supplements fundamentally modified the registration statement. The registration statement's language cited by the additional plaintiff merely defines a shelf registration – the price and amount of shares to be sold. The additional plaintiff's contention that the prospectus supplements incorporate "NAPCO's admitted false financials for 1Q23 and 2Q23" does not plausibly imply that the prospectus supplements contained fundamental changes to the registration statement. The additional plaintiff fails to explain how the allegedly incorrect inventory treatments amount to "fundamental changes." Rather, incorporation of the same incorrect inventory treatment into later-filed financial documents does not reflect a fundamental change. Further, financial performances, like operating results, cannot represent fundamental changes. See Gaynor, 273 F. Supp. 3d at 864.

Accordingly, the fundamental change exception to the individual defendants' inclusion in 17 C.F.R. §230.430B(f) does not apply. The Court finds that the effective date of the registration statement, as to the individual defendants, is the initial shelf registration date, September 12, 2022. Consequently, the individual defendants signed the shelf registration statement effective before the class period. The Court, therefore, will grant the individual defendants' motion to dismiss the Section 11 claim against them on this ground.

## CONCLUSION

For these reasons, defendants' motions to dismiss are GRANTED as to individual defendants' liability under Section 12(a)(2) and Section 11 of the Securities Act but are otherwise DENIED.

**SO ORDERED.**

*Brian M. Cogan*

_____
U.S.D.J.

Dated: Brooklyn, New York
       April 11, 2025