# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

──────────────────────────────────── x

RANDY ZORNBERG, Individually and on       :   Civil Action No. 1:23-cv-06465-BMC
Behalf of All Others Similarly Situated,   :
                                           :   CLASS ACTION
                      Plaintiff,           :
                                           :   [PROPOSED] SECOND AMENDED
         vs.                               :   COMPLAINT FOR VIOLATIONS OF
                                           :   THE
NAPCO SECURITY TECHNOLOGIES, INC.,         :   FEDERAL SECURITIES LAWS
RICHARD L. SOLOWAY, KEVIN S.               :
BUCHEL, PAUL STEPHEN BEEBER, RICK          :
LAZIO, DONNA SOLOWAY, ROBERT               :
UNGAR, ANDREW J. WILDER, NEEDHAM           :
& COMPANY, LLC, and WILLIAM BLAIR          :
& COMPANY, L.L.C.,SOLOWAY and              :
KEVIN S. BUCHEL,                           :
                                           :
                      Defendants.          :   DEMAND FOR JURY TRIAL
──────────────────────────────────── x

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 22 |
| | A. Introduction to All Claims | 2 |
| | B. Introduction to the Exchange Act Claims | 2 |
| | C. Introduction to the Securities Act Claims | 6 |
| II. | JURISDICTION AND VENUE | 7 |
| III. | PARTIES | 7 |
| IV. | CLASS ACTION ALLEGATIONS | 9 |
| V. | THE COMPANY AND ITS BUSINESS | 11 |
| VI. V. | SUBSTANTIVE ALLEGATIONS UNDER THE EXCHANGE ACT | 12 |
| | A. The Exchange Act Defendants' Fraudulent Scheme to Manage NAPCO's Income-Related Metrics by Manipulating Restatement of Its 1Q23, 2Q23, and 3Q23 Financials | 12 |
| | B. Defendants Knew or Recklessly Disregarded that NAPCO's Reported Inventory and Cost of Goods Sold 12 was Materially Overstated During Fiscal 2023 | 16 |
| | 1. Defendants' Pandemic-Related Purchasing Strategy Inflated NAPCO's Inventory Value | 16 |
| | B2. ███████████████████████ | 17 |
| | 3. ███████████████████████ | 20 |
| | C. Soloway and Buchel's Suspicious Stock Sales | 23 |
| | D. The Restatement Is an Admission that NAPCO's Interim Financial Statements for Fiscal 2023 Violated GAAP and Were Materially Inaccurate | 26 |
| | CE. NAPCO's Fraudulent Financial Reporting of Inventory, Cost of Goods Sold, and Income-Related Metrics | 30 |

- i -

**Page**

DF.    Materially False and Misleading Statements Made During the Class Period........32

1.    1Q23 Financial Results.................................................................................32

2.    2Q23 Financial Results.................................................................................35

3.    3Q23 Financial Results.................................................................................41

EG.    NAPCO Announces the Restatement ................................................................46

FH.    Post-Class Period Events .................................................................................47

GVI.    ADDITIONAL SCIENTER ALLEGATIONS.................................................49

HVII.    LOSS CAUSATION AND ECONOMIC LOSS.............................................55

I.    VIII.................................................................................NO SAFE HARBOR    56

J.    IX................................................................A PRESUMPTION OF RELIANCE APPLIES    57

K.    Exchange Act Counts.................................................................................58

X.    CLASS ACTION ALLEGATIONS .......................................................................58

XI.    COUNTS.............................................................................................................60

COUNT I .................................................................................................................60

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against the Exchange ActAll Defendants ............................................................60

COUNT II ................................................................................................................62

For Violations of Section 20(a) of the Exchange Act
Against the Officer Defendants ............................................................................62

VII.    ALLEGATIONS UNDER THE SECURITIES ACT .......................................63

A.    The Offering.................................................................................................44

B.    The Offering Materials Contained Inaccurate Statements of Material Fact
and Omitted Material Information Required to Be Disclosed Therein..................65

1.    NAPCO's Materially Inaccurate Financial Reporting...............................46

**Page**

2.    The Materially Inaccurate 1Q23 Form 10-Q Was Incorporated in the Offering Materials................................................................68

3.    The Materially Inaccurate 2Q23 Form 10-Q Was Incorporated in the Offering Materials................................................................69

C.    Securities Act Counts.................................................................................72

COUNT III.........................................................................................................................72

        For Violations of Section 11 of the Securities Act
        Against All Defendants.............................................................................72

COUNT IV.........................................................................................................................55

        For Violations of Section 12(a)(2) of the Securities Act
        Against All Defendants.............................................................................55

COUNT V...........................................................................................................................76

        For Violations of Section 15 of the Securities Act
        Against the Individual Defendants...............................................................62

XII.    VIII.....................................................................PRAYER FOR RELIEF    77

XIII.    IX.....................................................................JURY DEMAND    7878

~~Lead plaintiff~~Class Representatives Donald W. Hutchings, individually and as trustee of several trusts[1] ~~("Lead Plaintiff") and additional plaintiff~~[2] and City of Warren Police and Fire Retirement System ("~~Plaintiff" and, together with Lead Plaintiff,~~ "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters based upon the investigation undertaken by counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Napco Security Technologies, Inc. ("NAPCO" or the "Company"), press releases, analyst and media reports, and other public reports and information about the Company, and ~~interviews with former employees of NAPCO.~~documents produced by Defendants (defined below) and third parties during fact discovery to date. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after ~~a reasonable opportunity for~~further fact discovery and expert discovery.

---

[1] ~~The trusts are: the Brady Adams Hutchings Irrevocable Trust U/A DTD 12/18/2012; the Caroline Hutchings Morin Irrevocable Trust U/A DTD 12/30/2014; the Donald W Hutchings Living Trust U/A DTD 09/19/1994; the Donald W Hutchings Principal Residence Trust U/A DTD 09/19/1994; the Hutchings Community Property Trust U/A DTD 05/20/2015; the Jay Whitney Hutchings Irrevocable Trust, Grantors Donald W. Hutchings and Pamela Paul Hutchings, dated December 18, 2012; the Julie Renee Hutchings Irrevocable Trust U/A DTD 12/18/12; the Kyle Hutchings Morin Irrevocable Trust U/A DTD 12/30/2014; the Pamela Paul Hutchings Living Trust U/A DTD 09/19/1994; and the Pamela Paul Hutchings Principal Residence Trust U/A DTD 09/19/1994.~~

[2] The trusts are: the Brady Adams Hutchings Irrevocable Trust U/A DTD 12/18/2012; the Caroline Hutchings Morin Irrevocable Trust U/A DTD 12/30/2014; the Donald W Hutchings Living Trust U/A DTD 09/19/1994; the Donald W Hutchings Principal Residence Trust U/A DTD 09/19/1994; the Hutchings Community Property Trust U/A DTD 05/20/2015; the Jay Whitney Hutchings Irrevocable Trust, Grantors Donald W. Hutchings and Pamela Paul Hutchings, dated December 18, 2012; the Julie Renee Hutchings Irrevocable Trust U/A DTD 12/18/12; the Kyle Hutchings Morin Irrevocable Trust U/A DTD 12/30/2014; the Pamela Paul Hutchings Living Trust U/A DTD 09/19/1994; and the Pamela Paul Hutchings Principal Residence Trust U/A DTD 09/19/1994.

## I.    INTRODUCTION

### A.    ~~Introduction to All Claims~~

~~1.~~    This is a federal securities class action ~~alleging two distinct sets~~on behalf of ~~claims.~~

~~2.~~1.    ~~The first set of claims alleged are fraud~~those who purchased or otherwise acquired NAPCO common stock between November 7, 2022 and August 18, 2023, inclusive (the "Class Period") and were damaged thereby, seeking to pursue claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder~~, on behalf of those who purchased or otherwise acquired NAPCO common stock between November 7, 2022 and August 18, 2023, inclusive (the "Class Period") and were damaged thereby~~.

~~3.    The second set of claims alleged are non-fraud claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of those who purchased or otherwise acquired NAPCO common stock pursuant or traceable to the registration statement and prospectuses issued in connection with the offering of NAPCO common stock on or about February 13, 2023 (the "Offering") and were damaged thereby.~~

~~4.~~2.    Headquartered in Amityville, New York, defendant NAPCO designs and manufactures security solutions, including access control devices, intrusion and fire alarm systems, and video surveillance products.  Its fiscal year ends on June 30.

### B.    ~~Introduction to the Exchange Act Claims~~

~~5.~~3.    On August 18, 2023, NAPCO announced that it would need to restate its interim financial statements for the first three quarters of fiscal 2023, ended September 30, 2022 ("1Q23"), December 31, 2022 ("2Q23"), and March 31, 2023 ("3Q23"), and that its previously-issued ~~financial results~~financials for those quarters "should no longer be relied upon~~.~~"" (the "Restatement").  The Company explained that, for those quarters, its inventories had been overstated and its cost of goods sold ("COGS") had been understated, "resulting in **overstated gross profit, operating income and**

- 2 -

*net income*," and gave preliminary estimates of its overstatement of net income.  NAPCO also admitted that a previously-undisclosed material weakness existed in its internal controls over financial reporting.

~~6.~~4.    Shortly thereafter, on September 1, 2023, the Company filed amended quarterly reports, which confirmed the severity of its financial misstatements.  The ~~restatement~~Restatement showed that during the Class Period, NAPCO's net income had been overstated by as much as *114.97%*, its income per share had been overstated by as much as *112.5%*, its operating income had been overstated by as much as *118.02%*, and its gross profit and gross margins had been overstated by as much as *35.59%*.

~~7.~~5.    When NAPCO revealed that it would need to restate its financial results and provided preliminary estimates for restated net income at the end of the Class Period, the price of its common stock fell more than *45%*.

~~8.~~6.    Although NAPCO attempted to characterize the ~~restatement~~Restatement as stemming from innocent accounting "errors," in fact, it was the product of a fraudulent scheme to inflate NAPCO's income-related metrics, orchestrated by ~~the Exchange Act~~ Defendants.[3]



---

[3]    ~~The "Exchange Act Defendants" are NAPCO, its founder and Chief Executive Officer ("CEO") Richard L. Soloway ("Soloway"), and its Chief Financial Officer ("CFO") Kevin S. Buchel ("Buchel").~~

████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

████ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

7.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ NAPCO's inventory had risen sharply as a result of Defendants' decision to purchase components used in NAPCO's products at high costs in the wake of COVID-related supply chain shortages.

8.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



~~12.~~11. By maintaining inflated inventory values for three consecutive quarters, defendants Soloway and Buchel caused NAPCO to report inflated income metrics—which enabled them to cash out their stock holdings as the Company's share price reached all-time highs. Defendants Soloway and Buchel each sold nearly half of their NAPCO stock during the Class Period, with Soloway selling *48.5%* of his shares for proceeds of approximately *$104 million*, and Buchel selling *45.5%* of his shares for proceeds of approximately *$4.5 million.*—at a time when NAPCO's inflated income metrics enabled the Company to meet (and exceed) market expectations, when it otherwise would not have.

~~C.      Introduction to the Securities Act Claims~~

~~13.      Separately, with respect to the Securities Act claims, Plaintiff City of Warren Police and Fire Retirement System expressly disclaims the allegations set forth in ¶2 and ¶¶4-12 above, and in §VI below. For these claims, Plaintiff pleads in the alternative that Defendants (defined below) violated the Securities Act by incorporating by reference NAPCO's materially false and misleading financial statements for the first two quarters of fiscal 2023 in the registration statement and prospectuses for the Offering.~~

12. Defendants Soloway and Buchel's first round of sales occurred shortly after Defendants announced inflated results for 1Q23, and the next round of sales occurred in a precisely-timed secondary offering, shortly after Defendants announced inflated results for 2Q23. ████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████        ████████████

████████████████████████████████████

████████████████████████████████████

- 6 -

## II.    JURISDICTION AND VENUE

~~14.~~13.   The claims asserted herein arise under~~: (i)~~ Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5~~); and (ii) Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o~~).

~~15.~~14.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331~~,~~ and Section 27 of the Exchange Act (15 U.S.C. §78aa~~), and Section 22 of the Securities Act (15 U.S.C. §77v~~).

~~16.~~15.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b~~),~~) and Section 27 of the Exchange Act~~, and Section 22 of the Securities Act~~.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

~~17.~~16.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## III.    PARTIES

~~18.~~17.   As set forth in his certification previously filed with the Court and incorporated herein by reference, Lead Plaintiff Donald W. Hutchings purchased NAPCO common stock during the Class Period, and was damaged thereby.  *See* ECF 22-2.

~~19.~~18.   As set forth in its certification previously filed with the Court and incorporated herein by reference, Plaintiff City of Warren Police and Fire Retirement System~~, as set forth in the attached~~

~~certification,~~ purchased NAPCO common stock during the Class Period, and ~~pursuant and traceable to the Offering, and~~ was damaged thereby.  *See* ECF 40 at 65-66.

~~20.~~19.  Defendant NAPCO provides security devices and systems.  The Company's principal executive offices are located at 333 Bayview Avenue, Amityville, New York 11701.  NAPCO's common stock is listed and trades on the NASDAQ, an efficient market, under the symbol "NSSC."

~~21.~~20.  Defendant Soloway—NAPCO's founder—is, and was at all relevant times, the Company's CEO, President, Secretary, and Chairman of the Board of Directors.  ~~Defendant Soloway was also a selling stockholder in the Offering and signed the Offering Materials (defined below).~~

~~22.~~21.  Defendant Buchel is, and was at all relevant times, NAPCO's CFO, Executive Vice President of Operations, Treasurer, and a Director.  ~~Defendant Buchel was also a selling stockholder in the Offering and signed the Offering Materials.~~

~~23.~~22.  Defendants Soloway and Buchel are collectively referred to as the "~~Officer~~Individual Defendants" and, together with NAPCO, as ~~the "Exchange Act~~ "Defendants."

~~24.      Defendants Paul Stephen Beeber, Rick Lazio, Donna Soloway, Robert Ungar, and Andrew J. Wilder each served as a director of the Company at the time of the Offering and signed the Offering Materials.  They are collectively referred to as the "Director Defendants" (and, together with the Officer Defendants (i.e., Soloway and Buchel), as the "Individual Defendants").~~

~~25.      Defendants Needham & Company, LLC ("Needham") and William Blair & Company, L.L.C. ("William Blair") served as joint bookrunners of the Offering and representatives of the underwriters.  They each received commissions and other professional fees in connection with the Offering.  Needham and William Blair are collectively referred to as the "Underwriter Defendants."~~

26. The Underwriter Defendants received and offered the following number of shares for sale:

| Underwriter | Number of Shares |
|---|---|
| Needham & Company, LLC | 1,050,000 |
| William Blair & Company, L.L.C. | 1,050,000 |
| Total | 2,100,000 |

27. The Underwriter Defendants also received an option — which they exercised in full — to purchase on a *pro rata* basis up to 300,000 additional shares at the Offering price, less the underwriting discounts and commissions.

28. The Underwriter Defendants participated in drafting and disseminating the Offering Materials, soliciting investors for the Offering, and marketing and pricing the Offering. The Underwriter Defendants failed to conduct adequate due diligence in connection with the Offering, and were negligent in failing to ensure that the Offering Materials were prepared accurately and in accordance with the rules and regulations governing their preparation. The Underwriter Defendants' negligence was a substantial factor leading to the harm complained of herein.

29. NAPCO, the Individual Defendants, and the Underwriter Defendants are collectively referred to as "Defendants."

IV. CLASS ACTION ALLEGATIONS

30. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired NAPCO common stock: (i) during the Class Period, seeking to pursue remedies under the Exchange Act; and (ii) pursuant or traceable to the Offering Materials, including purchasers who

were successfully solicited by any defendant, seeking to pursue remedies under the Securities Act (collectively, the "Class") and were damaged thereby. Excluded from the Class are: (i) Defendants and members of their immediate families; (ii) the officers and directors of the Company, at all relevant times, and members of their immediate families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv) any entity in which any Defendant has or had a controlling interest.

31.1. The members of the Class are so numerous that joinder of all members is impracticable. NAPCO common stock is actively traded on the NASDAQ and millions of shares were sold in the Offering. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, there are likely hundreds, if not thousands, of members in the proposed Class. Record owners and other Class members may be identified from records maintained by NAPCO or its transfer agent and may be notified of the pendency of this action using a form of notice customarily used in securities class actions.

32.1. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

33.1. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, those of the Class.

34.1. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)    whether Defendants violated the Exchange Act and/or the Securities Act;

(b)(a)    whether Defendants misrepresented and/or omitted material facts; and

(c)(a)    whether and to what extent Class members have sustained damages, as well as the appropriate measure of damages.

35.1.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible, for Class members to individually seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## V.IV.   THE COMPANY AND ITS BUSINESS

36.23.   Defendant NAPCO designs and manufactures electronic security devices, provides wireless communication services for intrusion and fire alarm systems, and offers school safety solutions. The security systems it provides include access control, door-locking, intrusion and fire alarm, and video surveillance. The Company sells its products primarily to independent distributors, dealers, and installers of security equipment.

37.24.   Approximately two-thirds of NAPCO's revenues are generated by equipment sales. The remainder are recurring revenues from monthly subscription fees it charges to provide wireless services for communicating security breaches and fire alarms.

38.25.   The Company is headquartered in Amityville, New York, and manufactures its products in the Dominican Republic. NAPCO's fiscal year begins on July 1 and ends on June 30. Accordingly, its first quarter ("1Q") ends on September 30, its second quarter ("2Q") ends on

December 31, its third quarter ("3Q") ends on March 31, and its fourth quarter ("4Q") ends on June 30.

~~VI.~~V.   SUBSTANTIVE ALLEGATIONS ~~UNDER THE EXCHANGE ACT~~

    ~~A.     The Exchange Act Defendants' Fraudulent Scheme to Manage NAPCO's Income-Related Metrics by Manipulating Its Inventory and Cost of Goods Sold~~

    A.     ~~At the end of the Class Period, on~~ NAPCO's Restatement of Its 1Q23, 2Q23, and 3Q23 Financials

26.     On August 18, 2023, NAPCO ~~admitted~~announced that it would restate its ~~previously issued interim~~ financial statements for the first three quarters of fiscal 2023, ended September 30, 2022 ~~("~~(1Q23~~")~~),~~)~~, December 31, 2022 ~~("~~(2Q23~~")~~),~~)~~, and March 31, 2023 ~~("3Q23") would need to be restated~~(3Q23), and ~~"~~that its previously issued financials for those quarters should no longer be relied upon.~~"~~.  The Company explained that, for those quarters, its inventories had been overstated and COGS had been understated, resulting in overstated gross profit, operating income, and net income, and gave the following preliminary estimates of its overstatement of net income:

| Quarter | Net Income - Previous | Net Income – Restated (Estimate) | Difference |
|---|---|---|---|
| 1Q23 | $6.4 million | $2.9 million | ($3.5 million) |
| 2Q23 | $8.4 million | $3.7 million | ($4.7 million) |
| 3Q23 | $10.8 million | $9.5 million | ($1.3 million) |

NAPCO also admitted that a previously undisclosed material weakness existed in its internal controls over financial reporting.  Defendants explained the "errors" in NAPCO's financial statements as follows:

> During the preparation of the Company's consolidated financial statements for the fiscal year ended June 30, 2023, management of the Company identified certain errors related to the Company's calculation of cost of goods sold ("COGS") and inventory for each of the first three quarters of fiscal 2023. Specifically, although the

costs of several components fluctuated substantially during fiscal 2023, the Company's costing procedures did not appropriately account for such fluctuations. As a result, inventories were overstated and COGS was understated, resulting in overstated gross profit, operating income and net income for each period.

39.27.   On September 1, 2023, NAPCO confirmed the severity of its financial misstatements, when it filed with the SEC amended quarterly reports on Form 10-Q/A that restated NAPCO's interim financial statements for 1Q23, 2Q23, and 3Q23 (the "Restatement").its financial results for 1Q23, 2Q23, and 3Q23.  For 1Q23, NAPCO's net income had been overstated by 107.6%, income per share by 112.5%, operating income by 98.7%, and gross profit and gross margins by 24.72%. For 2Q23, NAPCO's net income had been overstated by 115%, income per share by 109%, operating income by 118%, and gross profit and gross margins by 35.6%.  For 3Q23, NAPCO's net income had been overstated by 13.5%, income per share by 11.5%, operating income by 13.2%, and gross profit and gross margins by 6.54%.

40.     In announcing the need for the Restatement, NAPCO acknowledged that the inaccurate financial metrics the Company had reported for 1Q23, 2Q23, and 3Q23 stemmed from the improper overstatement of the inventory NAPCO possessed at the end of each affected quarter.  This overstatement of inventory resulted in a concomitant: (i) understatement of the equipment inventory the Company had sold — i.e., cost of goods sold; and (ii) overstatement of NAPCO's income-related metrics.

41.     Several former employees ("FEs") of NAPCO described a practice in which, during certain quarters, NAPCO employees were directed to delay shipping sold inventory to customers until after the beginning of the next quarter.  On such occasions, the sold inventory remained warehoused at the Company's facilities.

42.     FE1, FE2, and FE3 each recounted NAPCO's practice of halting shipments of sold inventory to customers before the close of a fiscal quarter.  FE1 was midlevel manager within

- 13 -

NAPCO's Continental Access business for over a decade, including throughout the Class Period. FE2 worked at NAPCO for a number of years, including during NAPCO's 1Q23 and 2Q23. FE2's responsibilities included acquiring and shipping inventory within his[4] business division, and he had access to inventory levels at NAPCO. FE3 was a midlevel manager at NAPCO for several years, until early 2023.

43.     According to FE1 and FE2, the Company would stop shipping out inventory, and would instead ship that inventory during the following quarter. FE1 and FE2 both stated that in many of these instances, the inventory was already sitting in NAPCO's warehouse facilities. FE1 further stated that in those situations, the warehoused inventory had been prepared for shipment to customers. FE3 confirmed that in such instances, the warehoused inventory had already been sold to customers.

44.     FE1 reported that NAPCO's practice of withholding shipments occurred frequently during his employment, and believed that it likely occurred during 1Q23, 2Q23, and 3Q23. FE3 stated that this practice occurred during the quarter before the Class Period (ended June 30, 2022), 1Q23 and 2Q23. FE2 and FE3 further stated that NAPCO had been engaging in the practice for years.

45.     FE3 relayed that NAPCO withheld shipments of sold inventory in order to "sandbag the numbers," and characterized the practice as intentional.

46.     FE1 reported that he was informed by insiders at NAPCO that the directive to halt shipments prior to the end of the quarter came from defendant Buchel. As FE1 explained, this directive was, in turn, given to the Vice President of Sales and the Vice President of Operations.

---

[4]     All FEs are referenced using male gender pronouns to protect their identities. Likewise, the job descriptions and dates of employment of these FEs are intentionally vague in order to protect their identities.

47.    FE2 personally received directives not to ship out inventory, and confirmed that he received that instruction from the Company's Vice President of Operations. FE2 understood that the Vice President of Operations had received the directive to stop shipping inventory from defendant Buchel.

48.    FE3 identified two sales directors at NAPCO who were told by NAPCO's executive team to stop shipping inventory. According to FE3, one of these sales directors was instructed to keep the practice "quiet." FE3 recounted that the other sales director personally told him about the practice.

49.    FE1 and FE3 both reported that NAPCO's practice of withholding shipments of sold inventory was well-known within the Company. According to FE3, employees openly discussed the practice amongst themselves, but were afraid to raise it with upper management. FE3 recounted being told by co-workers, "It is what it is."

50.    Upon information and belief, when NAPCO withheld the shipment of sold inventory, the Exchange Act Defendants overstated NAPCO's reported inventory, by improperly counting sold product as inventory, and thus understated the cost of the equipment inventory the Company sold during the quarter — i.e., the cost of goods sold.

51.    Because cost of goods sold has a direct bearing on a company's income-related metrics, this enabled the Exchange Act Defendants to inflate NAPCO's reported net income and related results during 1Q23, 2Q23, and 3Q23. Through this scheme, the Exchange Act Defendants reverse-engineered and artificially managed NAPCO's financial results in order to meet internal targets and market expectations, including analysts' estimates.

28.    Despite Defendants' efforts to characterize the Restatement as being the result of innocent errors in calculating inventory and COGS (which would not affect quarterly net sales),

these announcements caused NAPCO's share price to plummet more than 45%, from $38.41 per share on August 18, 2023, to $21.11 per share on August 21, 2023.

29.

30.

### B.    Defendants Knew or Recklessly Disregarded that NAPCO's Reported Inventory was Materially Overstated During Fiscal 2023

#### 1.    Defendants' Pandemic-Related Purchasing Strategy Inflated NAPCO's Inventory Value

31.    Before the Class Period, in response to global COVID-related supply-chain disruptions, Defendants had adopted an aggressive purchasing strategy, whereby NAPCO acquired critical components used to manufacture its products without regard to pricing or actual production needs—wagering that this approach would pay off in the long run.  Defendants disclosed this strategy to investors, explaining that it was partly responsible for NAPCO's inventory growing to $50 million for fiscal 2022 (ended June 30, 2022), from about $32 million a year earlier.

- 16 -



2. ███████████████████████████

32. ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████

33. ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

---

5  "Inventory on hand" is the physical count and value of goods currently available for sale, while "ending inventory" is the specific accounting figure representing the total value of all unsold goods at the end of a financial period, calculated using beginning inventory, purchases, and COGS.







████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

40.     Earlier in 2022, before the Class Period, NAPCO had encountered a strikingly similar issue.  On May 10, 2022, the Company announced that it was delaying the filing of its Form 10-Q for 3Q22 to reevaluate its inventory reserves.  On May 17, 2022, NAPCO restated its previous reserves for inventory obsolescence for fiscal 2019 to fiscal 2021, admitting that a "material weakness in internal control over financial reporting existed . . . related to a lack of an effectively designed control activity over the reserve for obsolete inventory."  For fiscal 2022, the Company, in its Form 10-K (dated August 29, 2022, and signed by defendants Soloway and Buchel), identified the continuing material weakness as "related to the reserve for excess and slow-moving inventory," which "was a result of a lack of effective review and reconciliation controls over the forecasted sales and usage data."

41.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

42.     ████████████████████████████████████████████████

████████████████████████████████████████████████████





**C.      Soloway and Buchel's Suspicious Stock Sales**

45.      After the close of fiscal 2022 (*i.e.*, June 30, 2022), with NAPCO stock trading around $25 per share, defendants Soloway and Buchel

46.      And while the Company filed a shelf registration statement on September 12, 2022, defendant

47.

48.      On November 15, 2022, just eight days after NAPCO reported its purportedly "record breaking" 1Q23 financial results, with net income, operating income, and gross profit actually

- 23 -

overstated by 107%, 98%, and 24%, respectively— ████████████████████████████████████ ████████████████████████████████████████ —defendants Soloway and Buchel sold more than 1.3 million NAPCO shares pursuant to a Form 144 filing at $24.79 per share, realizing proceeds of nearly $33 million. Had NAPCO accurately reported its 1Q23 results, instead of exceeding analysts' $0.13 EPS expectations by 31% ($0.04 per share), *it would have missed expectations by 38% ($0.05 per share).*

49. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

---

[8] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

50.     Soloway and Buchel's secondary offering closed on February 13, 2023, at $31.50 per share, raising another $75.6 million, only days after the February 6, 2023 announcement of NAPCO's "largest quarterly net income in the Company's history"—which was actually overstated by 115%—an even larger amount than in 1Q23.  Had NAPCO correctly reported these results, its earnings would have ***missed analyst expectations by 21% ($0.03 per share)***—upending the Company's growth narrative and causing its stock price to crash, as it later did when the Restatement was announced.

51.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

52.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

53.     ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████

54.     Thus motivated to continue pushing NAPCO's stock price higher, Defendants reported another quarter of inflated income metrics, announcing on May 8, 2023 that NAPCO's 3Q23 "net income of $10.8 million" was "the largest quarterly net income in the Company's history."

55.     In total, during the Class Period, defendant Soloway sold 48.5% of his NAPCO stock for proceeds of approximately $104 million, and defendant Buchel sold 45.5% of his stock for proceeds of approximately $4.5 million (excluding exercised options), at times when they knew or recklessly disregarded that ████████████████████████████

██████████████████████████████████████████

**~~B.~~D.     The Restatement Is an Admission that NAPCO's Interim Financial Statements for Fiscal 2023 Violated GAAP and Were Materially Inaccurate**

~~52.~~56.  Generally Accepted Accounting Principles ("GAAP") generally encompasses those conventions, rules and procedures necessary to define accepted accounting practices at a particular

- 26 -

time.  SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1). Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP.  17 C.F.R. §210.10-01(a).

53.57.  NAPCO has now admitted that the interim financial statements it issued to investors and filed with the SEC for the first three quarters of fiscal 2023 were materially inaccurate, presented in violation of GAAP, and "should no longer be relied upon."  Accordingly, each of the interim financial statements for those quarters is presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

54.58.  By virtue of the Restatement, *NAPCO itself* has concluded that the now-restated interim financial statements for 1Q23, 2Q23, and 3Q23 that the Company issued during the Class Period were materially misstated—since only materially misstated financial statements are to be corrected and re-reported on a retroactive basis.[9]

55.59.  Thus, there is no dispute that NAPCO's financial statements and financial disclosures were materially inaccurate throughout the Class Period.

---

[9]    *See, e.g.*, Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections*, SEC Codification of Staff Accounting Bulletins ("CSAB") Topic 1M *Financial Statements, Materiality* and Topic 1-N, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements*.  According to the FASB, ASC is the source of authoritative GAAP to be applied to nongovernmental entities.

56.60.  ~~The Exchange Act~~ Defendants have also admitted that, in addition to NAPCO's preexisting internal control deficiencies, the Restatement "demonstrated an additional material weakness in [its] internal controls over financial reporting."[10]

57.61.  GAAP, as set forth in ASC Topic No. 250, *Accounting Changes and Error Corrections*, provides that errors in previously-issued financial statements are to be corrected via a restatement of the previously-issued financial statements.  Adjustments related thereto are to be reported in the restatement as "error corrections."

58.62.  When NAPCO issued the Restatement on September 1, 2023, after the Class Period, it filed with the SEC amended quarterly reports on Form 10-Q/A that restated NAPCO's interim financial statements for 1Q23, 2Q23 and 3Q23 to correct errors related to the Company's reported inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins.

59.63.  Throughout the Class Period, ~~the Exchange Act~~ Defendants knew, or recklessly disregarded, that they had caused NAPCO to issue interim financial statements for 1Q23, 2Q23, and 3Q23 that were not presented in accordance with GAAP because those financial statements overstated NAPCO's net income and related metrics, by improperly overstating the Company's inventory and understating its cost of goods sold.

60.64.  By doing so, ~~the Exchange Act~~ Defendants violated the provisions set forth in Section 13 of the Exchange Act, which required them to: (i) present NAPCO's business activities in a manner that accurately and fairly reflected its transactions; and (ii) maintain a system of internal

---

[10]    A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

accounting controls sufficient to provide reasonable assurances that NAPCO's financial statements conformed to GAAP, as follows:

Every issuer which has a class of securities registered pursuant to Section 78I of this title and every issuer which is required to file reports pursuant to Section 78o(d) of this title shall --

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that --

(I)    transactions are executed in accordance with management's general or specific authorization;

(II)    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(III)    access to assets is permitted only in accordance with management's general or specific authorization; and

(IV)    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]  15 U.S.C. §77m(2)(A)-(B)(i)-(iv).

61.    ~~The basic accounting precept that expenses be recorded in the same period in which the corresponding benefit is realized is arguably the most fundamental tenet of accrual accounting. *See* FASB Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting.*~~

62.    ~~GAAP, as set forth in ASC Topic No. 330, *Inventories*, provides that the primary objective of accounting for inventories is the proper determination of income, through the process of matching appropriate costs against revenues.~~

~~63.~~65.    ~~These accounting principles are neither complex, nor a matter of subjective interpretation or opinion. The Exchange Act~~ Defendants knew, or recklessly ignored, that NAPCO's

- 29 -

interim financial statements for 1Q23, 2Q23, and 3Q23 were presented in violation of ~~these provisions of~~ GAAP, and were materially false and misleading.

### ~~C.~~E.    NAPCO's Fraudulent Financial Reporting of Inventory, Cost of Goods Sold, and Income-Related Metrics

~~64.~~66.  ~~The Exchange Act~~ Defendants' ~~scheme to manage NAPCO's quarterly results by retaining sold inventory~~fraud had the intended effect ~~for 1Q23, 2Q23, and 3Q23~~ of ~~understating the cost of equipment inventory NAPCO sold (*i.e.*, cost of goods sold), which in turn, overstated its~~ overstating NAPCO's income-related metrics for ~~each of those quarters.~~1Q23, 2Q23, and 3Q23. The quantitative impact of ~~the Exchange Act~~ Defendants' scheme is set forth below.

~~65.~~67.  For 1Q23, ended September 30, 2022, NAPCO's cost of goods sold was understated by **14.45%**, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by **107.59%**;

- Income per share was overstated by **112.5%**;

- Operating income was overstated by **98.71%**; and

- Gross profit and gross margins were each overstated by **24.72%**.

~~66.~~68.  For 2Q23, ended December 31, 2022, NAPCO's cost of goods sold was understated by **18.27%**, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by **114.97%**;

- Income per share was overstated by **109.1%**;

- Operating income was overstated by **118.02%**; and

- Gross profit and gross margins were each overstated by **35.59%**.

~~67.~~69.  In addition, for the first six months of fiscal 2023, ended December 31, 2022, NAPCO's cost of goods sold was understated by **16.47%**, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by ***111.72%***;

- Income per share was overstated by ***110.53%***;

- Operating income was overstated by ***109.2%***; and

- Gross profit and gross margins were each overstated by ***30.11%***.

68.70.  For 3Q23, ended March 31, 2023, NAPCO's cost of goods sold was understated by ***6.26%***, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by ***13.52%***;

- Income per share was overstated by ***11.5%***;

- Operating income was overstated by ***13.21%***; and

- Gross profit and gross margins were each overstated by ***6.54%***.

69.71.  In addition, for the first nine months of fiscal 2023, ended March 31, 2023, NAPCO's cost of goods sold was understated by ***13.44%***, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by ***55.1%***;

- Income per share was overstated by ***55.56%***;

- Operating income was overstated by ***54.55%***; and

- Gross profit and gross margins were each overstated by ***20.12%***.

70.72.  As planned, the Exchange Act Defendants' fraud enabled NAPCO to meet—and even exceed—analysts' estimates during the Class Period.  For example, as defendantDefendant Soloway highlighted in the Company's press release for 1Q23, NAPCO had "easily exceed[ed] published street consensus estimates" by reporting EPS of $0.17.[11]  In reality, NAPCO would not have met— let alone exceeded—the analysts' consensus estimate of 1Q23 EPS of $0.13, since its actual EPS for

---

[11]    EPS is equivalent to income per share.

1Q23 was just $0.08.  Likewise, when discussing NAPCO's financial results for 2Q23 during its February 6, 2023 conference call, ~~defendant~~Defendant Soloway stated that NAPCO had been "able to beat published Street consensus estimates" by reporting EPS of $0.23.  As with the previous quarter, NAPCO would not have met or exceeded the analysts' consensus estimate of 2Q23 EPS of $0.14, since its actual EPS for 2Q23 was $0.11.

### ~~D.~~F.    Materially False and Misleading Statements Made During the Class Period

#### 1.    1Q23 Financial Results

~~71.~~73.  The Class Period begins on November 7, 2022, when NAPCO filed with the SEC its quarterly report on Form 10-Q for the first quarter of fiscal 2023, September 30, 2022 (the "1Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel.  For the quarter, the 1Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $63,837,000 as of September 30, 2022;

- Cost of goods sold of $21,326,000;

- Net income of $6,402,000;

- Income per share of $0.17;

- Operating income of $7,249,000;

- Gross profit of $18,167,000; and

- Gross margins of 46%.

~~72.~~74.  The statements referenced above in ¶~~71~~73 were materially false and misleading when made because ~~the Exchange Act~~ Defendants ~~had engaged in a scheme to reverse engineer and artificially manage~~knew, or recklessly disregarded, that NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ inventory~~, which~~ was overstated ~~the Company's reported inventory and understated its cost of goods sold~~ ████

- 32 -

██████████████████████████████████████████, which in turn, inflated NAPCO's the Company's income.  As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 1Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $60,236,000 as of September 30, 2022, and had been overstated by *5.98%*;

- Cost of goods sold was $24,927,000, and had been understated by *14.45%*;

- Net income was $3,084,000, and had been overstated by *107.59%*;

- Income per share was $0.08, and had been overstated by *112.5%*;

- Operating income was $3,648,000, and had been overstated by *98.71%*;

- Gross profit was $14,566,000, and had been overstated by *24.72%*; and

- Gross margins were approximately 36.9%, and had been overstated by *24.72%*.

73.75.  In addition, the 1Q23 Form 10-Q represented that NAPCO had two preexisting "material weaknesses in internal control."  One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes."  The second material weakness "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data."  The 1Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

74.76.  The statements referenced above in ¶73 75 were materially false and misleading when made because the Exchange Act Defendants knew, or recklessly disregarded, but failed to disclose

that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its inventory costing procedures; (ii) those material weaknesses had allowed ~~the Exchange Act Defendants to reverse- engineer and artificially manage~~ NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as inventory~~inventory to remain overstated ███████████████████████████████, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls **had** "result[ed] in . . . misstatements to the [Company's] financial statements" for 1Q23.

~~75.~~77.  Also on November 7, 2022, NAPCO issued a press release announcing its financial results for 1Q23.  The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by ~~defendant~~Defendant Buchel.

~~76.~~78.  The press release reported the same metrics for the quarter as the 1Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins.  Those reported results were materially false and misleading for the reasons set forth above in ¶~~72~~74.

~~77.~~79.  In the press release, ~~defendant~~Defendant Soloway commented that "**NAPCO executed exceptionally well in the first quarter, easily exceeding published street consensus estimates for Q1 on . . . Net Income[] [and] EPS . . . .**"  During a conference call held later in the day on November 7, 2022, ~~defendant~~Defendant Soloway described NAPCO's "fiscal first quarter [of] 2023" as "**a record breaking successful one**."

~~78.~~80.  The statements referenced above in ¶~~77~~79 were materially false and misleading when made because ~~the Exchange Act~~ Defendants ~~had engaged in a scheme to reverse engineer and artificially manage~~knew, or recklessly disregarded, that NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ inventory~~, which~~ was overstated ~~the~~

- 34 -

Company's reported inventory and understated its cost of goods sold    and ████████ ███████████████████████████████████████████████, which in turn, inflated ~~NAPCO's~~ the Company's income.  As a result—as the Company has now admitted—NAPCO's financial results for 1Q23 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶~~72~~74.  In truth, NAPCO had not merely "executed exceptionally well in the first quarter," but had also benefited from ~~the Exchange Act~~ Defendants' fraud.  In addition, 1Q23 had not been "a record breaking successful" quarter, and NAPCO had only been able to "easily exceed[] published street consensus estimates for Q1 on" net income and EPS because of ~~the Exchange Act~~ Defendants' fraud.

### 2. 2Q23 Financial Results

~~79.~~81.  On February 6, 2023, NAPCO filed with the SEC its quarterly report on Form 10-Q for the second quarter of fiscal 2023, ended December 31, 2022 (the "2Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel.  For the quarter, the 2Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $64,192,000 as of December 31, 2022;

- Cost of goods sold of $22,852,000;

- Net income of $8,446,000;

- Income per share of $0.23;

- Operating income of $9,436,000;

- Gross profit of $19,462,000; and

- Gross margins of 46%.

~~80.~~82.  The statements referenced above in ¶~~79~~81 were materially false and misleading when made because ~~the Exchange Act~~ Defendants ~~had engaged in a scheme to reverse engineer and artificially manage~~knew, or recklessly disregarded, that NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ inventory~~, which~~ was overstated ~~the~~

Company's reported inventory and understated its cost of goods sold   and ███████ ██████████████████████████████████████████████████, which in turn, inflated NAPCO's the Company's income.  As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 2Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $55,483,000 as of December 31, 2022, and had been overstated by *15.7%*;

- Cost of goods sold was $27,960,000, and had been understated by *18.27%*;

- Net income was $3,929,000, and had been overstated by *114.97%*;

- Income per share was $0.11, and had been overstated by *109.1%*;

- Operating income was $4,328,000, and had been overstated by *118.02%*;

- Gross profit was $14,354,000, and had been overstated by *35.59%*; and

- Gross margins were approximately 33.9%, and had been overstated by *35.59%*.

81.83.  In addition, for the first six months of fiscal 2023, ended December 31, 2022, the 2Q23 Form 10-Q reported:

- Cost of goods sold of $44,178,000;

- Net income of $14,848,000;

- Income per share of $0.40;

- Operating income of $16,685,000;

- Gross profit of $37,629,000; and

- Gross margins of 46%.

82.84.  The statements referenced above in ¶81 83 were materially false and misleading when made because the Exchange Act Defendants had engaged in a scheme to reverse engineer and artificially manage knew, or recklessly disregarded, that NAPCO's financial results by retaining sold

- 36 -

product at the end of the quarter and improperly counting it as inventory, which was overstated the Company's reported inventory and understated its cost of goods sold   and ███████████

██████████████████████████████████████████████, which in turn, inflated NAPCO's the Company's income.  As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for the first six months of fiscal 2023, NAPCO's actual financial results were as follows:

- Cost of goods sold was $52,887,000, and had been understated by *16.47%*;

- Net income was $7,013,000, and had been overstated by *111.72%*;

- Income per share was $0.19, and had been overstated by *110.53%*;

- Operating income was $7,976,000, and had been overstated by *109.2%*;

- Gross profit was $28,920,000, and had been overstated by *30.11%*; and

- Gross margins were approximately 35.4%, and had been overstated by *30.11%*.

83.85.  In addition, the 2Q23 Form 10-Q reiterated that NAPCO had two preexisting "material weaknesses in internal control."  One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes."  The second material weakness "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data."  The 2Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

84.86.  The statements referenced above in ¶8385 were materially false and misleading when made because the Exchange Act Defendants knew, or recklessly disregarded, but failed to disclose

- 37 -

that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its inventory costing procedures; (ii) those material weaknesses had allowed ~~the Exchange Act Defendants to reverse-engineer and artificially manage~~ NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ ████████████ ████████████████████████████, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 2Q23.

~~85.~~87.  Also on February 6, 2023, NAPCO issued a press release announcing its financial results for 2Q23.  The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by ~~defendant~~Defendant Buchel.

~~86.~~88.  The press release reported the same metrics for the quarter as the 2Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins.  Those reported results were materially false and misleading for the reasons set forth above in ¶~~80~~82.

~~87.~~89.  The press release also reported the same metrics for the first six months of fiscal 2023 as the 2Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, and gross profit.  Those reported results were materially false and misleading for the reasons set forth above in ¶~~82~~84.

~~88.~~90.  In addition, the press release emphasized that NAPCO's "[n]et income for the quarter *was a quarterly record $8.4 million or $0.23 per diluted share*."  Commenting on the quarterly results, ~~defendant~~Defendant Soloway likewise highlighted that "*net income of $8.4 million [was] the largest quarterly net income in the Company's history*."  He further stated that "*[o]verall gross margins were 46%*," representing "*a significant increase over last year's Q2 gross margin of*

*34%*.” ~~defendant~~Defendant Soloway emphasized that “***NAPCO continued to execute exceptionally well in the second quarter, with strong growth in Q2 on***” metrics including “***Net Income***” and “***EPS***,” and attributed “***NAPCO's outstanding record breaking results for the first half of fiscal 2023***” to “***the strong demand [for] each of our product lines*** . . . .”

~~89.~~91.   The statements referenced above in ¶~~88~~90 were materially false and misleading when made because ~~the Exchange Act~~ Defendants ~~had engaged in a scheme to reverse engineer and artificially manage~~knew, or recklessly disregarded, that NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ inventory~~, which~~ was overstated ~~the Company's reported inventory and understated its cost of goods sold—and~~ ███████████ ██████████████████████████████████████████, which in turn~~,~~ inflated ~~NAPCO's~~the Company's income.  As a result—as the Company has now admitted—NAPCO's financial results for 2Q23 and for the first six months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶~~80~~82 and ¶~~82~~84.  Because of ~~the Exchange Act~~ Defendants' fraud, NAPCO's 2Q23 “net income” was not “$8.4 million,” but was actually $3.9 million, and therefore was not “a quarterly record” or “the largest quarterly net income in the Company's history.”  Indeed, NAPCO's actual net income for 2Q23 was far below its quarterly record of $7.8 million, reported in the first quarter of fiscal 2022.  Likewise, EPS was not “$0.23 per . . . share,” but was actually just $0.11 per share.  In addition, “[o]verall gross margins” were not “46%,” but were actually 33.9%, and had not “increase[d]” “significant[ly] . . . over last year's Q2 gross margin[s] of 34%.”  Finally, NAPCO had not “execute[d] exceptionally well in the second quarter,” its “strong growth” in net income and EPS was illusory, and its “outstanding record breaking results for the first half of fiscal 2023” were attributable in part to ~~the Exchange Act~~ Defendants' fraud, and not solely to “strong demand” for NAPCO's products.

90.92.  Later in the day on February 6, 2023, NAPCO held a conference call to discuss the 2Q23 financial results, during which defendantDefendant Soloway stated that NAPCO had been "**able to beat published Street consensus estimates for** . . . **EPS[] [and] net income**," and attributed the Company's "**outstanding performance**" to "**the continued strong demand for each of [its] product lines** . . . ."  Also during the call, defendantDefendant Buchel attributed "**[t]he significant increase in gross profit dollars as well as gross margin** for equipment sales for both[] the 3 and the 6 months ended December 31, 2022," in part to the "**lower cost of certain components**" due to "**improvements within the company's supply chain**."

91.93.  The statements referenced above in ¶9092 were materially false and misleading when made because the Exchange Act Defendants had engaged in a scheme to reverse engineer and artificially manageknew, or recklessly disregarded, that NAPCO's financial results by retaining sold product at the end of the quarter and improperly counting it as inventory, which was overstated the Company's reported inventory and understated its cost of goods sold   and ███████████ ████████████████████████████████████████████, which in turn, inflated NAPCO'sthe Company's income.  As a result—as the Company has now admitted— NAPCO's financial results for 2Q23 and for the first six months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶8082 and ¶8284.  In truth, NAPCO had only been "able to beat published Street consensus estimates for" EPS and net income because of the Exchange Act Defendants' fraud.  Likewise, NAPCO's "outstanding performance," including "[t]he significant increase in gross profit" and "gross margin[s]" were attributable in part to the Exchange Act Defendants' fraud, and not solely to "continued strong demand" for NAPCO's products or "improvements within" its "supply chain."

- 40 -

### 3.    3Q23 Financial Results

92.94.  On May 8, 2023, NAPCO filed with the SEC its quarterly report on Form 10-Q for the third quarter of fiscal 2023, ended March 31, 2023 (the "3Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel.  For the quarter, the 3Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $60,786,000 as of March 31, 2023;

- Cost of goods sold of $20,861,000;

- Net income of $10,840,000;

- Income per share of $0.29;

- Operating income of $11,932,000;

- Gross profit of $22,671,000; and

- Gross margins of 52.1%.

93.95.  The statements referenced above in ¶9294 were materially false and misleading when made because the Exchange Act Defendants had engaged in a scheme to reverse engineer and artificially manageknew, or recklessly disregarded, that NAPCO's financial results by retaining sold product at the end of the quarter and improperly counting it as inventory, which was overstated the Company's reported inventory and understated its cost of goods sold   and ███████████ ████████████████████████████████████████, which in turn, inflated NAPCO's the Company's income.  As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 3Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $50,685,000 as of March 31, 2023, and had been overstated by *19.93%*;

- Cost of goods sold was $22,253,000, and had been understated by *6.26%*;

- Net income was $9,549,000, and had been overstated by *13.52%*;

- Income per share was $0.26, and had been overstated by *11.5%*;

- Operating income was $10,540,000, and had been overstated by *13.21%*;

- Gross profit was $21,279,000, and had been overstated by *6.54%*; and

- Gross margins were approximately 48.9%, and had been overstated by *6.54%*.

94.96.  In addition, for the first nine months of fiscal 2023, ended March 31, 2023, the 3Q23 Form 10-Q reported:

- Cost of goods sold of $65,039,000;

- Net income of $25,688,000;

- Income per share of $0.70 (basic);

- Operating income of $28,617,000;

- Gross profit of $60,300,000; and

- Gross margins of 48.1%.

95.97.  The statements referenced above in ¶94 96 were materially false and misleading when made because the Exchange Act Defendants had engaged in a scheme to reverse engineer and artificially manage knew, or recklessly disregarded, that NAPCO's financial results by retaining sold product at the end of the quarter and improperly counting it as inventory, which was overstated the Company's reported inventory and understated its cost of goods sold  and ███████████ ██████████████████████████████████████████, which in turn, inflated NAPCO's the Company's income.  As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for the first nine months of fiscal 2023, NAPCO's actual financial results were as follows:

- Cost of goods sold was $75,140,000, and had been understated by *13.44%*;

- Net income was $16,562,000, and had been overstated by *55.1%*;

- Income per share was $0.45 (basic), and had been overstated by *55.56%*;

- 42 -

- Operating income was $18,516,000, and had been overstated by **54.55%**;

- Gross profit was $50,199,000, and had been overstated by **20.12%**; and

- Gross margins were approximately 40.1%, and had been overstated by **20.12%**.

~~96.~~98. In addition, the 3Q23 Form 10-Q reiterated that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 3Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

~~97.~~99. The statements referenced above in ¶¶~~96~~98 were materially false and misleading when made because ~~the Exchange Act~~ Defendants knew, or recklessly disregarded, ~~but failed to disclose~~ that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its inventory costing procedures; (ii) those material weaknesses had allowed ~~the Exchange Act Defendants to reverse-engineer and artificially manage~~ NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as ████████ ████████████████████████████████████~~, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 3Q23.

98.100. Also on May 8, 2023, NAPCO issued a press release announcing its financial results for 3Q23. The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by defendantDefendant Buchel.

99.101. The press release reported the same metrics for the quarter as the 3Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins. Those reported results were materially false and misleading for the reasons set forth above in ¶9395.

100.102.     The press release also reported the same metrics for the first nine months of fiscal 2023 as the 3Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, and gross profit. Those reported results were materially false and misleading for the reasons set forth above in ¶9597.

101.103.     In addition, the press release highlighted NAPCO's "*Quarterly Record Net Income of $10.8 [million]*," and defendantDefendant Soloway similarly emphasized that "*net income of $10.8 million in Q3 was a record-breaker for any quarter in the Company's history*," and "*the largest quarterly net income in the Company's history . . . .*" Defendant Soloway also attributed "*NAPCO's outstanding record breaking results, for both Q3 and the first nine months of fiscal 2023*" to "*strong sales of each of our product lines . . . .*"

102.104.     The statements referenced above in ¶101103 were materially false and misleading when made because the Exchange Act Defendants had engaged in a scheme to reverse engineer and artificially manageknew, or recklessly disregarded, that NAPCO's financial results by retaining sold product at the end of the quarter and improperly counting it as inventory, which was overstated the Company's reported inventory and understated its cost of goods sold and █████ ████████████████████████████████████████████████████████, which in

turn, inflated ~~NAPCO's~~the Company's income.  As a result—as the Company has now admitted—NAPCO's financial results for 3Q23 and for the first nine months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶¶~~93~~95 and ¶~~95~~97.  In truth, NAPCO's 3Q23 "net income" was not "$10.8 million," but was actually $9.5 million, and its "record" and "largest" quarterly net income "in the Company's history" was due in part to ~~the Exchange Act~~ Defendants' fraud.  Likewise, "NAPCO's outstanding record breaking results, for both Q3 and the first nine months of fiscal 2023" were attributable in part to ~~the Exchange Act~~ Defendants' fraud, and not solely to "strong sales of each of [its] product lines. . . ."

~~103.~~105.    During a conference call held later in the day on May 8, 2023, ~~defendant~~Defendant Soloway reiterated that NAPCO's "***fiscal third quarter 2023 was a record-breaking successful one***," and pointed to "the ***10th consecutive quarterly [growth] streak***" that the Company was "now on."  He further stated that NAPCO had "***a pristine balance sheet*** . . . ."  During the call, ~~defendant~~Defendant Buchel represented that "***[t]he significant increase in gross profit dollars*** as well as gross margin for equipment sales for both the 3 and the 9 months ended March 31, 2023 ***[was] primarily due to . . . increases in equipment revenues***[,]" as well as "***the increased availability and lower costs of certain components, lower transportation expenses***," and "***a favorable shift in product mix*** . . . ."

~~104.~~106.    The statements referenced above in ¶~~103~~105 were materially false and misleading when made because ~~the Exchange Act~~ Defendants ~~had engaged in a scheme to reverse engineer and artificially manage~~knew, or recklessly disregarded, that NAPCO's ~~financial results by retaining sold product at the end of the quarter and improperly counting it as~~ inventory~~, which~~ was overstated ~~the Company's reported inventory and understated its cost of goods sold—and~~ █████████ ████████████████████████████████████████████, which in

turn, inflated NAPCO's the Company's income. As a result—as the Company has now admitted—NAPCO's financial results for 3Q23 and for the first nine months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶¶93 95 and ¶95 97. In truth, NAPCO's "record-breaking successful" results for 3Q23 were attributable in part to the Exchange Act Defendants' fraud. Likewise, "[t]he significant increase[s] in gross profit dollars as well as gross margin for equipment sales for both the 3 and the 9 months ended March 31, 2023" were attributable in part to the Exchange Act Defendants' fraud, and therefore were not "primarily due to . . . increases in equipment revenues," "the increased availability and lower costs of certain components, lower transportation expenses," and "a favorable shift in product mix . . . ." In addition, NAPCO was not on a "10th consecutive quarterly [growth] streak" because the Company's actual financial results for 1Q23 and 2Q23 had broken any purported growth streak. Finally, NAPCO's "balance sheet" was not "pristine" because its net income, income per share, operating income, gross profit, gross margins, inventory, and cost of goods sold were each was materially misstated as a result of the Exchange Act Defendants' fraud.

### E.G.    NAPCO Announces the Restatement

105.107.      On August 18, 2023, after the close of the markets, NAPCO issued a press release revealing that the Company would need to restate its financial results for 1Q23, 2Q23, and 3Q23, and that its previously-issued interim financial statements for those quarters "***should no longer be relied upon***." The press release disclosed that, for those quarters, "inventories were overstated and COGS [cost of goods sold] was understated, resulting in ***overstated gross profit, operating income and net income for each period***." It further explained that NAPCO was "in the process of preparing amended Forms 10-Q for each of the first three quarters of fiscal 2023," and provided the following "preliminary" estimates of NAPCO's overstatement of net income:

- 46 -

| Period End | Net Income - Previously Reported | Net Income - Restated Estimate | $ Difference |
|---|---|---|---|
| First quarter ended September 30, 2022 | $6.4M | $2.9M | $3.5M |
| Second quarter ended December 31, 2022 | $8.4M | $3.7M | $4.7M |
| Third quarter ended March 31, 2023 | $10.8M | $9.5M | $1.3M |

106.108.    Finally, the press release revealed that "[d]ue to the . . . restatements, management of the Company has determined that a material weakness existed in the Company's internal controls over financial reporting for each of the first three quarters of fiscal 2023, rendering the Company's disclosure controls and procedures ineffective at the end of each such quarter."

107.109.    Although the press release attempted to characterize the restatementRestatement as stemming from innocent "errors" in calculating inventory and cost of goods sold, the significant scope of the estimated overstatements of net income, and the disclosure that a number of additional income-related metrics had been overstated during the first three quarters of fiscal 2023, caused the Company's share price to plummet.

108.110.    In response to the press release, the price of NAPCO common stock fell more than **45%**, from a closing price of $38.41 per share on August 18, 2023, to close at $21.11 per share on Monday, August 21, 2023 (the next trading day), on more than 40 times the previous day's trading volume.

### F.H.   Post-Class Period Events

109.111.    On September 1, 2023, NAPCO filed with the SEC amended Forms 10-Q/A containing the restated financial results for 1Q23, 2Q23, and 3Q23.  The Restatement confirmed that NAPCO's income-related metrics had been grossly overstated during the first three quarters of fiscal 2023.  For 1Q23, 2Q23, and 3Q23, respectively: (i) net income had been overstated by 107.59%, 114.97%, and 13.52%; (ii) income per share had been overstated by 109.1%, 112.5%, and 11.5%;

- 47 -

(iii) operating income had been overstated by 98.71%, 118.02%, and 13.21%; and (iv) gross profit and gross margins had each been overstated by 24.72%, 35.59%, and 6.54%.

~~110.~~ 112.    On October 27, 2023, NAPCO announced that it would "dismiss its current independent registered public accounting firm, Baker Tilly US, LLP ('Baker Tilly')"—which had served as NAPCO's auditor since 2008—"effective on the Company's filing of its Form 10-Q for the quarter ending September 30, 2023." Shortly thereafter, on November 3, 2023, NAPCO announced that Baker Tilly would be replaced by Deloitte & Touche LLP.

113.

114.    In the wake of defendants Soloway and Buchel's lucrative stock sales and the Restatement, Buchel was promoted to President and Chief Operating Officer effective May 2, 2024, while initially maintaining his position as CFO. In the press release announcing the promotion, Soloway said it was "well-deserved."

115.

116.

117. On June 25, 2024, the SEC announced that it had settled insider trading charges against Schettino. Among other things, the SEC consent order required that Schettino disgorge $198,566, pay an additional $237,381 in prejudgment interest and penalties, and it barred him from serving as an officer or director of a public company.

118. On March 31, 2025, NAPCO received a subpoena from the SEC. NAPCO publicly disclosed the SEC subpoena in its Form 10-Q filed with the SEC on May 5, 2025, stating that the SEC's investigation is "principally focused on the Company's previously disclosed restatements and related material weakness determination." According to NAPCO's most recent 10-Q, filed on November 3, 2025, the SEC investigation remains ongoing, and NAPCO "has produced, and will continue to produce documents, responsive to the SEC subpoena."

G.VI. ADDITIONAL SCIENTER ALLEGATIONS

111.119. As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Company or in their own

names during the Class Period were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

112.120.    ~~The Exchange Act~~ Defendants, by virtue of their receipt of information reflecting the true facts regarding NAPCO, their control over, and/or receipt and/or modification of NAPCO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NAPCO, were active and culpable participants in the fraudulent scheme alleged herein.

113.121.    ~~The Exchange Act~~ Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the ~~Officer~~Individual Defendants ~~(i.e., defendants Soloway and Buchel).~~.

114.122.    The ~~Officer~~Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, and prospects, as alleged herein. The ~~Officer~~Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading

statements regarding the Company were being issued; and approved or ratified these statements, in violation of the federal securities laws.

115.123.      NAPCO, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true facts from investors.

124.



116.125.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

117.126.      In addition, the Exchange Act Defendants were motivated to engage in the alleged fraudulent course of conduct in order to enable certain Company insiders, including Defendantsdefendants Soloway and Buchel, to collectively sell 3,744,150 shares of their personally-held NAPCO common stock during the Class Period, for proceeds of more than *$108 million*, under circumstances that were unusual and suspicious, as set forth below:

| Insider | Date | Price | Shares Sold | Proceeds | Rule 10b5-1 Plan | % Sold |
|---|---|---|---|---|---|---|
| **Defendant Soloway** (CEO, Chairman) | 11/15/2022 02/13/2023 02/15/2023 | $24.79 $31.50 $31.50 | 1,271,442 2,012,500 287,500 **3,571,442** | $31,519,047 $63,393,750 $9,056,250 **$103,969,047** | No No No | **48.5%** |
| **Defendant Buchel** (CFO) | 11/15/2022 02/13/2023 02/15/2023 | $24.79 $31.50 $31.50 | 52,977 87,500 12,500 **152,977** | $1,313,300 $2,756,250 $393,750 **$4,463,300** | No No No | **45.5%** |
| **Paul Stephen Beeber** (Director) | 11/23/2022 | $26.10 | **1,731** | **$45,179** | No | **14.6%** |
| **Michael Carrieri** (Senior Vice President of Engineering Development) | 11/23/2022 11/30/2022 | $26.45 $26.05 | 9,000 9,000 **18,000** | $238,050 $234,450 **$472,500** | No No | **29%** |
| | **Total:** | | **3,744,150** | **$108,950,026** | | |

118.127.    These insider sales were suspiciously-timed because each of the insiders who sold stock did so in November 2022, shortly after NAPCO's announcement on November 7, 2022 of 1Q23 financial results that were inflated by ~~the Exchange Act Defendants' scheme to overstate NAPCO's income-related metrics by retaining sold product at the end of the quarter and improperly counting it as inventory, which overstated the Company's reported inventory and understated its cost of goods sold.~~ ████████ ████ At the time of these sales, NAPCO had recently reported quarterly results that overstated its 1Q23: net income by 107.59%, income per share by 112.5%, operating income by 98.71%, and gross profit and gross margins by 24.72%.

119.128.    Defendants Soloway and Buchel made substantial sales on November 15, 2022, with Soloway selling 1,271,442 shares of his personally-held NAPCO common stock for

- 53 -

proceeds of approximately *$31.5 million*, and Buchel selling 52,997 shares of his personally-held NAPCO common stock for proceeds of approximately *$1.3 million*.

~~120.~~129.    Defendants Soloway and Buchel made even larger insider sales in February 2023—orchestrating an offering in order to enable Soloway to unload an additional 2,300,000 shares of his personally-held NAPCO common stock for proceeds of approximately *$72.5 million*, and Buchel to unload an additional 100,000 shares of his personally-held NAPCO common stock for proceeds of approximately *$3.2 million*.

~~121.~~130.    These sales insider were suspiciously-timed because they took place on February 13, 2023 and February 15, 2023, shortly after NAPCO's announcement on February 6, 2023 of 2Q23 financial results that were inflated by ~~the Exchange Act Defendants' scheme to overstate NAPCO's income-related metrics by retaining sold product at the end of the quarter and improperly counting it as inventory, which overstated the Company's reported inventory and understated its cost of goods sold.~~ ██████████████████████████████ ██████████████████ And they were made pursuant to offering materials that incorporated by reference NAPCO's inflated financial results for both 1Q23 and 2Q23.  Indeed, NAPCO announced the Offering on February 8, 2023, almost immediately after it issued the inflated 2Q23 financial results.  At the time of these sales, NAPCO had recently reported quarterly results that overstated its 2Q23: net income by 114.97%, income per share by 109.1%, operating income by 118.02%, and gross profit and gross margins by 35.59%.

~~122.~~131.    In total, defendant Soloway sold *48.5%* of his personally-held NAPCO common stock during the Class Period for proceeds of approximately *$104 million*, and defendant Buchel sold *45.5%* his personally-held NAPCO common stock during the Class Period for proceeds of approximately *$4.5 million*.

- 54 -

123.132.    By contrast, *none* of the insiders who sold stock during the Class Period made *any* stock sales during the year before the Class Period.  ~~Defendants Soloway and Buchel, and insider Michael Carrieri, also have not made any stock sales since the Class Period.~~

124.133.    Notably, defendant Buchel—who himself engaged in insider trading during the Class Period while playing a key role in the fraud—is, and was, NAPCO's "Insider Trading Compliance Officer."  In that role, Buchel was required, pursuant to the Company's Insider Trading Policy, to "pre-clear each proposed trade or transfer" of NAPCO securities by its "executive officers and directors and their [f]amily [m]embers[.]"  At the very least, this presented a clear conflict of interest with respect to his own insider sales.

125.134.    Finally, *none* of the Class Period sales were made pursuant to Rule 10b5-1 trading plans—which underscores the suspicious nature of those sales.

## ~~H.~~VII. LOSS CAUSATION AND ECONOMIC LOSS

126.135.    During the Class Period, as detailed herein, ~~the Exchange Act~~ Defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NAPCO common stock and operated as a fraud or deceit on Class Period purchasers of NAPCO common stock.  As detailed above in ¶¶~~105-108~~107-110, when ~~the Exchange Act~~ Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of NAPCO common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of NAPCO common stock during the Class Period, ~~Lead Plaintiff~~Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

127.136.    By failing to disclose to investors the adverse facts detailed herein, ~~the Exchange Act~~ Defendants presented a misleading picture of NAPCO's business and prospects.  ~~The Exchange Act~~ Defendants' false and misleading statements and omissions had the intended effect

and caused NAPCO common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $41.25 per share on June 13, 2023.

128.137.    The precipitous decline in the price of NAPCO common stock was a direct result of the nature and extent of the Exchange Act Defendants' fraud finally being revealed to investors and the market and/or the risks concealed by the Exchange Act Defendants' fraud materializing and causing losses to investors.  The timing and magnitude of the decline in the price of NAPCO securities negates any inference that the loss suffered by Lead PlaintiffPlaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead PlaintiffPlaintiffs and the other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of NAPCO common stock and the subsequent significant decline in the value of NAPCO common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed and/or the risks concealed by the Exchange Act Defendants' fraud materialized.

## I.VIII. NO SAFE HARBOR

129.138.    NAPCO's "safe harbor" warnings accompanying its purportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  The specific statements pled herein were not FLS or identified as such, but rather were statements of present or historical fact.  To the extent any statements can properly be considered forward-looking, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly FLS.

130.139.    The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading

and/or the FLS was authorized and approved by an executive officer of the Company who knew that the FLS was false or misleading.  None of the historic or present tense statements made by ~~the Exchange Act~~ Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by ~~the Exchange Act~~ Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## ~~J.~~IX.   A PRESUMPTION OF RELIANCE APPLIES

~~131.~~140.     ~~Lead Plaintiff is~~Plaintiffs are entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for NAPCO's publicly-traded stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose alleged herein, NAPCO common stock traded at artificially inflated prices during the Class Period.  ~~Lead Plaintiff~~Plaintiffs and other Class members purchased NAPCO common stock in reliance on the integrity of the market price of the stock and the market information relating to NAPCO, and were damaged thereby.

~~132.~~141.     At all relevant times, the market for NAPCO common stock was efficient for at least the following reasons:

(a)     NAPCO common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     NAPCO common stock traded at volumes during the Class Period that reflected the impact of available information, and the trading price of the stock reacted promptly to publicly available news and information;

(c)     NAPCO filed periodic public reports with the SEC and otherwise regularly communicated with analysts and investors using established market communication mechanisms, including press releases; and

- 57 -

(d)     securities analysts and investors followed NAPCO and issued reports on its prospects and performance, and information on NAPCO regularly entered the marketplace and was reflected in the trading price of its stock.

133.142.     As a result, the market for NAPCO common stock promptly digested relevant information from publicly available sources and the trading price of the stock reflected such information.  Under these circumstances, all purchasers of NAPCO common stock during the Class Period suffered similar injury by purchasing NAPCO common stock at artificially inflated prices and a presumption of reliance applies.

134.143.     A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  Because the claims alleged are predicated in part upon omissions of material fact for which there was a duty to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Exchange Act Defendants' material omissions set forth above, that requirement is satisfied here.

**K.     Exchange Act Counts**

## X.     CLASS ACTION ALLEGATIONS

144.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired NAPCO common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants and members of their immediate families; (ii) the officers and directors of the Company, at all relevant times, and members of their immediate families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv) any entity in which any Defendant has or had a controlling interest.

145.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NAPCO common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, there are likely hundreds, if not thousands, of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by NAPCO or its transfer agent and may be notified of the pendency of this action using a form of notice customarily used in securities class actions.

146.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

147.    Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, those of the Class.

148.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

       (a)    whether Defendants violated the Exchange Act;

       (b)    whether Defendants misrepresented and/or omitted material facts; and

       (c)    whether and to what extent Class members have sustained damages, as well as the appropriate measure of damages.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible, for Class members to individually seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI.    COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against ~~the Exchange Act~~All Defendants**

~~135.~~150.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above~~, except those that pertain only to the Securities Act claims and/or disclaim fraud or scienter (including ¶3 and ¶13),~~ as if fully set forth herein.

~~136.~~151.    This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, on behalf of the Class, against ~~the Exchange Act~~all Defendants ~~(i.e., defendants NAPCO, Soloway and Buchel).~~.

~~137.~~152.    During the Class Period, ~~the Exchange Act~~ Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other Class members to purchase NAPCO common stock at artificially inflated prices.

~~138.~~153.    During the Class Period, ~~the Exchange Act~~ Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.154.    The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

140.155.    As alleged herein, the Exchange Act Defendants acted with scienter in that they knew that the public documents and statements they issued, approved, or otherwise disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

141.156.    Additionally, the Exchange Act Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts, their control over the allegedly materially false and misleading statements and omissions, and their access to nonpublic information.

142.157.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NAPCO common stock. Plaintiffs and the Class would not have purchased NAPCO common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and/or omissions.

143.158. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of NAPCO common stock during the Class Period.

**COUNT IIII**

**For Violations of Section 20(a) of the Exchange Act**
**Against the OfficerIndividual Defendants**

144.159. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, except those that pertain only to the Securities Act claims and/or disclaim fraud or scienter (including ¶3 and ¶13), as if fully set forth herein.

145.160. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of the Class, against the OfficerIndividual Defendants (*i.e.*, defendants Soloway and Buchel).

146.161. The OfficerIndividual Defendants acted as controlling persons of NAPCO within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of NAPCO, the OfficerIndividual Defendants had, and exercised, power and authority to cause NAPCO to engage in the wrongful conduct complained of herein.

147.162. As set forth above, NAPCO and the OfficerIndividual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the OfficerIndividual Defendants are liable pursuant to Section 20(a) of the Exchange Act for NAPCO's Section 10(b) and Rule 10b-5 violations. To the extent necessary, each of the OfficerIndividual Defendants culpably participated in the underlying violations given their knowledge of and/or involvement in the wrongful conduct alleged herein.

148.163.    As a direct and proximate result of the ~~Officer~~Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.  By reason of such conduct, the ~~Officer~~Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## ~~VII.    ALLEGATIONS UNDER THE SECURITIES ACT~~

~~149.    In this section of the Complaint, Plaintiff City of Warren Police and Fire Retirement System asserts strict liability and negligence claims against Defendants pursuant to the Securities Act, on behalf of those who purchased or otherwise acquired NAPCO common stock pursuant or traceable to the Offering.~~

~~150.    The Securities Act allegations herein are based in strict liability and negligence, and Plaintiff expressly disclaims any allegation or inference of fraud or scienter for these allegations. Accordingly, in this section of the complaint, Plaintiff expressly disclaims all allegations above pertaining to the Exchange Act claims, including the allegations in ¶2 and ¶¶4-12, and in §VI.  For avoidance of doubt, the only allegations above that Plaintiff incorporates by reference in this section of the complaint are those pertaining to the Securities Act claims set forth in: the preamble paragraph; ¶1, ¶¶3-4, and ¶13 (Introduction); ¶¶14-17 (Jurisdiction and Venue); ¶¶10-22 and ¶¶24-29 (Parties); ¶¶30-35 (Class Action Allegations); and ¶¶36-38 (The Company and Its Business).~~

### ~~A.    The Offering~~

~~151.    On September 12, 2022, NAPCO filed a registration statement on Form S-3 (the "Registration Statement").  The Registration Statement provided that defendants Soloway and Buchel identified as the "selling stockholders" may, over time, offer and sell up to 3,830,449 shares of their NAPCO common stock in one or more offerings.~~

~~152.    Under the "automatic shelf" registration process, the Registration Statement became effective upon its filing, and allowed the selling stockholders to register securities for sale while~~

leaving them on the "shelf" until they decided to conduct an offering—provided that the Registration Statement met all of the requirements of applicable securities rules and regulations.

153. On February 8, 2023, NAPCO filed a preliminary prospectus supplement to the Registration Statement (Registration No. 333-267376) pursuant to Rule 424(b)(7) (the "Preliminary Prospectus"), in which the Company announced an offering of its common stock by the selling stockholders, pursuant to the Registration Statement. The Preliminary Prospectus identified Needham and William Blair as the underwriters for the offering.

154. On February 10, 2023, NAPCO filed a subsequent prospectus supplement to the Registration Statement pursuant to Rule 424(b)(7) (the "Prospectus Supplement," together with the Preliminary Prospectus, the "Prospectus," and together with the Registration Statement, the "Offering Materials"). The Prospectus Supplement stated that the selling stockholders, defendants Soloway and Buchel, were offering 2.1 million shares of their NAPCO common stock to the public at $31.50 per share, which would collectively yield them $64,827,000 in proceeds, before expenses. It further stated that Soloway and Buchel were granting the Underwriter Defendants, Needham and William Blair, the option to purchase up to an additional 300,000 shares of their common stock at the offering price, less underwriting discounts and commissions, within 30 days.

155. The Offering closed on February 13, 2023, with defendants Soloway and Buchel, respectively, selling 2,012,500 and 87,500 shares of their NAPCO common stock. On February 15, 2023, the Underwriter Defendants exercised in full their over-allotment option to purchase 300,000 additional shares from the selling stockholders, bringing the total number of shares sold in the Offering by Soloway and Buchel to 2.4 million—and increasing their total proceeds (before expenses) to $74,088,000. NAPCO did not receive any proceeds from the Offering, and incurred expenses of $496,000 in connection with the Offering.

156. The Offering Materials incorporated by reference the following filings NAPCO made with the SEC, each of which contained materially inaccurate statements of fact: (i) the quarterly report on Form 10-Q for the first quarter of fiscal 2023, ended September 30, 2022, filed on November 7, 2022 (the "1Q23 Form 10-Q"); and (ii) the quarterly report on Form 10-Q for the second quarter of fiscal 2023, ended December 31, 2022, filed on February 6, 2023 (the "2Q23 Form 10-Q").

**B.     The Offering Materials Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

157. The Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

158. Specifically, as set forth below, NAPCO's financial results incorporated by reference in the Offering Materials violated GAAP, and were materially misstated with respect to numerous metrics. The Offering Materials also failed to disclose an existing, additional material weakness in the Company's internal controls over financial reporting.

**1.     NAPCO's Materially Inaccurate Financial Reporting**

159. On August 18, 2023, NAPCO admitted that its previously-issued interim financial statements for, *inter alia*, the quarters ended September 30, 2022 ("1Q23") and December 31, 2022 ("2Q23") would need to be restated and "should no longer be relied upon." On September 1, 2023, NAPCO filed with the SEC amended quarterly reports on Form 10-Q/A that restated, *inter alia*, NAPCO's interim financial statements for 1Q23 and 2Q23 (the "Restatement").

160. In announcing the need for the Restatement, NAPCO acknowledged that the inaccurate financial metrics the Company had reported in the 1Q23 Form 10-Q and the 2Q23 Form

- 65 -

10-Q stemmed from the overstatement of inventory and understatement of cost of goods sold, "resulting in overstated gross profit, operating income and net income" for those quarters.

161.   Generally Accepted Accounting Principles ("GAAP") generally encompasses those conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP.  17 C.F.R. §210.10-01(a).

162.   NAPCO has now admitted that the interim financial statements it issued to investors and filed with the SEC for, *inter alia*, the first two quarters of fiscal 2023 were materially inaccurate, presented in violation of GAAP, and "should no longer be relied upon."  Accordingly, each of the interim financial statements for those quarters is presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

163.   By virtue of the Restatement, *NAPCO itself* has concluded that the now restated interim financial statements contained in the 1Q23 Form 10-Q and the 2Q23 Form 10-Q and incorporated by reference in the Offering Materials were materially misstated—since only materially misstated financial statements are to be corrected and re-reported on a retroactive basis.[13]

164.   Thus, there is no dispute that the Offering Materials contained materially inaccurate financial statements.

---

[13]   *See, e.g.*, Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections*, SEC Codification of Staff Accounting Bulletins ("CSAB") Topic 1M *Financial Statements, Materiality* and Topic 1-N, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements*.  According to the FASB, ASC is the source of authoritative GAAP to be applied to nongovernmental entities.

165. NAPCO has also admitted that, in addition to the Company's preexisting internal control deficiencies, the Restatement "demonstrated an additional material weakness in [its] internal controls over financial reporting."[14]

166. GAAP, as set forth in ASC Topic No. 250, *Accounting Changes and Error Corrections*, provides that errors in previously issued financial statements are to be corrected via a restatement of the previously issued financial statements. Adjustments related thereto are to be reported in the restatement as "error corrections."

167. When NAPCO issued the Restatement on September 1, 2023, it filed with the SEC amended quarterly reports on Form 10-Q/A that corrected errors in the 1Q23 Form 10-Q and the 2Q23 Form 10-Q related to the Company's reported inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins.

168. The Offering Materials represented that NAPCO's "financial information [was] presented in accordance with U.S. GAAP . . . ." That representation was materially false and misleading because—as NAPCO has now admitted—the 1Q23 Form 10-Q and the 2Q23 Form 10-Q, which were incorporated by reference in the Offering Materials, overstated NAPCO's inventory, understated its cost of goods sold, and overstated its net income and related metrics.

169. The basic accounting precept that expenses be recorded in the same period in which the corresponding benefit is realized is arguably the most fundamental tenet of accrual accounting. *See* FASB Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting*.

---

[14] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

170. GAAP, as set forth in ASC Topic No. 330, *Inventories*, provides that the primary objective of accounting for inventories is the proper determination of income, through the process of matching appropriate costs against revenues.

171. These accounting principles are neither complex, nor a matter of subjective interpretation or opinion. Because the Offering Materials incorporated by reference the 1Q23 Form 10-Q and the 2Q23 Form 10-Q, which were presented in violation of these provisions of GAAP, the Offering Materials were materially false and misleading.

### 2. The Materially Inaccurate 1Q23 Form 10-Q Was Incorporated in the Offering Materials

172. The Offering Materials incorporated by reference the 1Q23 Form 10-Q, which NAPCO had filed with the SEC on November 7, 2022. For the quarter, the 1Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $63,837,000 as of September 30, 2022;
- Cost of goods sold of $21,326,000;
- Net income of $6,402,000;
- Income per share of $0.17;
- Operating income of $7,249,000;
- Gross profit of $18,167,000; and
- Gross margins of 46%.

173. The statements referenced above in ¶172 were untrue statements of material fact because, as NAPCO has now admitted: (i) its financial statements were presented in violation of GAAP; and (ii) for 1Q23, its actual financial results were as follows:

- Total inventory (current and non-current) was $60,236,000 as of September 30, 2022, and had been overstated by *5.98%*;
- Cost of goods sold was $24,927,000, and had been understated by *14.45%*;

- 68 -

- Net income was $3,084,000, and had been overstated by *107.59%*;

- Income per share was $0.08, and had been overstated by *112.5%*;

- Operating income was $3,648,000, and had been overstated by *98.71%*;

- Gross profit was $14,566,000, and had been overstated by *24.72%*; and

- Gross margins were approximately 36.9%, and had been overstated by *24.72%*.

174. In addition, the 1Q23 Form 10-Q represented that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 1Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

175. The statements referenced above in ¶174 were untrue statements of material fact because, as NAPCO has now admitted: (i) it suffered from additional material weaknesses in internal controls over financial reporting; and (ii) those additional material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 1Q23.

### 3. The Materially Inaccurate 2Q23 Form 10-Q Was Incorporated in the Offering Materials

176. The Offering Materials also incorporated by reference the 2Q23 Form 10-Q, which NAPCO had filed with the SEC on February 6, 2023. For the quarter, the 2Q23 Form 10-Q reported:

- 69 -

- Total inventory (current and non-current) of $64,192,000 as of December 31, 2022;

- Cost of goods sold of $22,852,000;

- Net income of $8,446,000;

- Income per share of $0.23;

- Operating income of $9,436,000;

- Gross profit of $19,462,000; and

- Gross margins of approximately 46%.

177. The statements referenced above in ¶176 were untrue statements of material fact because—as NAPCO has now admitted: (i) its financial statements were presented in violation of GAAP; and (ii) for 2Q23, its actual financial results were as follows:

- Total inventory (current and non-current) was $55,483,000 as of December 31, 2022, and had been overstated by *15.7%*;

- Cost of goods sold was $27,960,000, and had been understated by *18.27%*;

- Net income was $3,929,000, and had been overstated by *114.97%*;

- Income per share was $0.11, and had been overstated by *109.1%*;

- Operating income was $4,328,000, and had been overstated by *118.02%*;

- Gross profit was $14,354,000, and had been overstated by *35.59%*; and

- Gross margins were approximately 33.9%, and had been overstated by *35.59%*.

178. In addition, for the first six months of fiscal 2023, ended December 31, 2022, the 2Q23 Form 10-Q reported:

- Cost of goods sold of $44,178,000;

- Net income of $14,848,000;

- Income per share of $0.40;

- Operating income of $16,685,000;

- Gross profit of $37,629,000; and

- 70 -

- ~~Gross margins of 46%.~~

~~179.    The statements referenced above in ¶178 were untrue statements of material fact because   as NAPCO has now admitted: (i) its financial statements were presented in violation of GAAP; and (ii) for the first six months of fiscal 2023, its actual financial results were as follows:~~

- ~~Cost of goods sold was $52,887,000, and had been understated by *16.47%*;~~

- ~~Net income was $7,013,000, and had been overstated by *111.72%*;~~

- ~~Income per share was $0.19, and had been overstated by *110.53%*;~~

- ~~Operating income was $7,976,000, and had been overstated by *109.2%*;~~

- ~~Gross profit was $28,920,000, and had been overstated by *30.11%*; and~~

- ~~Gross margins were approximately 35.4%, and had been overstated by *30.11%*.~~

~~180.    In addition, the 2Q23 Form 10-Q reiterated that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow-moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 2Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."~~

~~181.    The statements referenced above in ¶180 were untrue statements of material fact because   as NAPCO has now admitted: (i) it suffered from additional material weaknesses in internal controls over financial reporting; and (ii) those additional material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 1Q23.~~

- 71 -

C.     Securities Act Counts

COUNT III

For Violations of Section 11 of the Securities Act
Against All Defendants

182.    For purposes of this Count, Plaintiff City of Warren Police and Fire Retirement System repeats, incorporates, and realleges each and every allegation set forth above relating to the Securities Act claims as if fully set forth herein, and expressly disclaims each and every allegation relating to the Exchange Act claims, including any allegation or implication of fraud, recklessness, or intentional misconduct.

183.    For avoidance of doubt, the only allegations that Plaintiff incorporates by reference in this Count are those pertaining to the Securities Act claims set forth in: the preamble paragraph; ¶1, ¶¶3-4, and ¶13 (Introduction); ¶¶14-17 (Jurisdiction and Venue); ¶¶10-22 and ¶¶24-29 (Parties); ¶¶30-35 (Class Action Allegations); ¶¶36-38 (The Company and Its Business); and §VII (Allegations Under the Securities Act, ¶¶149-181). Plaintiff expressly disclaims all allegations above pertaining to the Exchange Act claims, including the allegations in ¶2 and ¶¶4-12, and in §VI.

184.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is expressly disclaimed.

185.    The Registration Statement, which was incorporated in and formed part of the Offering Materials, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

- 72 -

186. NAPCO was the registrant for the Offering. As an issuer of securities to the public, NAPCO is strictly liable to Plaintiff and the Class for the misstatements and omissions.

187. The Individual Defendants each signed and/or authorized the signing of the Registration Statement. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material misstatements and/or omissions of material facts. As such, the Individual Defendants are strictly liable to Plaintiff and the Class.

188. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the Offering was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Plaintiff and the Class.

189. Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Offering Materials were complete, accurate or non-misleading.

190. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

191. Plaintiff and the other members of the Class purchased NAPCO common stock pursuant or traceable to the Registration Statement for the Offering and have sustained damages as a result. The price of the stock has declined substantially subsequent and due to Defendants' violations.

192. At the time of their purchases of NAPCO common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein, and could not have reasonably discovered those facts prior to the disclosures herein.

193. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time this action was filed. Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

**COUNT IV**

**For Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

194. For purposes of this Count, Plaintiff City of Warren Police and Fire Retirement System repeats, incorporates, and realleges each and every allegation set forth above relating to the Securities Act claims as if fully set forth herein, and expressly disclaims each and every allegation relating to the Exchange Act claims, including any allegation or implication of fraud, recklessness, or intentional misconduct.

195. For avoidance of doubt, the only allegations that Plaintiff incorporates by reference in this Count are those pertaining to the Securities Act claims set forth in: the preamble paragraph; ¶1, ¶¶3-4, and ¶13 (Introduction); ¶¶14-17 (Jurisdiction and Venue); ¶¶10-22 and ¶¶24-29 (Parties); ¶¶30-35 (Class Action Allegations); ¶¶36-38 (The Company and Its Business); §VII (Allegations Under the Securities Act, ¶¶149-181); and ¶¶182-193 (Count III). Plaintiff expressly disclaims all

- 74 -

allegations above pertaining to the Exchange Act claims, including the allegations in ¶2 and ¶¶4-12, and in §VI.

196.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 12(a)(2) claim, and any implication of fraud or scienter is expressly disclaimed.

197.    Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Offering Materials and issued in connection with the Offering.  Plaintiff and other members of the Class purchased or otherwise acquired NAPCO common stock pursuant to the Offering.  The Offering Materials contained a defective and inaccurate Prospectus that Defendants used to induce Plaintiff and the other members of the Class to purchase the common stock registered in the Offering.

198.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the Offering, including their solicitation, the Offering could not, and would not, have been accomplished.  Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the Offering and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus.  The Prospectus was calculated to create interest in NAPCO common stock and was widely distributed by, or on behalf of, the Underwriter Defendants for that purpose; and

(b)    conceived and planned the Offering and orchestrated all activities necessary to affect the sale of NAPCO common stock to the investing public by issuing, promoting and supervising the distribution and ultimate sale of NAPCO common stock to the investing public.

199.   The Prospectus contained untrue statements of material fact, and/or concealed or failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and the other members of the Class who purchased NAPCO common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

200.   Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired NAPCO common stock.

201.   By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased NAPCO common stock pursuant to the Prospectus sustained damages in connection with their purchases.  Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

**COUNT V**

**For Violations of Section 15 of the Securities Act
Against the Individual Defendants**

202.   For purposes of this Count, Plaintiff City of Warren Police and Fire Retirement System repeats, incorporates, and realleges each and every allegation set forth above relating to the Securities Act claims as if fully set forth herein, and expressly disclaims each and every allegation relating to the Exchange Act claims, including any allegation or implication of fraud, recklessness, or intentional misconduct.

203. For avoidance of doubt, the only allegations that Plaintiff incorporates by reference in this Count are those pertaining to the Securities Act claims set forth in: the preamble paragraph; ¶1, ¶¶3-4, and ¶13 (Introduction); ¶¶14-17 (Jurisdiction and Venue); ¶¶10-22 and ¶¶24-29 (Parties); ¶¶30-35 (Class Action Allegations); ¶¶36-38 (The Company and Its Business); §VII (Allegations Under the Securities Act, ¶¶149-181); ¶¶182-193 (Count III); and ¶¶194-201 (Count IV). Plaintiff expressly disclaims all allegations above pertaining to the Exchange Act claims, including the allegations in ¶2 and ¶¶4-12, and in §VI.

204. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is expressly disclaimed.

205. The Individual Defendants each were control persons of NAPCO by virtue of their positions as directors and/or senior officers of NAPCO. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of NAPCO.

206. The Individual Defendants each were culpable participants in the primary violations of Sections 11 and 12(a)(2) of the Securities Act alleged herein, based on their having signed or authorized the signing of the Offering Materials and having otherwise participated in the process which allowed the Offering to be successfully completed.

## VIII.XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying the Class accordingly, designating Plaintiffs as class representatives, and appointing Lead Counsel as Class Counsel;

- 77 -

~~B~~A.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

~~C.    With respect to the Securities Act claims, awarding rescission or a rescissory measure of damages, to the extent available under the Securities Act, together with prejudgment interest thereon;~~

~~D~~B.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, counsel fees and expert fees; and

~~E~~C.    Granting such other, further, and/or different relief as the Court deems just and proper.

## ~~IX.~~XIII.    JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: ~~February 16, 2024~~January    , 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ERIN W. BOARDMAN
AVITAL O. MALINA
SKYLER JORDAN SANDS
JEREMY YOHANNAN

~~/s/ Erin W. Boardman~~
ERIN W. BOARDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
eboardman@rgrdlaw.com
amalina@rgrdlaw.com
ssands@rgrdlaw.com
jyohannan@rgrdlaw.com

JOHNSON FISTEL, ~~LLP~~PLLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  470/632-6000
~~770/200-3101 (fax)~~
michaelf@johnsonfistel.com

JOHNSON FISTEL, ~~LLP~~
~~RALPH M. STONE~~
~~620 Fifth Avenue, 2nd Floor~~
~~New York, NY  10020~~
PLLP
JEFFREY A. BERENS
2373 Central Park Boulevard, Suite 100
Denver, CO  80238
Telephone: ~~212/292-5690~~
~~ralphs~~ 303/861-1764
jeffb@johnsonfistel.com

*Lead Counsel ~~for Lead Plaintiff~~*

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.,
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for City of Warren Police and Fire Retirement System*