UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

RANDY ZORNBERG, Individually and on Behalf : 
of All Others Similarly Situated,            : Case No. 1.23-cv-06465-BMC

                                   :

                  Plaintiff,      : <u>CLASS ACTION</u>

                                   :

             vs.                :

                                   :

NAPCO SECURITY TECHNOLOGIES, INC.,   :
RICHARD L. SOLOWAY and KEVIN S.      :
BUCHEL,                                  :

               Defendants.

-------------------------------------------------------------------x

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Defendants by and through their undersigned counsel, hereby respond to the Second Amended Complaint, filed by Lead Plaintiff Donald W. Hutchings and Additional Plaintiff City of Warren Police and Fire Retirement System ("Plaintiffs"), as follows:

Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning Plaintiffs' investigation as described in the unnumbered introductory paragraph of the Second Amended Complaint, and otherwise deny any allegations in the unnumbered introductory paragraph.

Defendants deny each and every allegation in the Second Amended Complaint, including without limitation, allegations appearing in headings and subheadings, except as expressly admitted herein. Defendants deny that the headings and sub-headings of the Second Amended Complaint constitute allegations requiring a response. To the extent that any response is required to the headings and sub-headings of the Second Amended Complaint, which are repeated in this Answer solely for the convenience of the Court, Defendants deny any allegations or averments purportedly set forth therein. In its April 11, 2025 Ruling on Defendants' Motion to Dismiss, Docket Entry No. 59 (the "Order"), the Court granted in part and denied in part Defendants' motion to dismiss. The fact that Defendants have responded to all allegations set forth herein should not be construed as a waiver of any argument that Plaintiffs' claims are barred, in whole or in part by the Order, and Defendants expressly reserve all rights thereunder. Moreover, the fact that Defendants made answers to each Paragraph of the Second Amended Complaint should not be construed as a waiver of any argument, and Defendants expressly reserve all rights they may have to seek relief by appropriate motions to the allegations in the Second Amended Complaint.

Defendants reserve the right to amend and/or supplement this Answer.

- 1 -

**<u>RESPONSES TO SPECIFIC ALLEGATIONS</u>**

**I.      INTRODUCTION**

1.      This is a federal securities class action on behalf of those who purchased or otherwise acquired NAPCO common stock between November 7, 2022 and August 18, 2023, inclusive (the "Class Period") and were damaged thereby, seeking to pursue claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

**ANSWER:**  Paragraph 1 contains Plaintiffs' characterization of their claims to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 1, except admit that Plaintiffs purport to describe the claims asserted in the Second Amended Complaint.

2.      Headquartered in Amityville, New York, defendant NAPCO designs and manufactures security solutions, including access control devices, intrusion and fire alarm systems, and video surveillance products. Its fiscal year ends on June 30.

**ANSWER:**  Defendants admit the allegations in Paragraph 2.

3.      On August 18, 2023, NAPCO announced that it would need to restate its interim financial statements for the first three quarters of fiscal 2023, ended September 30, 2022 ("1Q23"), December 31, 2022 ("2Q23"), and March 31, 2023 ("3Q23"), and that its previously-issued financials for those quarters "should no longer be relied upon" (the "Restatement"). The Company explained that, for those quarters, its inventories had been overstated and its cost of goods sold ("COGS") had been understated, "resulting in ***overstated gross profit, operating income and net income,***" and gave preliminary estimates of its overstatement of net income. NAPCO also admitted that a previously-undisclosed material weakness existed in its internal controls over financial reporting.

**ANSWER:**   To the extent the allegations in Paragraph 3 purport to characterize, rely on, or quote NAPCO's August 18, 2023 Form 8-K, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 3.

4.    Shortly thereafter, on September 1, 2023, the Company filed amended quarterly reports, which confirmed the severity of its financial misstatements. The Restatement showed that during the Class Period, NAPCO's net income had been overstated by as much as ***114.97%,*** its income per share had been overstated by as much as ***112.5%,*** its operating income had been overstated by as much as ***118.02%,*** and its gross profit and gross margins had been overstated by as much as ***35.59%.***

**ANSWER:**  Defendants admit that, on September 1, 2023, the Company filed Form 10-Q/As.  To the extent the allegations in Paragraph 4 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/As, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 4.

5.    When NAPCO revealed that it would need to restate its financial results and provided preliminary estimates for restated net income at the end of the Class Period, the price of its common stock fell more than ***45%.***

**ANSWER:**   Defendants deny the allegations in Paragraph 5, except aver that NAPCO's stock price is a matter of public record and speaks for itself.

6.    Although NAPCO attempted to characterize the Restatement as stemming from innocent accounting "errors," in fact, it was the product of a fraudulent scheme to inflate NAPCO's income-related metrics, orchestrated by Defendants.

**ANSWER:**   Paragraph 6 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 6.

7.     In August 2022, while defendants Soloway and Buchel were beginning to plan the sale of nearly half of their NAPCO stock, Soloway expressed to Buchel his desire to "soft land[]" NAPCO's "inventory to much lower levels." NAPCO_ZORNBERG_000116351 at -354. NAPCO's inventory had risen sharply as a result of Defendants' decision to purchase components used in NAPCO's products at high costs in the wake of COVID-related supply chain shortages.

**ANSWER:**  To the extent the allegations in Paragraph 7 purport to characterize, rely on, or quote from a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 7, except admit that Defendants Soloway and Buchel sold NAPCO stock in November 2022 and February 2023.

8.     But by the start of the Class Period, defendant Buchel and NAPCO management were well aware that component costs were falling as supply-chain constraints abated. *See, e.g.,* NAPCO_ZORNBERG_000071259 at -259-60. In fact, defendant Buchel personally approved component purchases at vastly lower prices than the prices at which those items were then being carried in inventory. *See, e.g,* NAPCO_ZORNBERG_000182360 & NAPCO_ZORNBERG_000182366 at -360 (approval request for component purchase); NAPCO_ZORNBERG_000138390 & 000138391 at -391 (showing much higher unit cost for that component). By early 2023, defendant Buchel was aware that the costs recorded in inventory were markedly out-of-line with current costs, as costs for some components had come down as much as 99%. *See, e.g., id.* at -390-91.

**ANSWER:**  To the extent the allegations in Paragraph 8 purport to characterize or rely on documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 8.

9.      Because he oversaw NAPCO's monthly financial close, defendant Buchel also knew that NAPCO's reported inventory had not been properly adjusted downward to account for the rapidly dropping component costs. Instead, the Company's accounting controls only provided for mandatory inventory price testing and costing adjustments annually, at fiscal year-end—although nearly all other aspects of inventory valuation were reviewed and adjusted quarterly. *See* NAPCO_ZORNBERG_000097151 at -158-61.

**ANSWER:**  To the extent the allegations in Paragraph 9 purport to characterize or rely on a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 9.

10.      Indeed, Defendants knew that a previous inventory-related restatement, in May 2022, had resulted from "utilizing annual data rather than quarterly, which was not the most up to date values." DT00001060 at -065. Following that restatement, by September 2022, NAPCO had updated most of its inventory procedures from year-end to quarterly—but Defendants left inventory costing as the only inventory area that remained subject to annual review. NAPCO_ZORNBERG_000001364 at -371-73. This omission was deliberate, and it coincided with defendant Soloway's desire to "soft land[]" NAPCO's inflated inventory (NAPCO_ZORNBERG_000116351 at -354)—by postponing any evaluation of the inventory on NAPCO's books in light of *current* costs—even though Defendants knew component costs were plummeting, along with NAPCO's true inventory value. *See, e.g.,* NAPCO_ZORNBERG_000097151 at -159.

**ANSWER:**  To the extent the allegations in Paragraph 10 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 10.

11.     By maintaining inflated inventory values for three consecutive quarters, defendants Soloway and Buchel caused NAPCO to report inflated income metrics—which enabled them to cash out their stock holdings as the Company's share price reached all-time highs. Defendants Soloway and Buchel each sold nearly half of their NAPCO stock during the Class Period, with Soloway selling *48.5%* of his shares for proceeds of approximately *$104 million,* and Buchel selling *45.5%* of his shares for proceeds of approximately *$4.5 million—*at a time when NAPCO's inflated income metrics enabled the Company to meet (and exceed) market expectations, when it otherwise would not have.

**ANSWER:**  The first sentence of Paragraph 11 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 11.  Defendants otherwise deny the allegations in Paragraph 11, except admit that Defendant Soloway and Defendant Buchel sold stock during the Class Period worth approximately $104 million and $4.46 million respectively, when valued using the public offering price for the secondary offering of $31.50 per share.  As disclosed in their respective Form 4's, the net price per share was $30.87.

12.     Defendants Soloway and Buchel's first round of sales occurred shortly after Defendants announced inflated results for 1Q23, and the next round of sales occurred in a precisely- timed secondary offering, shortly after Defendants announced inflated results for 2Q23. And although defendants Soloway and Buchel were subject to a lock-up agreement following the secondary offering, they still sought to exercise all of their available options, and even inquired about being released from the lock-up agreement, while NAPCO's income metrics remained inflated for a third consecutive quarter. *See* NAPCO_ZORNBERG_000191309 at -309-11; NAPCO_ZORNBERG_000076064 at -064; NAPCO_ZORNBERG_000191655 at -655; NAPCO_ZORNBERG_000113651 at -652-53; NAPCO_ZORNBERG_000085312 at -312.

**ANSWER:**  To the extent the allegations in Paragraph 12 purport to characterize or rely on documents produced in this litigation, Defendants respectfully refer to such documents for their

complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 12, except admit (i) that Defendant Soloway and Defendant Buchel sold stock in November 2022 after the Company's announcement of 1Q23 earnings and in February 2023 after the Company's announcement of 2Q23 earnings, and (ii) Defendants Soloway and Buchel were subject to a lock-up agreement following the February 2023 secondary offering.

## II.   JURISDICTION AND VENUE

13.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

**ANSWER:**  Paragraph 13 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 13.

14.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

**ANSWER:**  Paragraph 14 purports to state legal conclusions to which no response is required.

15.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

**ANSWER:**  The first two sentences of Paragraph 15 purport to state legal conclusions to which no response is required.  Defendants otherwise deny the allegations in Paragraph 15, except admit that the Company's principal executive offices are located in Suffolk County, New York.

16.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

**ANSWER:** Paragraph 16 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 16.

## III.    PARTIES

17.    As set forth in his certification previously filed with the Court and incorporated herein by reference, Lead Plaintiff Donald W. Hutchings purchased NAPCO common stock during the Class Period, and was damaged thereby. *See* ECF 22-2.

**ANSWER:** Paragraph 17 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17 and on that basis deny them.

18.    As set forth in its certification previously filed with the Court and incorporated herein by reference, Plaintiff City of Warren Police and Fire Retirement System purchased NAPCO common stock during the Class Period, and was damaged thereby. *See* ECF 40 at 65-66.

**ANSWER:** Paragraph 18 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 18 and on that basis deny them.

19.    Defendant NAPCO provides security devices and systems. The Company's principal executive offices are located at 333 Bayview Avenue, Amityville, New York 11701. NAPCO's common stock is listed and trades on the NASDAQ, an efficient market, under the symbol "NSSC."

**ANSWER:** Defendants admit the allegations set forth in the first two sentences of Paragraph 19 and admit that NAPCO's common stock is listed and trades on the NASDAQ under the symbol "NSSC." Whether the market in which NAPCO traded is, at all times, an "efficient market" is a legal conclusion to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of this allegation and on that basis deny it.

20.     Defendant Soloway—NAPCO's founder—is, and was at all relevant times, the Company's CEO, President, Secretary, and Chairman of the Board of Directors.

**ANSWER:**  Defendants deny the allegations in the first sentence of Paragraph 20, except admit that Defendant Soloway is NAPCO's founder, and was NAPCO's CEO, President, Secretary, and Chairman of the Board of Directors during the Class Period, and is currently NAPCO's CEO, Secretary, and Chairman of the Board of Directors.

21.     Defendant Buchel is, and was at all relevant times, NAPCO's CFO, Executive Vice President of Operations, Treasurer, and a Director.

**ANSWER:**  Defendants deny the allegations in the first sentence of Paragraph 21, except admit that Defendant Buchel was NAPCO's CFO, Executive Vice President, Treasurer, and a Director during the Class Period, and is currently NAPCO's COO, President, Treasurer, and a Director.

22.     Defendants Soloway and Buchel are collectively referred to as the "Individual Defendants" and, together with NAPCO, as "Defendants."

**ANSWER:**  Paragraph 22 contains Plaintiffs' characterization of Defendants to which no response is required.   To the extent a response is required, Defendants admit that Plaintiffs purport to collectively refer to Defendants Soloway and Buchel as "Individual Defendants," and together with NAPCO, "Defendants."

## IV.     THE COMPANY AND ITS BUSINESS

23.     Defendant NAPCO designs and manufactures electronic security devices, provides wireless communication services for intrusion and fire alarm systems, and offers school safety solutions. The security systems it provides include access control, door-locking, intrusion and fire alarm, and video surveillance. The Company sells its products primarily to independent distributors, dealers, and installers of security equipment.

**ANSWER:**  Defendants deny the allegations in Paragraph 23, except admit that NAPCO manufactures and designs high-tech electronic security devices, cellular communication services for intrusion and fire alarm systems as well as provides school safety solutions.  Defendants further admit that its security products encompass access control systems, door-locking products, intrusion

- 9 -

and fire alarm systems and video surveillance products, which are sold principally to independent distributors, dealers, and installers of security equipment.

24.    Approximately two-thirds of NAPCO's revenues are generated by equipment sales. The remainder are recurring revenues from monthly subscription fees it charges to provide wireless services for communicating security breaches and fire alarms.

**ANSWER:**  Defendants admit that NAPCO generates revenue from equipment sales and wireless services provided for equipment.  Defendants deny the remaining allegations in Paragraph 24.

25.    The Company is headquartered in Amityville, New York, and manufactures its products in the Dominican Republic. NAPCO's fiscal year begins on July 1 and ends on June 30. Accordingly, its first quarter ("1Q") ends on September 30, its second quarter ("2Q") ends on December 31, its third quarter ("3Q") ends on March 31, and its fourth quarter ("4Q") ends on June 30.

**ANSWER:**  Defendants admit the allegations in Paragraph 25.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    NAPCO's Restatement of Its 1Q23, 2Q23, and 3Q23 Financials

26.    On August 18, 2023, NAPCO announced that it would restate its financial statements for the first three quarters of fiscal 2023, ended September 30, 2022 (1Q23), December 31, 2022 (2Q23), and March 31, 2023 (3Q23), and that its previously issued financials for those quarters should no longer be relied upon. The Company explained that, for those quarters, its inventories had been overstated and COGS had been understated, resulting in overstated gross profit, operating income, and net income, and gave the following preliminary estimates of its overstatement of net income:

| Quarter | Net Income – Previous | Net Income - Restated (Estimate) | Difference |
|---|---|---|---|

- 10 -

| 1Q23 | $6.4 million | $2.9 million | ($3.5 million) |
|---|---|---|---|
| 2Q23 | $8.4 million | $3.7 million | ($4.7 million) |
| 3Q23 | $10.8 million | $9.5 million | ($1.3 million) |

NAPCO also admitted that a previously undisclosed material weakness existed in its internal controls over financial reporting. Defendants explained the "errors" in NAPCO's financial statements as follows:

> During the preparation of the Company's consolidated financial statements for the fiscal year ended June 30, 2023, management of the Company identified certain errors related to the Company's calculation of cost of goods sold ("COGS") and inventory for each of the first three quarters of fiscal 2023. Specifically, although the costs of several components fluctuated substantially during fiscal 2023, the Company's costing procedures did not appropriately account for such fluctuations. As a result, inventories were overstated and COGS was understated, resulting in overstated gross profit, operating income and net income for each period.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 26. To the extent the allegations in Paragraph 26 purport to characterize, rely on, or quote NAPCO's August 18, 2023 Form 8-K or the September 1, 2023 Form 10-Q/As, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 26.

27.    On September 1, 2023, NAPCO confirmed the severity of its financial misstatements, when it filed with the SEC amended quarterly reports on Form 10-Q/A that restated its financial results for 1Q23, 2Q23, and 3Q23. For 1Q23, NAPCO's net income had been overstated by 107.6%, income per share by 112.5%, operating income by 98.7%, and gross profit and gross margins by 24.72%. For 2Q23, NAPCO's net income had been overstated by 115%, income per share by 109%, operating income by 118%, and gross profit and gross margins by 35.6%. For 3Q23, NAPCO's net income had been overstated by 13.5%, income per share by 11.5%, operating income by 13.2%, and gross profit and gross margins by 6.54%.

**ANSWER:** Defendants admit that, on September 1, 2023, the Company filed Form 10-Q/As that restated its financial results for 1Q23, 2Q23, and 3Q23. To the extent the allegations in

- 11 -

Paragraph 27 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/As, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 27.

28.     Despite Defendants' efforts to characterize the Restatement as being the result of innocent errors in calculating inventory and COGS (which would not affect quarterly net sales), these announcements caused NAPCO's share price to plummet more than 45%, from $38.41 per share on August 18, 2023, to $21.11 per share on August 21, 2023.

**ANSWER:** Defendants deny the allegations in Paragraph 28, except aver that NAPCO's stock price is a matter of public record and speaks for itself.

29.     Sophisticated market participants were not buying NAPCO's explanation either. The principal for Cannell Capital LLC, which years earlier was a 10% NAPCO shareholder, emailed B. Riley (which covers NAPCO) that "I think this might be worse than we thought. I know the CEO and he seems slimy." BRS-006321 at -321. A broker at B. Riley internally referred to NAPCO's inventory and net income as "lies" and "fake," and commented on "Soloway's 2.3mm share purge back in Feb to the suckers (errr. I mean institutions)." BRS-007510 & BRS-007430 at -430, -511. As NAPCO's "second largest active shareholder" summarized the situation: "[T]his looks terrible. Richard [Soloway] selling $60m+ of stock while earnings are being inflated by over 100%." NAPCO_ZORNBERG_000010562 at -562.

**ANSWER:** To the extent the allegations in Paragraph 29 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 29, except admit that Cannell Capital LLC was listed as a 10% owner of NAPCO prior to 2006.

30.     NAPCO's public explanation for the Restatement was, however, closer to the truth than the false "narrative" that Soloway had proposed to Buchel four days earlier, which

suggested blaming the Restatement on "some technical issues with the inventory management program on certain microprocessors costs . . . ." NAPCO_ZORNBERG_000075675 at -675.

**ANSWER:** To the extent the allegations in Paragraph 30 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 30.

### B.  Defendants Knew or Recklessly Disregarded that NAPCO's Reported Inventory was Materially Overstated During Fiscal 2023

#### 1.  Defendants' Pandemic-Related Purchasing Strategy Inflated NAPCO's Inventory Value

31.    Before the Class Period, in response to global COVID-related supply-chain disruptions, Defendants had adopted an aggressive purchasing strategy, whereby NAPCO acquired critical components used to manufacture its products without regard to pricing or actual production needs—wagering that this approach would pay off in the long run. Defendants disclosed this strategy to investors, explaining that it was partly responsible for NAPCO's inventory growing to $50 million for fiscal 2022 (ended June 30, 2022), from about $32 million a year earlier.

**ANSWER:** Defendants admit that NAPCO purchased components at higher prices as a result of COVID-related supply-chain disruptions. Defendants otherwise deny the allegations in Paragraph 31.

#### 2.  Defendants Observed NAPCO's Component Costs Normalizing During the First Half of Fiscal 2023, But Failed to Adjust Inventory

32.    By the first half of fiscal 2023 (*i.e.,* the second half of calendar year 2022), conditions had begun to change. On August 26, 2022—before the start of the Class Period, and while defendants Soloway and Buchel were planning the sale of roughly half of their shares— Soloway flagged NAPCO's "really big inventory," asking Buchel whether he was comfortable that the costly components being converted to finished goods would "soft land[] the inventory

- 13 -

to much lower levels." NAPCO_ZORNBERG_000116351 at -354. Implicit in Soloway's "soft landing" query, of course, was his awareness of what a painful "hard landing" inventory write-down would entail. Buchel responded that inventory "on hand is at inflated prices," while Bob Schettino, NAPCO's Controller, acknowledged that a substantial portion of those inflated items were "still in ending inventory."[2] *Id.* at -353. Later in the same email chain, Jason Cullinan, VP of Materials, told Buchel that air freight (which is a component of inventory) was dropping and "we are also starting to see some components freeing up on newly placed orders - expect to see continued improvements as we move towards 2023." *Id.* at -351.

**ANSWER:**  To the extent the allegations in Paragraph 32 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 32. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations in Footnote 2 and on that basis deny them.

33.    With the landscape continuing to shift, on October 26, 2022, NAPCO's Director of Purchasing, Bill Kaspar, emailed Buchel and others, reminding them that supply-chain constraints were easing and that it was time to rein in excessive purchasing. NAPCO_ZORNBERG_000071259 at -259-60. As Kaspar put it, "the music has changed and the DANCE must change now." *Id.* Underscoring that NAPCO management was closely tracking shifting component pricing and inventory value, Jason Cullinan, VP of Materials, responded with "High" importance, stating: "Let's keep a list of the higher value items . . . until next inventory mtg. Qty and value so we can report back."    *Id.* at -259. *See also, e.g,* NAPCO_ZORNBERG_000071382 & NAPCO_ZORNBERG_000071386 at - 386 (11/08/2022

---

[2]    "Inventory on hand" is the physical count and value of goods currently available for sale, while "ending inventory" is the specific accounting figure representing the total value of all unsold goods at the end of a financial period, calculated using beginning inventory, purchases, and COGS.

slide showing cost of item IC1246LF3[3] dropping from over $20 to $0.33 per unit during fiscal 2022, stating: "Unit cost wrong s/b .325, not $23.92"); NAPCO_ZORNBERG_000078358 & NAPCO_ZORNBERG_000078361 ("Corrected Costs" tab, showing IC1246LF3 carried at inflated $12.65 per unit in inventory during 2Q23).

**ANSWER:**   To the extent the allegations in Paragraph 33 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 33.

34.   Defendant Buchel had real-time visibility into the rapidly-falling costs because he was personally approving component purchases. For example, on October 31, 2022, Buchel received an email seeking approval of purchases of component parts GV5469 @ $0.20 and GV5466 @ $1.95 each. *See* NAPCO_ZORNBERG_000182360 & NAPCO_ZORNBERG_000182366 at - 360, -366. At the time, these items were being carried in inventory at much higher unit costs. *See* NAPCO_ZORNBERG_000138390 & 000138391 (spreadsheet provided to Buchel on 01/31/2023: "Marks excess raw matl ge $2500" tab showing unit costs of $31.50 for component GV5469 and $60.00 for component GV5466); NAPCO_ZORNBERG_000078358 & NAPCO_ZORNBERG_000078361 (Restatement-related spreadsheet, "Corrected Costs" tab). *See also* NAPCO_ZORNBERG_000138047 & NAPCO_ZORNBERG_000138055 at -047, -055 (08/12/2022 request for approval of purchase order, and purchase order for item IC1110LF at unit price of $60.00, signed by Buchel); NAPCO_ZORNBERG_000154261 & NAPCO_ZORNBERG_000154266 at -261, -266 (08/16/2022 request for approval of purchase order, and purchase order for item IC1110LF at unit price of $30.00, signed by Buchel). And as supply chain constraints abated, Buchel was

---

[3]   Components beginning with "IC" are semiconductors.

aware of NAPCO's efforts to curtail high-cost purchases of components. *See* NAPCO_ZORNBERG_000071315 at -315 (11/03/2022 email from Jason Cullinan, VP of Materials, to Buchel: "Told Peter also, no more IC1101's (small micro) until April.").

**ANSWER:** To the extent the allegations in Paragraph 34 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 34.

35.     Defendant Soloway likewise had visibility into the ongoing inventory issues, including the falling component costs, through his attendance at Buchel's "Weekly Management Meeting." *See, e.g.,* NAPCO_ZORNBERG_000004838 at -838.[4] A foremost topic at these meetings was addressing NAPCO's record high inventory. *See, e.g.,* NAPCO_ZORNBERG_000000143 at -143 (01/10/2023, "current inventory is at record high levels"); NAPCO_ZORNBERG_000006733 at -733 (01/26/2023, "We have six areas with excessive inventory."); NAPCO_ZORNBERG_000190959 at -959 (02/10/2023, "Inventory down"; "Use of Chinese broker[s]" to secure high-cost components "almost over.").

**ANSWER:** To the extent the allegations in Paragraph 35 and Footnote 4 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 35 and Footnote 4.

36.     Defendants knew that NAPCO's reported inventory had not been properly adjusted downward to account for the rapidly dropping component costs. Defendant Buchel, as CFO, oversaw NAPCO's monthly financial close. *See* NAPCO_ZORNBERG_000097151 at -161. He therefore understood that NAPCO's accounting systems and controls only provided for mandatory inventory price testing and costing adjustments annually, at fiscal year-end—

---

[4]     These weekly meetings occurred via ZOOM, and were scheduled to last an hour. NAPCO_ZORNBERG_000145923 at -923-24.

- 16 -

although nearly all other aspects of inventory valuation were reviewed and adjusted quarterly.

*Id.* at -158-60.

**ANSWER:**  To the extent the allegations in Paragraph 36 purport to characterize or rely on a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 36.

37.     Defendant Buchel's email communications confirm that he knew the costs recorded in inventory did not align with current costs, as costs for some components had come down as much as 99%. *See* NAPCO_ZORNBERG_000138390 & 000138391 at -390-91 (01/31/2023 email to Buchel, attaching spreadsheet showing "current" material unit cost for item GV5473 "is now [$].50," with item carried at $65.00 per unit). *See also* NAPCO_ZORNBERG_000136793 at -793 (3/10/2023 email to Buchel, attaching spreadsheet of component "costs from 6/30/22 and current costs"); NAPCO_ZORNBERG_000136794 (attached spreadsheet showing large variances between unit costs for fiscal 2022 (ended 06/30/2022) and unit costs as of 03/07/2023 for various components). Buchel was even reminded, on March 1, 2023, that notwithstanding the enormous drop in costs, inventory unit values remained "frozen" at their annually-set, June 30, 2022 levels. NAPCO_ZORNBERG_000105368 at -368 ("the current cost is lower than the June cost"; highlighting example of component that "should be .50, not $60.00").

**ANSWER:**  To the extent the allegations in Paragraph 37 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 37.

38.     By the beginning of calendar 2023, Defendants publicly acknowledged the falling component costs. On the Company's February 6, 2023 earnings call (for 2Q23)—which occurred

just a week before the secondary offering—defendant Buchel described the "increased availability and lower cost of certain components and transportation costs as compared to the same period last year . . . as a result of improvements within the company's supply chain." Still, Defendants made no effort to adjust quarterly inventory in light of these developments.

**ANSWER:**  Defendants admit that the Company held an earnings call on February 6, 2023 (for 2Q23) and that February 6, 2023 was one week before the secondary offering closed on February 13, 2023.  To the extent the allegations in Paragraph 38 purport to characterize, rely on, or quote NAPCO's February 6, 2023 earnings call, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 38.

> ### 3.    Defendants Knew Pandemic-Related Supply Chain Disruptions Had Undermined NAPCO's Inventory Processes and Compromised the Reliability of Annual Data

39.    Defendant Buchel oversaw NAPCO's monthly, quarterly, and annual financial close processes, and signed off on the Company's "Monthly Financial Close Process Checklist." *See* NAPCO_ZORNBERG_000097030 at -030-40. As such, he knew that NAPCO's formal inventory procedures provided for annual, year-end inventory price testing and costing. *Id.* at -038. Yet, during fiscal 2022 (ended 06/30/2022), Buchel did not hesitate to deviate from those procedures given the enormous component price fluctuations caused by the pandemic-related supply chain issues. In reviewing inventory overhead costing, NAPCO's accounting department recognized that, "given the large changes caused by the supply chain issues as well as overall increased raw material costs," the Company's annual costing analysis set forth in its procedures was insufficient, and that ***quarterly analysis was needed "to ensure the difference between using the YE [year-end] rates and the current rates would not be a material difference"*** NAPCO_ZORNBERG_000103477 & NAPCO_ZORNBERG_000103480 at -480 (08/15/2022 spreadsheet, "D&I Inquiries" tab, row 60); *id.* at rows 60-61 ("It was calculated at Q2 [2022] that the change in the cost pool would not have caused a material difference as compared to the

PY [prior year] rates. At Q3 [2022], when we calculated the impact of the new rates, it was determined to have a material impact, so the rates in the inventory for FS file was updated to current.").

**ANSWER:**  To the extent the allegations in Paragraph 39 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 39.

40.     Earlier in 2022, before the Class Period, NAPCO had encountered a strikingly similar issue. On May 10, 2022, the Company announced that it was delaying the filing of its Form 10-Q for 3Q22 to reevaluate its inventory reserves. On May 17, 2022, NAPCO restated its previous reserves for inventory obsolescence for fiscal 2019 to fiscal 2021, admitting that a "material weakness in internal control over financial reporting existed . . . related to a lack of an effectively designed control activity over the reserve for obsolete inventory." For fiscal 2022, the Company, in its Form 10-K (dated August 29, 2022, and signed by defendants Soloway and Buchel), identified the continuing material weakness as "related to the reserve for excess and slow-moving inventory," which "was a result of a lack of effective review and reconciliation controls over the forecasted sales and usage data."

**ANSWER:**  To the extent the allegations in Paragraph 40 purport to characterize, rely on, or quote NAPCO's May 10, 2022 Form 12b-25, May 17, 2022 10-K/A, and August 29, 2022 10-K, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 40.

41.     In actuality, the material weakness included the use of stale ***annual data*** rather than the most up to date ***quarterly data***. DT00001060 at -065 ("The Company was utilizing annual data rather than quarterly, which was not the most up to date values and therefore led to the material weakness").

**ANSWER:**   To the extent the allegations in Paragraph 41 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 41.

42.     Notwithstanding that NAPCO's pre-Class Period restatement had been caused by "utilizing annual [inventory] data rather than quarterly" *(id.),* during the Class Period *(i.e.,* fiscal 2023), defendant Buchel failed to take a revised approach of evaluating the annual inventory costs on NAPCO's books in light of ***current costs***—despite knowing that component costs (and thus inventory value) were fluctuating greatly from one quarter to the next. *See, e.g.,* NAPCO_ZORNBERG_000097151 at -159 (annual inventory costing procedures used in 2Q23). This was despite the fact that he knew from NAPCO's previous restatement there were additional unremedied weaknesses in NAPCO's inventory costing procedures concerning the failure to consider current costs—a fact that was not disclosed to investors. *See* DT00001060 at -065 (prior restatement caused by using "annual data rather than quarterly").

**ANSWER:**   To the extent the allegations in Paragraph 42 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 42.

43.     Indeed, after realizing that the annual inventory data was stale, Defendants had updated NAPCO's inventory processes, so that most procedures that were previously done at year- end were now done quarterly. For example, in March 2022, tasks such as those related to inventory "labor and overhead rates," inventory "[o]bsolescence," and inventory "Net Realizable Value" were done only at year-end. NAPCO_ZORNBERG_000097001. By September 2022 (1Q23), NAPCO had updated its financial close processes, so that all of these tasks would now occur quarterly. NAPCO_ZORNBERG_000001364 at -371-73. ***Inventory costing was the only***

*inventory area that remained limited to an annual review*. *Id.* at -372. Notably, the timing of these changes (and non-changes) corresponded to Soloway's email indicating that he wanted to "soft land[] the inventory to much lower levels." NAPCO_ZORNBERG_000116351 at -354.

**ANSWER:** To the extent the allegations in Paragraph 43 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 43.

44.      Worse yet, defendant Buchel failed to follow the existing inventory procedures which already required a high level *quarterly review* of inventory costs "for the reasonableness of high unit cost and total cost items," so as to "ensure completeness and that material errors are not present." NAPCO_ZORNBERG_000097151 at -158. Instead, Buchel reviewed, and then approved, NAPCO's monthly financial closings while having direct knowledge of the unreasonably high unit costs in inventory. *See, e.g., id.* at -161.

**ANSWER:** To the extent the allegations in Paragraph 44 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 44.

**C.      Soloway and Buchel's Suspicious Stock Sales**

45.      After the close of fiscal 2022 (*i.e.*, June 30, 2022), with NAPCO stock trading around $25 per share, defendants Soloway and Buchel reached out Needham, on August 1, 2022, regarding a plan for their insider sales, stating: "for estate diversification both Kevin & I would both like to sell 1/2 of our shares as NSSC reaches over $28 (which would be our NET selling price)." NAPCO_ZORNBERG_000172418 at -420. To net $28 per share in a secondary offering, Soloway calculated that NAPCO needed to boost its stock price up to at least $30.70 per share. NAPCO_ZORNBERG_000177626 at 629-30. Needham advised that the marketing

process for an offering should not begin until the stock hit $32 per share. NAPCO_ZORNBERG_000003346 at - 353.

**ANSWER:** Defendants aver that NAPCO's stock price at various points in time is a matter of public record and speaks for itself. To the extent the allegations in Paragraph 45 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 45.

46.   And while the Company filed a shelf registration statement on September 12, 2022, defendant Soloway wanted to time the selling of shares to maximize his proceeds. *See* NAPCO_ZORNBERG_000076026 at -026 (contemplating on 09/15/2022 whether it was "time to market our stock all out" as "the price . . . drifts back up toward the $31 range"). On October 14, 2022, Soloway told Morgan Stanley that any offering should take place "after our 1st quarter numbers which will be released 11/7. That week or the following week." NAPCO_ZORNBERG_000004451 at -451.

**ANSWER:** To the extent the allegations in Paragraph 46 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 46, except admit that, on September 12, 2022, the Company filed a Form S-3 Registration Statement.

47.   Ultimately, the plan evolved into an initial stock sale pursuant to a Form 144 (1,324,419 shares), followed by a larger sale (2.4 million shares) in a secondary offering. *See* NAPCO_ZORNBERG_000006466 at -466-70.

**ANSWER:** To the extent the allegations in Paragraph 47 purport to characterize or rely on a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 47, except admit that Defendant Soloway and Defendant Buchel sold 1,324,419 shares of stock in November 2022 pursuant to a Form 144

private placement and sold approximately 2.4 million shares of stock in a February 2023 secondary public offering.

48.     On November 15, 2022, just eight days after NAPCO reported its purportedly "record breaking" 1Q23 financial results, with net income, operating income, and gross profit actually overstated by 107%, 98%, and 24%, respectively—and knowing that "the music ha[d] changed" and inventory unit costs had come down (NAPCO_ZORNBERG_000071259 at -259-60)—defendants Soloway and Buchel sold more than 1.3 million NAPCO shares pursuant to a Form 144 filing at $24.79 per share, realizing proceeds of nearly $33 million. Had NAPCO accurately reported its 1Q23 results, instead of exceeding analysts' $0.13 EPS expectations by 31% ($0.04 per share), *it would have missed expectations by 38% ($0.05 per share)*.

**ANSWER:**   To the extent the allegations in Paragraph 48 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 48, except admit that Defendants Soloway and Buchel collectively sold more than 1.3 million NAPCO shares pursuant to a Form 144 filing at $24.79 per share, which yielded nearly $33 million.

49.     By January 2023, defendant Soloway was insisting on creating "big buyer demand," proposing a non-deal roadshow to get NAPCO's stock "back over $30" so that he could net $28 per share. NAPCO_ZORNBERG_000006433 at -433. In response, Morgan Stanley felt compelled to "clarify" for Soloway that "the intent behind the non-deal roadshow is just to educate investors, and not to stimulate demand"—reminding him to comply with applicable SEC regulations. *Id.* Shortly after this reprimand, Soloway decided to enlist Needham instead of Morgan Stanley to underwrite a secondary public offering. *See* NAPCO_ZORNBERG_000004220.[5] Notwithstanding Soloway's stated plan to "get down

---

[5]     Soloway also jettisoned Canaccord as an underwriter for the secondary offering, later complaining in a 02/09/2023 email that Canaccord employees had called Buchel and others at  NAPCO "a bunch of liars and verbally attacked

Case 1:23-cv-06465-BMC    Document 94    Filed 02/23/26    Page 25 of 83 PageID #: 2017

to 10% ownership," William Cass of Needham advised pitching the secondary offering to investors as "the last time stock is sold for a while," and "recommend[ed]" that Soloway and Buchel "enter into a lock-up agreement . . . to really drive home the point [that] are done selling"—while assuring Soloway that "[w]e could always release you from the lock-up early if the stock is trading up . . . ." *Id.*

**ANSWER:**  To the extent the allegations in Paragraph 49 and Footnote 5 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 49 and Footnote 5.

50.      Soloway and Buchel's secondary offering closed on February 13, 2023, at $31.50 per share, raising another $75.6 million, only days after the February 6, 2023 announcement of NAPCO's "largest quarterly net income in the Company's history"—which was actually overstated by 115%—an even larger amount than in 1Q23. Had NAPCO correctly reported these results, its earnings would have ***missed analyst expectations by 21% ($0.03 per share)***—upending the Company's growth narrative and causing its stock price to crash, as it later did when the Restatement was announced.

**ANSWER:**  Defendants admit that the secondary offering closed on February 13, 2023, at a public offering price of $31.50 per share and that February 13, 2023 was seven days after the February 6, 2023 announcement of NAPCO's announcement of its 2Q23 earnings. To the extent the allegations in Paragraph 50 purport to characterize, rely on, or quote NAPCO's February 6, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 50.

Kevin [Buchel] for 40 minutes."        NAPCO_ZORNBERG_000007048 at -048.      See also NAPCO_ZORNBERG_000002362 at -362 (notice of termination dated 10/03/2022, claiming that "market conditions are rocky and we believe  any strategy will not work at this time.").

51.     Almost immediately after the secondary offering, Soloway and Buchel continued to push to maximize their NAPCO stock proceeds before Defendants would need to "hard land" NAPCO's inflated inventory—and its earnings. On February 16, 2023, Buchel reached out to William Cass at Needham, stating he and Soloway "were considering cashless exercises of some options" and wanted to know if they were "restricted from doing so based on the lockup agreements"—after first discussing the issue with Bob Schettino, who at the time was the subject of SEC and DOJ investigations into his own insider sales. NAPCO_ZORNBERG_000191309 at 309-11. Cass responded that the underwriters "might be willing to re-visit letting you out of the lock-up early but it would realistically only occur after you've reported another quarter of earnings AND having the stock materially higher than the $31.50 deal price." *Id.* at -09. He further cautioned Buchel that "if the stock starts running up, we can discuss, though we'd encourage you to . . . abide by the lock-up." *Id.*

**ANSWER:**   To the extent the allegations in Paragraph 51 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 51.

52.     On February 20, 2023, Soloway emailed Buchel, asking: "what plans do you have for your stock options?" NAPCO_ZORNBERG_000076064 at -064. Three days later, Buchel submitted a signed request to "[e]xercise stock options via swap: 2,000 at $4.375; 3,200 at $7.345; 6,400 at $15.270; and 16,000 at $11.675." NAPCO_ZORNBERG_000191655 at -655.

**ANSWER:**   To the extent the allegations in Paragraph 52 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 52.

53.     On February 27, 2023, defendant Soloway wrote to Gregg Dluginsky of Baker Tilly, stating that he "want[ed] to exercise all" of his stock options "deep into the money," and asking about the tax implications. NAPCO_ZORNBERG_000113651 at -652-53. Dluginsky advised Soloway that, in order for the proceeds to be taxed at the lower capital gains rate (as opposed to being taxed ordinary income), "you need the price of Napco stock to go up." *Id.* at -653. On March 8, 2023, Soloway used his Gmail account to again seek advice from Bob Schettino on 'Stock option[s] I have[.]" NAPCO_ZORNBERG_000085312 at -312. Schettino advised Soloway that "[a]ssuming the stock price continues to go up," he should "do a cashless exercise . . . as soon as you can to minimize the gain taxed at the higher ordinary income tax rate. *Id.* Schettino explained that "As long as the stock price continues to go up, this pushes more of the appreciation into capital gains." *Id.*

**ANSWER:**   To the extent the allegations in Paragraph 53 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 53.

54.     Thus motivated to continue pushing NAPCO's stock price higher, Defendants reported another quarter of inflated income metrics, announcing on May 8, 2023 that NAPCO's 3Q23 "net income of $10.8 million" was "the largest quarterly net income in the Company's history."

**ANSWER:**   To the extent the allegations in Paragraph 54 purport to characterize, rely on, or quote NAPCO's May 8, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 54.

55.     In total, during the Class Period, defendant Soloway sold 48.5% of his NAPCO stock for proceeds of approximately $104 million, and defendant Buchel sold 45.5% of his stock

for proceeds of approximately $4.5 million (excluding exercised options), at times when they knew or recklessly disregarded that component costs "still in ending inventory" were greatly overstated—in turn, inflating NAPCO's income metrics. NAPCO_ZORNBERG_000116351 at -353.

**ANSWER:**   Paragraph 55 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 55 purport to characterize, rely on, or quote documents produced in the litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 55, except admit Defendant Soloway and Defendant Buchel sold stock during the Class worth approximately $104 million and $4.46 million respectively, when valued using the public offering price for the secondary offering of $31.50 per share.  As disclosed in their respective Form 4's, the net price per share was $30.87.

### D.     The Restatement Is an Admission that NAPCO's Interim Financial Statements for Fiscal 2023 Violated GAAP and Were Materially Inaccurate

56.     Generally Accepted Accounting Principles ("GAAP") generally encompasses those conventions, rules and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP. 17 C.F.R. §210.10-01(a).

**ANSWER:**  To the extent the allegations in Paragraph 56 purport to characterize, rely on, or quote GAAP and 17 C.F.R. §210.4-01(a)(1), Defendants respectfully refer to them for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 56.

57.     NAPCO has now admitted that the interim financial statements it issued to investors and filed with the SEC for the first three quarters of fiscal 2023 were materially inaccurate, presented in violation of GAAP, and "should no longer be relied upon." Accordingly,

- 27 -

each of the interim financial statements for those quarters is presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

**ANSWER:** Paragraph 57 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 57 purport to characterize, rely on, or quote NAPCO's August 18, 2023 Form 8-K, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 57.

58. By virtue of the Restatement, *NAPCO itself* has concluded that the now-restated interim financial statements for 1Q23, 2Q23, and 3Q23 that the Company issued during the Class Period were materially misstated—since only materially misstated financial statements are to be corrected and re-reported on a retroactive basis.[6]

**ANSWER:** Paragraph 58 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 58 purport to characterize or rely on NAPCO's August 18, 2023 Form 8-K or September 1, 2023 Form 10-Q/As and FASB, ASC, and CSAB accounting materials cited by Plaintiffs, Defendants respectfully refer to such documents and materials for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 58.

59. Thus, there is no dispute that NAPCO's financial statements and financial disclosures were materially inaccurate throughout the Class Period.

**ANSWER:** Paragraph 59 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 59, except admit that certain aspects of NAPCO's financial statements were restated in the September 1, 2023 Form 10-Q/As.

---

[6] *See, e.g.,* Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topic 250, *Accounting Changes and Error Corrections,* SEC Codification of Staff Accounting Bulletins ("CSAB") Topic 1M *Financial Statements, Materiality* and Topic 1-N, *Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements.* According to the FASB, ASC is the source of authoritative GAAP to be applied to nongovernmental entities.

60.    Defendants have also admitted that, in addition to NAPCO's preexisting internal control deficiencies, the Restatement "demonstrated an additional material weakness in [its] internal controls over financial reporting."[7]

**ANSWER:**  To the extent the allegations in Paragraph 60 purport to characterize, rely on, or quote NAPCO's August 18, 2023 Form 8-K, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 60.

61.    GAAP, as set forth in ASC Topic No. 250, *Accounting Changes and Error Corrections,* provides that errors in previously-issued financial statements are to be corrected via a restatement of the previously-issued financial statements. Adjustments related thereto are to be reported in the restatement as "error corrections."

**ANSWER:**  To the extent the allegations in Paragraph 61 purport to characterize, rely on, or quote ASC Topic No. 250, Defendants respectfully refer to the document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 61.

62.    When NAPCO issued the Restatement on September 1, 2023, after the Class Period, it filed with the SEC amended quarterly reports on Form 10-Q/A that restated NAPCO's interim financial statements for 1Q23, 2Q23 and 3Q23 to correct errors related to the Company's reported inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins.

**ANSWER:**  Defendants admit that, on September 1, 2023, the Company filed Form 10-Q/As that restated NAPCO's interim financial statements for 1Q23, 2Q23 and 3Q23.  To the extent the allegations in Paragraph 62 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/As, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

---

[7]    A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

63.     Throughout the Class Period, Defendants knew, or recklessly disregarded, that they had caused NAPCO to issue interim financial statements for 1Q23, 2Q23, and 3Q23 that were not presented in accordance with GAAP because those financial statements overstated NAPCO's net income and related metrics, by improperly overstating the Company's inventory and understating its cost of goods sold.

**ANSWER:** Paragraph 63 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 63.

64.     By doing so, Defendants violated the provisions set forth in Section 13 of the Exchange Act, which required them to: (i) present NAPCO's business activities in a manner that accurately and fairly reflected its transactions; and (ii) maintain a system of internal accounting controls sufficient to provide reasonable assurances that NAPCO's financial statements conformed to GAAP, as follows:

Every issuer which has a class of securities registered pursuant to Section 78I of this title and every issuer which is required to file reports pursuant to Section 78o(d) of this title shall -

A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -

(I)     transactions are executed in accordance with management's general or specific authorization;

(II)     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(III)     access to assets is permitted only in accordance with management's general or specific authorization; and

- 30 -

(IV)    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.] 15 U.S.C. §77m(2)(A)-(B)(i)-(iv).

**ANSWER:**  Paragraph 64 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 64 purport to characterize or rely on 15 U.S.C. §77m(2)(A)-(B)(i)-(iv), Defendants respectfully refer to such statute for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 64.

65.    Defendants knew, or recklessly ignored, that NAPCO's interim financial statements for 1Q23, 2Q23, and 3Q23 were presented in violation of GAAP, and were materially false and misleading.

**ANSWER:**  Paragraph 65 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 65.

E.    **NAPCO's Fraudulent Financial Reporting of Inventory, Cost of Goods Sold, and Income-Related Metrics**

66.    Defendants' fraud had the intended effect of overstating NAPCO's income-related metrics for 1Q23, 2Q23, and 3Q23. The quantitative impact of Defendants' scheme is set forth below.

**ANSWER:**  Defendants deny the allegations in Paragraph 66.

67.    For 1Q23, ended September 30, 2022, NAPCO's cost of goods sold was understated by *14.45%,* which in turn, overstated its income-related metrics as follows:

- Net income was overstated by *107.59%;*

- Income per share was overstated by *112.5%;*

- Operating income was overstated by *98.71%;* and

- Gross profit and gross margins were each overstated by *24.72%.*

**ANSWER:** To the extent the allegations in Paragraph 67 purport to characterize or rely on NAPCO's November 7, 2022 Form 10-Q or September 1, 2023 Form 10-Q/A for Q1 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

68. For 2Q23, ended December 31, 2022, NAPCO's cost of goods sold was understated by *18.27%,* which in turn, overstated its income-related metrics as follows:

- Net income was overstated by 114.97%;

- Income per share was overstated by 109.1%;

- Operating income was overstated by 118.02%; and

- Gross profit and gross margins were each overstated by 35.59%.

**ANSWER:** To the extent the allegations in Paragraph 68 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

69. In addition, for the first six months of fiscal 2023, ended December 31, 2022, NAPCO's cost of goods sold was understated by *16.47%,* which in turn, overstated its income-related metrics as follows:

- Net income was overstated by 111.72%;

- Income per share was overstated by 110.53%;

- Operating income was overstated by 109.2%; and

- Gross profit and gross margins were each overstated by 30.11%.

**ANSWER:** To the extent the allegations in Paragraph 69 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

70.     For 3Q23, ended March 31, 2023, NAPCO's cost of goods sold was understated by *6.26%*, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by 13.52%;

- Income per share was overstated by 11.5%;

- Operating income was overstated by 13.21%; and

- Gross profit and gross margins were each overstated by 6.54%.

**ANSWER:**  To the extent the allegations in Paragraph 70 purport to characterize or rely on NAPCO's May 8, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 70.

71.     In addition, for the first nine months of fiscal 2023, ended March 31, 2023, NAPCO's cost of goods sold was understated by *13.44%*, which in turn, overstated its income-related metrics as follows:

- Net income was overstated by 55.1%;

- Income per share was overstated by 55.56%;

- Operating income was overstated by 54.55%; and

- Gross profit and gross margins were each overstated by 20.12%.

**ANSWER:**  To the extent the allegations in Paragraph 71 purport to characterize or rely on NAPCO's Form 10-Q or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 71.

72.     As planned, Defendants' fraud enabled NAPCO to meet—and even exceed— analysts' estimates during the Class Period. For example, as Defendant Soloway highlighted in the Company's press release for 1Q23, NAPCO had "easily exceed[ed] published street

consensus estimates" by reporting EPS of $0.17.[8] In reality, NAPCO would not have met—let alone exceeded—the analysts' consensus estimate of 1Q23 EPS of $0.13, since its actual EPS for 1Q23 was just $0.08. Likewise, when discussing NAPCO's financial results for 2Q23 during its February 6, 2023 conference call, Defendant Soloway stated that NAPCO had been "able to beat published Street consensus estimates" by reporting EPS of $0.23. As with the previous quarter, NAPCO would not have met or exceeded the analysts' consensus estimate of 2Q23 EPS of $0.14, since its actual EPS for 2Q23 was $0.11.

**ANSWER:**  The first sentence of Paragraph 72 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 72 purport to characterize, rely on, or quote NAPCO's November 7, 2022 press release or February 6, 2023 earnings call, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 72.

F.      **Materially False and Misleading Statements Made During the Class Period**

1.      **1Q23 Financial Results**

73.      The Class Period begins on November 7, 2022, when NAPCO filed with the SEC its quarterly report on Form 10-Q for the first quarter of fiscal 2023, September 30, 2022 (the "1Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel. For the quarter, the 1Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $63,837,000 as of September 30, 2022;

- Cost of goods sold of $21,326,000;

- Net income of $6,402,000;

- Income per share of $0.17;

- Operating income of $7,249,000;

---

[8]      EPS is equivalent to income per share.

- Gross profit of $18,167,000; and

- Gross margins of 46%.

**ANSWER:** The first sentence of Paragraph 73 purports to state a legal conclusion to which no response is required. Defendants admit that, on November 7, 2022, the Company filed a Form 10-Q for the first quarter of fiscal 2023, which ended September 30, 2022, and was signed by Defendants Soloway and Buchel. To the extent the allegations in Paragraph 73 purport to characterize or rely on NAPCO's November 7, 2022 Form 10-Q, Defendants respectfully refer to this document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 73.

74.     The statements referenced above in ¶73 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 1Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $60,236,000 as of September 30, 2022, and had been overstated by 5.98%;

- Cost of goods sold was $24,927,000, and had been understated by 14.45%;

- Net income was $3,084,000, and had been overstated by 107.59%;

- Income per share was $0.08, and had been overstated by 112.5%;

- Operating income was $3,648,000, and had been overstated by 98.71%;

- Gross profit was $14,566,000, and had been overstated by 24.72%; and

- Gross margins were approximately 36.9%, and had been overstated by 24.72%.

**ANSWER:** Paragraph 74 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 74 purport to characterize or rely on NAPCO's November 7, 2022 Form 10-Q or September 1, 2023 Form 10-Q/A for Q1 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 74.

75.    In addition, the 1Q23 Form 10-Q represented that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow- moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 1Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

**ANSWER:**  To the extent the allegations in Paragraph 75 purport to characterize, rely on, or quote NAPCO's November 7, 2022 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

76.    The statements referenced above in ¶75 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its inventory costing procedures; (ii) those material weaknesses had allowed NAPCO's inventory to remain overstated despite dramatically lower component costs, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 1Q23.

**ANSWER:**  Paragraph 76 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 76 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/A for Q1 2023, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them,

and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 76.

77.     Also on November 7, 2022, NAPCO issued a press release announcing its financial results for 1Q23. The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by Defendant Buchel.

**ANSWER:**  Defendants admit the allegations in Paragraph 77.

78.     The press release reported the same metrics for the quarter as the 1Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins. Those reported results were materially false and misleading for the reasons set forth above in ¶74.

**ANSWER:**  The second sentence of Paragraph 78 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 78 purport to characterize or rely on NAPCO's November 7, 2022 press release and September 1, 2023 Form 10-Q/A for Q1 2023, Defendants respectfully refer to these documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 78.

79.     In the press release, Defendant Soloway commented that *"NAPCO executed exceptionally well in the first quarter, easily exceeding published street consensus estimates for Q1 on . . . Net Income[] [and] EPS . . . ."* During a conference call held later in the day on November 7, 2022, Defendant Soloway described NAPCO's "fiscal first quarter [of] 2023" as *"a record breaking successful one."*

**ANSWER:**  To the extent the allegations in Paragraph 79 purport to characterize, rely on, or quote NAPCO's November 7, 2022 press release or November 7, 2022 conference call, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

80.     The statements referenced above in ¶79 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted— NAPCO's financial results for 1Q23 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶74. In truth, NAPCO had not merely "executed exceptionally well in the first quarter," but had also benefited from Defendants' fraud. In addition, 1Q23 had not been "a record breaking successful" quarter, and NAPCO had only been able to "easily exceed[] published street consensus estimates for Q1 on" net income and EPS because of Defendants' fraud.

**ANSWER:**  Paragraph 80 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 80 purport to characterize, rely on, or quote NAPCO's November 7, 2022 press release, November 7, 2022 conference call, or September 1, 2023 Form 10-Q/A for Q1 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 80.

### 2.     2Q23 Financial Results

81.     On February 6, 2023, NAPCO filed with the SEC its quarterly report on Form 10-Q for the second quarter of fiscal 2023, ended December 31, 2022 (the "2Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel. For the quarter, the 2Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $64,192,000 as of December 31, 2022;

- Cost of goods sold of $22,852,000;

- Net income of $8,446,000;

- Income per share of $0.23;

- Operating income of $9,436,000;

- Gross profit of $19,462,000; and

- Gross margins of 46%.

**ANSWER:** Defendants admit that, on February 6, 2023, the Company filed a Form 10-Q for the second quarter of fiscal 2023, which ended December 31, 2022, and was signed by Defendants Soloway and Buchel. To the extent the allegations in Paragraph 81 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 81.

82. The statements referenced above in ¶81 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 2Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $55,483,000 as of December 31, 2022, and had been overstated by *15.7%;*

- Cost of goods sold was $27,960,000, and had been understated by *18.27%;*

- Net income was $3,929,000, and had been overstated by *114.97%;*

- Income per share was $0.11, and had been overstated by *109.1%;*

- Operating income was $4,328,000, and had been overstated by *118.02%;*

- Gross profit was $14,354,000, and had been overstated by *35.59%;* and

- Gross margins were approximately 33.9%, and had been overstated by *35.59%.*

**ANSWER:** Paragraph 82 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 82 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q, or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations

inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 82.

83.    In addition, for the first six months of fiscal 2023, ended December 31, 2022, the 2Q23 Form 10-Q reported:

- Cost of goods sold of $44,178,000;

- Net income of $14,848,000;

- Income per share of $0.40;

- Operating income of $16,685,000;

- Gross profit of $37,629,000; and

- Gross margins of 46%.

**ANSWER:**  To the extent the allegations in Paragraph 83 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

84.    The statements referenced above in ¶83 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for the first six months of fiscal 2023, NAPCO's actual financial results were as follows:

- Cost of goods sold was $52,887,000, and had been understated by *16.47%;*

- Net income was $7,013,000, and had been overstated by *111.72%;*

- Income per share was $0.19, and had been overstated by *110.53%;*

- Operating income was $7,976,000, and had been overstated by *109.2%;*

- 40 -

- Gross profit was $28,920,000, and had been overstated by *30.11%;* and

- Gross margins were approximately 35.4%, and had been overstated by *30.11%*.

**ANSWER:**  Paragraph 84 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 84 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 84.

85.     In addition, the 2Q23 Form 10-Q reiterated that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow- moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 2Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

**ANSWER:**  To the extent the allegations in Paragraph 85 purport to characterize, rely on, or quote NAPCO's February 6, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

86.     The statements referenced above in ¶85 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its inventory costing procedures; (ii) those material weaknesses had allowed NAPCO's inventory

to remain overstated despite dramatically lower component costs, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 2Q23.

**ANSWER:** Paragraph 86 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 86 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 86.

87.    Also on February 6, 2023, NAPCO issued a press release announcing its financial results for 2Q23. The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by Defendant Buchel.

**ANSWER:** Defendants admit the allegations in Paragraph 87.

88.    The press release reported the same metrics for the quarter as the 2Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins. Those reported results were materially false and misleading for the reasons set forth above in ¶82.

**ANSWER:** The second sentence of Paragraph 88 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 88 purport to characterize or rely on NAPCO's February 6, 2023 press release or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 88.

89.    The press release also reported the same metrics for the first six months of fiscal 2023 as the 2Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, and gross profit. Those reported results were materially false and misleading for the reasons set forth above in ¶84.

**ANSWER:**  The second sentence of Paragraph 89 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 89 purport to characterize or rely on NAPCO's February 6, 2023 press release or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 89.

90.     In addition, the press release emphasized that NAPCO's "[n]et income for the quarter *was a quarterly record $8.4 million or $0.23 per diluted share'"* Commenting on the quarterly results, Defendant Soloway likewise highlighted that "*net income of $8.4 million [was]the largest quarterly net income in the Company's history"*" He further stated that "*[overall gross margins were 46%"*" representing "*a significant increase over last year's Q2 gross margin of 34%"*" Defendant Soloway emphasized that "*NAPCO continued to execute exceptionally well in the second quarter, with strong growth in Q2 on*" metrics including "*Net Income*" and "*EPS*," and attributed *"NAPCO 's outstanding record breaking results for the first half of fiscal 2023"*" to "*the strong demand [for] each of our product lines* . . . ."

**ANSWER:**  To the extent the allegations in Paragraph 90 purport to characterize, rely on, or quote NAPCO's February 6, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

91.     The statements referenced above in ¶90 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted— NAPCO's financial results for 2Q23 and for the first six months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶82 and ¶84. Because of Defendants' fraud, NAPCO's 2Q23 "net income" was not "$8.4

million," but was actually $3.9 million, and therefore was not "a quarterly record" or "the largest quarterly net income in the Company's history." Indeed, NAPCO's actual net income for 2Q23 was far below its quarterly record of $7.8 million, reported in the first quarter of fiscal 2022. Likewise, EPS was not "$0.23 per . . . share," but was actually just $0.11 per share. In addition, "[o]verall gross margins" were not "46%," but were actually 33.9%, and had not "increase[d]" "significant[ly] . . . over last year's Q2 gross margin[s] of 34%." Finally, NAPCO had not "execute[d] exceptionally well in the second quarter," its "strong growth" in net income and EPS was illusory, and its "outstanding record breaking results for the first half of fiscal 2023" were attributable in part to Defendants' fraud, and not solely to "strong demand" for NAPCO's products.

**ANSWER:** The first, second, third, and seventh sentences of Paragraph 91 purport to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 91 purport to characterize, rely on, or quote NAPCO's February 6, 2023 press release or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 91.

92.    Later in the day on February 6, 2023, NAPCO held a conference call to discuss the 2Q23 financial results, during which Defendant Soloway stated that NAPCO had been "***able to beat published Street consensus estimates for . . . EPS[] [and] net income,***" and attributed the Company's "***outstanding performance***" to "***the continued strong demand for each of[its] product lines . . . .***" Also during the call, Defendant Buchel attributed "***[t]he significant increase in gross profit dollars as well as gross margin*** for equipment sales for both[] the 3 and the 6 months ended December 31, 2022," in part to the "***lower cost of certain components***" due to "***improvements within the company's supply chain'***"

**ANSWER:** Defendants admit that, on February 6, 2023, the Company hosted a conference call in connection with its Q2 2023 financial results. To the extent the allegations in Paragraph 92

purport to characterize, rely on, or quote NAPCO's February 6, 2023 conference call, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

93.     The statements referenced above in ¶92 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted— NAPCO's financial results for 2Q23 and for the first six months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶82 and ¶84. In truth, NAPCO had only been "able to beat published Street consensus estimates for" EPS and net income because of Defendants' fraud. Likewise, NAPCO's "outstanding performance," including "[t]he significant increase in gross profit" and "gross margin[s]" were attributable in part to Defendants' fraud, and not solely to "continued strong demand" for NAPCO's products or "improvements within" its "supply chain."

**ANSWER:**  Paragraph 93 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 93 purport to characterize, rely on, or quote NAPCO's February 6, 2023 conference call or September 1, 2023 Form 10-Q/A for Q2 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 93.

### 3.     3Q23 Financial Results

94.     On May 8, 2023, NAPCO filed with the SEC its quarterly report on Form 10-Q for the third quarter of fiscal 2023, ended March 31, 2023 (the "3Q23 Form 10-Q"), which was signed by defendants Soloway and Buchel. For the quarter, the 3Q23 Form 10-Q reported:

- Total inventory (current and non-current) of $60,786,000 as of March 31, 2023;

- Cost of goods sold of $20,861,000;

- Net income of $10,840,000;

- Income per share of $0.29;

- Operating income of $11,932,000;

- Gross profit of $22,671,000; and

- Gross margins of 52.1%.

**ANSWER:** Defendants admit that, on May 8, 2023, the Company filed a Form 10-Q for the third quarter of fiscal 2023, which ended March 31, 2023, and was signed by Defendants Soloway and Buchel. To the extent the allegations in Paragraph 94 purport to characterize or rely on NAPCO's May 8, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 94.

95. The statements referenced above in ¶94 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for 3Q23, NAPCO's actual financial results were as follows:

- Total inventory (current and non-current) was $50,685,000 as of March 31, 2023, and had been overstated by *19.93%;*

- Cost of goods sold was $22,253,000, and had been understated by *6.26%;*

- Net income was $9,549,000, and had been overstated by *13.52%;*

- Income per share was $0.26, and had been overstated by *11.5%;*

- Operating income was $10,540,000, and had been overstated by *13.21%;*

- Gross profit was $21,279,000, and had been overstated by *6.54%;* and

- Gross margins were approximately 48.9%, and had been overstated by *6.54%.*

**ANSWER:** Paragraph 95 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 95 purport characterize or rely on NAPCO's

May 8, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 95.

96.    In addition, for the first nine months of fiscal 2023, ended March 31, 2023, the 3Q23 Form 10-Q reported:

- Cost of goods sold of $65,039,000;

- Net income of $25,688,000;

- Income per share of $0.70 (basic);

- Operating income of $28,617,000;

- Gross profit of $60,300,000; and

- Gross margins of 48.1%.

**ANSWER:**  To the extent the allegations in Paragraph 96 purport to characterize or rely on NAPCO's May 8, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

97.    The statements referenced above in ¶96 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted—(i) NAPCO's financial results were presented in violation of GAAP and were materially inaccurate; and (ii) for the first nine months of fiscal 2023, NAPCO's actual financial results were as follows:

- Cost of goods sold was $75,140,000, and had been understated by *13.44%;*

- Net income was $16,562,000, and had been overstated by *55.1%;*

- Income per share was $0.45 (basic), and had been overstated by *55.56%;*

- 47 -

- Operating income was $18,516,000, and had been overstated by *54.55%;*

- Gross profit was $50,199,000, and had been overstated by *20.12%;* and

- Gross margins were approximately 40.1%, and had been overstated by *20.12%.*

**ANSWER:** Paragraph 97 purports to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 97 purport to characterize or rely on NAPCO's May 8, 2023 Form 10-Q or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 97.

98. In addition, the 3Q23 Form 10-Q reiterated that NAPCO had two preexisting "material weaknesses in internal control." One material weakness "related to ineffective information technology general controls (ITGCs) in the area of user access and lack of effective program change-management over certain information technology (IT) systems that support the Company's financial reporting processes." The second material weakness "related to the reserve for excess and slow- moving inventory" and "was a result of a lack of effective review and reconciliation controls over [] forecasted sales and usage data." The 3Q23 Form 10-Q further stated that, although "the Company's internal controls over financial reporting were not effective" as a result of these material weaknesses, the material weaknesses had "not result[ed] in any identified misstatements to [NAPCO's] financial statements and there were no changes to [its] previously released financial results."

**ANSWER:** To the extent the allegations in Paragraph 98 purport to characterize, rely on, or quote NAPCO's May 8, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

99. The statements referenced above in ¶98 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that: (i) NAPCO suffered from additional material weaknesses in internal controls over financial reporting related to its

- 48 -

inventory costing procedures; (ii) those material weaknesses had allowed NAPCO's inventory to remain overstated despite dramatically lower component costs, which in turn inflated the Company's income; and (iii) as a result, NAPCO's material weaknesses in internal controls *had* "result[ed] in . . . misstatements to the [Company's] financial statements" for 3Q23.

**ANSWER:**  Paragraph 99 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 99 purport to characterize or rely on NAPCO's September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein Defendants otherwise deny the allegations in Paragraph 99.

100.    Also on May 8, 2023, NAPCO issued a press release announcing its financial results for 3Q23. The Company filed the press release with the SEC as an exhibit to a Current Report on Form 8-K, which was signed by Defendant Buchel.

**ANSWER:**  Defendants admit the allegations in Paragraph 100.

101.    The press release reported the same metrics for the quarter as the 3Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income per share, operating income, gross profit, and gross margins. Those reported results were materially false and misleading for the reasons set forth above in ¶95.

**ANSWER:**  The second sentence of Paragraph 101 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 101 purport to characterize or rely on NAPCO's May 8, 2023 press release or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 101.

102.    The press release also reported the same metrics for the first nine months of fiscal 2023 as the 3Q23 Form 10-Q with respect to inventory, cost of goods sold, net income, income

per share, operating income, and gross profit. Those reported results were materially false and misleading for the reasons set forth above in ¶97.

**ANSWER:** The second sentence of Paragraph 102 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 102 purport to characterize or rely on NAPCO's May 8, 2023 press release or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 102.

103.    In addition, the press release highlighted NAPCO's "***Quarterly Record Net Income of $10.8 [million]***," and Defendant Soloway similarly emphasized that "***net income of $10.8 million in Q3 was a record-breaker for any quarter in the Company's history***," and "***the largest quarterly net income in the Company's history*** . . . ." Defendant Soloway also attributed "***NAPCO's outstanding record breaking results, for both Q3 and the first nine months of fiscal 2023***" to "***strong sales of each of our product lines*** . . . ."

**ANSWER:**  To the extent the allegations in Paragraph 103 purport to characterize, rely on, or quote NAPCO's May 8, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 103.

104.    The statements referenced above in ¶103 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company has now admitted— NAPCO's financial results for 3Q23 and for the first nine months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶95 and ¶97. In truth, NAPCO's 3Q23 "net income" was not "$10.8 million," but was actually $9.5 million, and its "record" and "largest" quarterly net income "in the Company's history" was

due in part to Defendants' fraud. Likewise, "NAPCO's outstanding record breaking results, for both Q3 and the first nine months of fiscal 2023" were attributable in part to Defendants' fraud, and not solely to "strong sales of each of [its] product lines. . . ."

**ANSWER:** Paragraph 104 purport to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 104 purport to characterize, rely on, or quote NAPCO's May 8, 2023 press release or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 104.

105. During a conference call held later in the day on May 8, 2023, Defendant Soloway reiterated that NAPCO's *"fiscal third quarter 2023 was a record-breaking successful one,"* and pointed to "the *10th consecutive quarterly [growth] streak"* that the Company was "now on." He further stated that NAPCO had "*a pristine balance sheet* . . . ." During the call, Defendant Buchel represented that "*[t]he significant increase in gross profit dollars* as well as gross margin for equipment sales for both the 3 and the 9 months ended March 31, 2023 *[was]primarily due to . . . increases in equipment revenues*[,]" as well as "*the increased availability and lower costs of certain components, lower transportation expenses,"* and "*a favorable shift in product mix* . . . ."

**ANSWER:** To the extent the allegations in Paragraph 105 purport to characterize, rely on, or quote NAPCO's May 8, 2023 conference call, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 105.

106. The statements referenced above in ¶105 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that NAPCO's inventory was overstated and had not been properly adjusted downward to account for dramatically lower component costs, which in turn inflated the Company's income. As a result—as the Company

- 51 -

has now admitted— NAPCO's financial results for 3Q23 and for the first nine months of fiscal 2023 were presented in violation of GAAP and were materially inaccurate, as set forth above in ¶95 and ¶97. In truth, NAPCO's "record-breaking successful" results for 3Q23 were attributable in part to Defendants' fraud. Likewise, "[t]he significant increase[s] in gross profit dollars as well as gross margin for equipment sales for both the 3 and the 9 months ended March 31, 2023" were attributable in part to Defendants' fraud, and therefore were not "primarily due to . . . increases in equipment revenues," "the increased availability and lower costs of certain components, lower transportation expenses," and "a favorable shift in product mix . . . ." In addition, NAPCO was not on a "10th consecutive quarterly [growth] streak" because the Company's actual financial results for 1Q23 and 2Q23 had broken any purported growth streak. Finally, NAPCO's "balance sheet" was not "pristine" because its inventory was materially misstated as a result of Defendants' fraud.

**ANSWER:**  Paragraph 106 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 106 purport to characterize, rely on, or quote NAPCO's May 8, 2023 conference call or September 1, 2023 Form 10-Q/A for Q3 2023, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 106.

## G.    NAPCO Announces the Restatement

107.    On August 18, 2023, after the close of the markets, NAPCO issued a press release revealing that the Company would need to restate its financial results for 1Q23, 2Q23, and 3Q23, and that its previously-issued interim financial statements for those quarters "***should no longer be relied upon***." The press release disclosed that, for those quarters, "inventories were overstated and COGS [cost of goods sold] was understated, resulting in ***overstated gross profit, operating income and net income for each period***." It further explained that NAPCO was "in the process

- 52 -

of preparing amended Forms 10-Q for each of the first three quarters of fiscal 2023," and

provided the following "preliminary" estimates of NAPCO's overstatement of net income:

| Period End | Net Income - Previously Reported | Net Income - Restated Estimate | $ Difference |
|---|---|---|---|
| First quarter ended September 30, 2022 | $6.4M | $2.9M | $3.5M |
| Second quarter ended December 31, 2022 | $8.4M | $3.7M | $4 7M |
| Third quarter ended March 31, 2023 | $10.8M | $9.5M | $1.3M |

**ANSWER:**   Defendants admit that, on August 18, 2023, the Company issued a press release with respect to the financial results from the first three quarters of 2023.  To the extent the allegations in Paragraph 107 purport to characterize, rely on, or quote NAPCO's August 18, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 107.

108.    Finally, the press release revealed that "[d]ue to the . . . restatements, management of the Company has determined that a material weakness existed in the Company's internal controls over financial reporting for each of the first three quarters of fiscal 2023, rendering the Company's disclosure controls and procedures ineffective at the end of each such quarter."

**ANSWER:**  To the extent the allegations in Paragraph 108 purport to characterize, rely on, or quote NAPCO's August 18, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 108.

109.    Although the press release attempted to characterize the Restatement as stemming from innocent "errors" in calculating inventory and cost of goods sold, the significant scope of the estimated overstatements of net income, and the disclosure that a number of additional

- 53 -

income- related metrics had been overstated during the first three quarters of fiscal 2023, caused the Company's share price to plummet.

**ANSWER:** Paragraph 109 purport to state legal conclusions to which no response is required. To the extent the allegations in Paragraph 109 purport to characterize, rely on, or quote NAPCO's August 18, 2023 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 109.

110. In response to the press release, the price of NAPCO common stock fell more than *45%,* from a closing price of $38.41 per share on August 18, 2023, to close at $21.11 per share on Monday, August 21, 2023 (the next trading day), on more than 40 times the previous day's trading volume.

**ANSWER:** Defendants deny the allegations in Paragraph 110, except aver that NAPCO's stock price is a matter of public record and speaks for itself.

### H.      Post-Class Period Events

111. On September 1, 2023, NAPCO filed with the SEC amended Forms 10-Q/A containing the restated financial results for 1Q23, 2Q23, and 3Q23. The Restatement confirmed that NAPCO's income-related metrics had been grossly overstated during the first three quarters of fiscal 2023. For 1Q23, 2Q23, and 3Q23, respectively: (i) net income had been overstated by 107.59%, 114.97%, and 13.52%; (ii) income per share had been overstated by 109.1%, 112.5%, and 11.5%; (iii) operating income had been overstated by 98.71%, 118.02%, and 13.21%; and (iv) gross profit and gross margins had each been overstated by 24.72%, 35.59%, and 6.54%.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 111. To the extent the allegations in Paragraph 111 purport to characterize, rely on, or quote NAPCO's September 1, 2023 Form 10-Q/As, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 111.

112.    On October 27, 2023, NAPCO announced that it would "dismiss its current independent registered public accounting firm, Baker Tilly US, LLP ('Baker Tilly')"—which had served as NAPCO's auditor since 2008—"effective on the Company's filing of its Form 10-Q for the quarter ending September 30, 2023." Shortly thereafter, on November 3, 2023, NAPCO announced that Baker Tilly would be replaced by Deloitte & Touche LLP.

**ANSWER:**  Defendants admit that, on October 27, 2023, the Company disclosed through its Form 8-K that the Company was conducting a competitive selection process for a new independent registered public accounting firm, and, on November 3, 2023, disclosed through its Form 8-K that the Company selected Deloitte & Touche LLP.  To the extent the allegations in Paragraph 112 purport to characterize, rely on, or quote NAPCO's October 27, 2023 Form 8-K or November 3, 2023 Form 8-K, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 112.

113.    On November 2, 2023, after this action was filed, NAPCO's Board directed the Company to enter into an indemnification agreement with Michael Almes, the Assistant Controller, "in regard to the class action lawsuit" "on such terms and conditions that Mr. Buchel . . . deems appropriate." BT_LIT0009501 at -504; DT00000295 at 295-96.

**ANSWER:** To the extent the allegations in Paragraph 113 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein. Defendants deny the allegations in Paragraph 113.

114.    In the wake of defendants Soloway and Buchel's lucrative stock sales and the Restatement, Buchel was promoted to President and Chief Operating Officer effective May 2, 2024, while initially maintaining his position as CFO. In the press release announcing the promotion, Soloway said it was "well-deserved."

**ANSWER:** To the extent the allegations in Paragraph 114 purport to characterize, rely on, or quote NAPCO's May 2, 2024 press release, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any

- 55 -

characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 114, except admit that effective May 2, 2024, Defendant Buchel was promoted to President and Chief Operating Officer while, at the time, maintaining his position as Chief Financial Officer.

115.   On May 4, 2024, the Board removed NAPCO's long-time Controller (since 1991) and Vice President of Finance, Bob Schettino, from those roles following a settlement in principle with the SEC for insider trading in NAPCO stock. DT00000313 at -313. Soloway and Buchel had known since at least April 2021 that Schettino was being investigated for insider trading but allowed him to continue to oversee NAPCO's accounting function.[9] Even after the settlement, Defendants displayed little concern for Schettino's misconduct—or its corrosive effect on NAPCO's control environment—by retaining him as an employee within the finance and accounting department, reporting directly to Buchel. DT00000313 at -313.

**ANSWER:**   To the extent the allegations in Paragraph 115 and Footnote 9 purport to characterize or rely on documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 115 and Footnote 9.

116.   On defendant Buchel's recommendation, the Board also promoted Schettino's second-in-command, Assistant Controller Michael Almes, to Controller effective "immediately." *Id.* According to Buchel, Almes had been doing "a good job." *Id.*

**ANSWER:** To the extent the allegations in Paragraph 116 purport to characterize, rely on, or quote a document produced in this litigation, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 116, except admit that Mr. Almes was promoted to the position of Controller in March 2024.

---

[9]   During the Class Period, Schettino was under investigation by the SEC and DOJ for avoiding $198,566 in losses by selling 20,975 shares of NAPCO common stock in January 2020 on the basis of inside information. Defendants Soloway and Buchel knew this since the SEC and DOJ had sought documents from NAPCO regarding Schettino's insider trading on April 22, 2021, November 10, 2021, and July 21, 2022. BT_LIT0006430 at -430-31. In fact, at the same August 25, 2022 Board meeting where Soloway announced his intent to sell shares through a secondary offering, Buchel discussed the ongoing SEC and DOJ investigation of Schettino and the significant legal costs associated with responding to the subpoenas. NAPCO_ZORNBERG_000008234 at -236.

117.    On June 25, 2024, the SEC announced that it had settled insider trading charges against Schettino. Among other things, the SEC consent order required that Schettino disgorge $198,566, pay an additional $237,381 in prejudgment interest and penalties, and it barred him from serving as an officer or director of a public company.

**ANSWER:** To the extent the allegations in Paragraph 117 purport to characterize or rely on the June 25, 2024 consent order entered by the SEC in connection with its investigation of Mr. Schettino's insider sales, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with it, and deny any characterization of or suggested implication concerning the content contained therein.

118.    On March 31, 2025, NAPCO received a subpoena from the SEC. NAPCO publicly disclosed the SEC subpoena in its Form 10-Q filed with the SEC on May 5, 2025, stating that the SEC's investigation is "principally focused on the Company's previously disclosed restatements and related material weakness determination." According to NAPCO's most recent 10-Q, filed on November 3, 2025, the SEC investigation remains ongoing, and NAPCO "has produced, and will continue to produce documents, responsive to the SEC subpoena."

**ANSWER:** To the extent the allegations in Paragraph 118 purport to characterize, rely on, or quote NAPCO's May 5, 2025 10-Q and November 3, 2025 10-Q, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 118, and note that the SEC investigation referenced in Paragraph 118 was terminated as disclosed in NAPCO's February 2, 2026 10-Q.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

119.    As alleged herein, Defendants acted with scienter in that Defendants: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Company or in their own names during the Class Period were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and

substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**ANSWER:**  Paragraph 119 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 119.

120.    Defendants, by virtue of their receipt of information reflecting the true facts regarding NAPCO, their control over, and/or receipt and/or modification of NAPCO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NAPCO, were active and culpable participants in the fraudulent scheme alleged herein.

**ANSWER:**  Paragraph 120 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 120.

121.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

**ANSWER:**  Paragraph 121 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 121.

122.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, and prospects, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading

- 58 -

statements regarding the Company were being issued; and approved or ratified these statements, in violation of the federal securities laws.

**ANSWER:** Paragraph 122 purports to state legal conclusions to which no response is required. To the extent a response is required, Individual Defendants deny the allegations in Paragraph 122, except admit that Defendant Richard Soloway served as NAPCO's Chief Executive Officer during the Class Period and Defendant Kevin Buchel served as NAPCO's Chief Financial Officer during the Class Period and that in these roles they participated in the management of the Company. The allegations in Paragraph 122 are not directed at NAPCO and therefore no response is required. To the extent a response is required, NAPCO incorporate Individual Defendants' response to Paragraph 122.

123. NAPCO, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the true facts from investors.

**ANSWER:** Paragraph 123 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 123.

124. NAPCO's executive-driven financial gamesmanship provides additional evidence of scienter. NAPCO executives routinely engaged in deliberate quarter-end gamesmanship designed to manage reported results. Upper management, including defendant Buchel, would often halt all shipments prior to quarter end if and when NAPCO hit its numbers. This was apparently done so as not to overshoot expectations and provide an artificial boost to the following quarter's results.

**ANSWER:** Paragraph 124 purports to state legal conclusions to which no response is required. To the extent a response is required. Defendants otherwise deny the allegations in Paragraph 124.

125.    Defendant Buchel and NAPCO's Controller, Robert Schetttino, directed these shipment halts at the end of 1Q23 and 2Q23. *See, e.g.,* NAPCO_ZORNBERG_000075817 at -817 (09/23/2022 email from Schettino to Buchel: "I told Chuck to get to the point where he has $400k in shipping and then stop. . . . We can always ship more if needed but I doubt it will drop."); NAPCO_ZORNBERG_000057861 at -864 (12/27/2022 email to Buchel and Schettino, "Getting very close to needing to make the call to stop."). Although the Restatement did not directly arise from this practice, Defendants' intentional quarter-end manipulations are powerful circumstantial evidence of their willingness to distort NAPCO's reported financial results—and of their knowing or reckless misconduct.

**ANSWER:**  Paragraph 125 purports to state legal conclusions to which no response is required.  To the extent the allegations in Paragraph 125 purport to characterize, rely on, or quote documents produced in this litigation, Defendants respectfully refer to such documents for their complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.  Defendants otherwise deny the allegations in Paragraph 125, except admit that the Restatement did not arise from the practices alleged in Paragraph 125.

126.    In addition, Defendants were motivated to engage in the alleged fraudulent course of conduct in order to enable certain Company insiders, including defendants Soloway and Buchel, to collectively sell 3,744,150 shares of their personally-held NAPCO common stock during the Class Period, for proceeds of more than *$108 million,* under circumstances that were unusual and suspicious, as set forth below:

| Insider | Date | Price | Shares Sold | Proceeds | Rule 10b5-1 Plan | % Sold |
|---|---|---|---|---|---|---|
| **Defendant Soloway** (CEO, Chairman) | 11/15/2022 02/13/2023 02/15/2023 | $24.79 $31.50 $31.50 | 1,271,442 2,012,500 287,500 **3,571,442** | $31,519,047 $63,393,750 $9,056,250 **$103,969,047** | No No No | **48.5%** |

| Insider | Date | Price | Shares Sold | Proceeds | Rule 10b5-1 Plan | % Sold |
|---|---|---|---|---|---|---|
| **Defendant Buchel** (CFO) | 11/15/2022 02/13/2023 02/15/2023 | $24.79 $31.50 $31.50 | 52,977 87,500 12,500 **152,977** | $1,313,300 $2,756,250 $393,750 **$4,463,300** | No No No | **45.5%** |
| **Paul Stephen Beeber** (Director) | 11/23/2022 | $26.10 | **1,731** | **$45,179** | No | **14.6%** |
| **Michael Carrieri** (Senior Vice President of Engineering Development) | 11/23/2022 11/30/2022 | $26.45 $26.05 | 9,000 9,000 **18,000** | $238,050 $234,450 **$472,500** | No No | **29%** |
| | **Total**: | | **3,744,150** | **$108,950,026** | | |

**ANSWER:** Paragraph 126 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 126, except admit that Defendant Richard Soloway sold 3,571,442 shares of NAPCO stock during the Class Period, Defendant Kevin Buchel sold 152,977 shares of NAPCO stock during the Class Period, Paul Stephen Beeber sold 1,731 shares of NAPCO stock during the Class Period valued at approximately $45,000, and Michael Carrieri sold 18,000 shares of NAPCO stock during the Class Period valued at approximately $470,000. Defendants note that as reported on their respective Form 4's, $31.50 was the public offering price per share, but Defendants Soloway and Buchel received a net price of $30.87 per share.

127. These insider sales were suspiciously-timed because each of the insiders who sold stock did so in November 2022, shortly after NAPCO's announcement on November 7, 2022 of 1Q23 financial results that were inflated by Defendants' deliberate or reckless failure to properly adjust downward NAPCO's inventory. At the time of these sales, NAPCO had recently reported quarterly results that overstated its 1Q23: net income by 107.59%, income per share by 112.5%, operating income by 98.71%, and gross profit and gross margins by 24.72%.

**ANSWER:** Defendants deny the allegations in Paragraph 127, except admit that each of the sales in Paragraph 127 were executed after the Company filed its November 7, 2022 Form 10-

Q.  To the extent the allegations in Paragraph 127 purport to characterize or rely on NAPCO's November 7, 2022 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

128.    Defendants Soloway and Buchel made substantial sales on November 15, 2022, with Soloway selling 1,271,442 shares of his personally-held NAPCO common stock for proceeds of approximately *$31.5 million,* and Buchel selling 52,997 shares of his personally-held NAPCO common stock for proceeds of approximately *$1.3 million.*

**ANSWER:**  Defendants admit that, on November 15, 2022, Defendant Richard Soloway sold 1,271,442 shares of NAPCO stock valued at approximately $31.5 million and Defendant Kevin Buchel sold 52,997 shares NAPCO stock valued at approximately $1.3 million.  Defendants otherwise deny the allegations in Paragraph 128.

129.    Defendants Soloway and Buchel made even larger insider sales in February 2023— orchestrating an offering in order to enable Soloway to unload an additional 2,300,000 shares of his personally-held NAPCO common stock for proceeds of approximately *$72.5 million,* and Buchel to unload an additional 100,000 shares of his personally-held NAPCO common stock for proceeds of approximately *$3.2 million.*

**ANSWER:**  Defendants deny the allegations in Paragraph 129, except admit that, pursuant to a Secondary Public Offering that closed February 15, 2023, Defendant Richard Soloway sold 2,300,000 shares of NAPCO stock valued at approximately $72.5 million and Defendant Kevin Buchel sold 100,000 shares of NAPCO stock valued at approximately $3.2 million.

130.    These sales insider were suspiciously-timed because they took place on February 13, 2023 and February 15, 2023, shortly after NAPCO's announcement on February 6, 2023 of 2Q23 financial results that were inflated by Defendants' deliberate or reckless failure to properly adjust downward NAPCO's inventory. And they were made pursuant to offering materials that incorporated by reference NAPCO's inflated financial results for both 1Q23 and 2Q23. Indeed, NAPCO announced the Offering on February 8, 2023, almost immediately after it issued the

inflated 2Q23 financial results. At the time of these sales, NAPCO had recently reported quarterly results that overstated its 2Q23: net income by 114.97%, income per share by 109.1%, operating income by 118.02%, and gross profit and gross margins by 35.59%.

**ANSWER:** Defendants deny the allegations in Paragraph 130, except admit that the sales referenced in Paragraph 130 were made through a secondary public offering which took place after the Company filed its February 6, 2023 Form 10-Q. To the extent the allegations in Paragraph 130 purport to characterize or rely on NAPCO's February 6, 2023 Form 10-Q, Defendants respectfully refer to such document for its complete and accurate contents, deny any allegations inconsistent with them, and deny any characterization of or suggested implication concerning the content contained therein.

131.    In total, defendant Soloway sold *48.5%* of his personally-held NAPCO common stock during the Class Period for proceeds of approximately *$104 million,* and defendant Buchel sold *45.5%* his personally-held NAPCO common stock during the Class Period for proceeds of approximately *$4.5 million*.

**ANSWER:** Defendants admit that Defendant Soloway sold NAPCO stock valued at approximately $104 million during the Class Period and Defendant Buchel sold NAPCO stock valued at approximately $4.46 million during the Class Period, when using the public offering price for the stock sold in the secondary offering. As disclosed in their respective Form 4's, the net price per share was $30.87. Defendants otherwise deny the allegations in Paragraph 131.

132.    By contrast, *none* of the insiders who sold stock during the Class Period made *any* stock sales during the year before the Class Period.

**ANSWER:** Defendants admit the allegations in the first sentence of Paragraph 132. Defendants otherwise deny the allegations in Paragraph 132.

133.    Notably, defendant Buchel—who himself engaged in insider trading during the Class Period while playing a key role in the fraud—is, and was, NAPCO's "Insider Trading Compliance Officer." In that role, Buchel was required, pursuant to the Company's Insider Trading Policy, to "pre-clear each proposed trade or transfer" of NAPCO securities by its "executive officers and directors and their [f]amily [m]embers[.]" At the very least, this presented a clear conflict of interest with respect to his own insider sales.

**ANSWER:** The first and last sentences of Paragraph 133 purport to state legal conclusions to which no response is required. To the extent a response is required, Defendants respectfully refer to the insider trading policy for its complete and accurate contents, deny any allegations inconsistent with the policy, and deny any characterization of or suggested implication concerning the content contained therein. Defendants otherwise deny the allegations in Paragraph 133, except admit that, during the Class Period, NAPCO maintained an Insider Trading Policy and Defendant Buchel was the Company's Insider Trading Compliance Officer.

134. Finally, *none* of the Class Period sales were made pursuant to Rule 10b5-1 trading plans—which underscores the suspicious nature of those sales.

**ANSWER:** Defendants deny the allegations in Paragraph 134, except admit that none of the stock sales referenced in the complaint were made pursuant to a Rule 10b5-1 trading plan.

## VII.    LOSS CAUSATION AND ECONOMIC LOSS

135. During the Class Period, as detailed herein, Defendants made false and misleading statements and/or engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NAPCO common stock and operated as a fraud or deceit on Class Period purchasers of NAPCO common stock. As detailed above in ¶¶107-110, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of NAPCO common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of NAPCO common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

**ANSWER:** Paragraph 135 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 135.

136. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of NAPCO's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused NAPCO common stock

- 64 -

to trade at artificially inflated levels throughout the Class Period, reaching as high as $41.25 per share on June 13, 2023.

**ANSWER:** Paragraph 136 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 136, except admit that the highest price of NAPCO Common Stock on June 13, 2023 was $41.25.

137. The precipitous decline in the price of NAPCO common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market and/or the risks concealed by Defendants' fraud materializing and causing losses to investors. The timing and magnitude of the decline in the price of NAPCO securities negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.,* damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of NAPCO common stock and the subsequent significant decline in the value of NAPCO common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed and/or the risks concealed by Defendants' fraud materialized.

**ANSWER:** Paragraph 137 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 137.

## VIII.   NO SAFE HARBOR

138. NAPCO's "safe harbor" warnings accompanying its purportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The specific statements pled herein were not FLS or identified as such, but rather were statements of present or historical fact. To the extent any statements can properly be considered forward-looking, such statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ materially from those in the purportedly FLS.

**ANSWER:**  Paragraph 138 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 138.

139.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and/or the FLS was authorized and approved by an executive officer of the Company who knew that the FLS was false or misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**ANSWER:**  Paragraph 139 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 139.

## IX.    A PRESUMPTION OF RELIANCE APPLIES

140.    Plaintiffs are entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for NAPCO's publicly-traded stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and misleading statements and failures to disclose alleged herein, NAPCO common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other Class members purchased NAPCO common stock in reliance on the integrity of the market price of the stock and the market information relating to NAPCO, and were damaged thereby.

**ANSWER:**  Paragraph 140 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 140 and on that basis deny them.

- 66 -

141.   At all relevant times, the market for NAPCO common stock was efficient for at least the following reasons:

(a)   NAPCO common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)   NAPCO common stock traded at volumes during the Class Period that reflected the impact of available information, and the trading price of the stock reacted promptly to publicly available news and information;

(c)   NAPCO filed periodic public reports with the SEC and otherwise regularly communicated with analysts and investors using established market communication mechanisms, including press releases; and

(d)   securities analysts and investors followed NAPCO and issued reports on its prospects and performance, and information on NAPCO regularly entered the marketplace and was reflected in the trading price of its stock.

**ANSWER:**  Paragraph 141 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 141, except admit that (i) NAPCO common stock was listed and traded on the NASDAQ, (ii) the Company filed periodic public reports with the U.S. Securities and Exchange Commission, (iii) the Company would from time to time issue press releases, and (iv) the Company was followed by multiple securities analysts.

142.   As a result, the market for NAPCO common stock promptly digested relevant information from publicly available sources and the trading price of the stock reflected such information. Under these circumstances, all purchasers of NAPCO common stock during the Class Period suffered similar injury by purchasing NAPCO common stock at artificially inflated prices and a presumption of reliance applies.

**ANSWER:**  Paragraph 142 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants lack knowledge or information

- 67 -

sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 142 and on that basis deny them.

143.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972). Because the claims alleged are predicated in part upon omissions of material fact for which there was a duty to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

**ANSWER:**  Paragraph 143 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 143.

## X.    CLASS ACTION ALLEGATIONS

144.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired NAPCO common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants and members of their immediate families; (ii) the officers and directors of the Company, at all relevant times, and members of their immediate families; (iii) the legal representatives, heirs, successors, or assigns of any of the foregoing; and (iv) any entity in which any Defendant has or had a controlling interest.

**ANSWER:**  Paragraph 144 purports to state legal conclusions and contains Plaintiffs' characterization of their claims and the class to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 144, except admit that Plaintiffs purport to assert the claims alleged in the Second Amended Complaint on behalf of the class alleged therein.

145.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NAPCO common stock was actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, there are likely hundreds, if not thousands, of members in the proposed Class. Record owners and other Class members may be identified from records maintained by NAPCO or its transfer agent and may be notified of the pendency of this action using a form of notice customarily used in securities class actions.

**ANSWER:** Paragraph 145 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 145, except admit that NAPCO common stock traded on the NASDAQ during the Class Period.

146. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

**ANSWER:** Paragraph 146 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 146 and on that basis deny them.

147. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, those of the Class.

**ANSWER:** Paragraph 147 purports to state legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 147 regarding Plaintiffs' and alleged Class members' claims and damages or their respective interests, and on that basis deny them. Defendants otherwise deny the allegations in Paragraph 147.

148. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

- 69 -

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants misrepresented and/or omitted material facts; and

(c)     whether and to what extent Class members have sustained damages, as well

as the appropriate measure of damages.

**ANSWER:**  Paragraph 148 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 148.

149.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible, for Class members to individually seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

**ANSWER:**  Paragraph 149 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 149.

## XI.     COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

150.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

**ANSWER:** Paragraph 150 contains Plaintiffs' characterization of their complaint to which no response is required.  To the extent a response is required, Defendants repeat and incorporate their answers to the paragraphs realleged therein.

151.    This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, on behalf of the Class, against all Defendants.

**ANSWER:**  Paragraph 151 contains Plaintiffs' characterization of their claims to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 151, except admit that Plaintiffs purport to describe the Exchange Act claims asserted in the Second Amended Complaint.

152.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other Class members to purchase NAPCO common stock at artificially inflated prices.

**ANSWER:**  Paragraph 152 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 152.

153.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**  Paragraph 153 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 153.

154.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

**ANSWER:**  Paragraph 154 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 154.

155.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements they issued, approved, or otherwise disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**ANSWER:**  Paragraph 155 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 155.

156.    Additionally, Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts, their control over the allegedly materially false and misleading statements and omissions, and their access to nonpublic information.

**ANSWER:**  Paragraph 156 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 156.

157.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NAPCO common stock. Plaintiffs and the Class would not have purchased NAPCO common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

**ANSWER:**  Paragraph 157 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 157.

158.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of NAPCO common stock during the Class Period.

**ANSWER:**  Paragraph 158 purports to state legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 158.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

159.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

**ANSWER:**  Paragraph 159 contains Plaintiffs' characterization of their complaint to which no response is required.  To the extent a response is required, Individual Defendants repeat and incorporate their answers to the paragraphs realleged therein.  The allegations in Paragraph 159 are not directed at NAPCO and therefore no response is required.  To the extent a response is required, NAPCO and incorporate Individual Defendants' response to Paragraph 159.

160.     This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of the Class, against the Individual Defendants *(i.e.,* defendants Soloway and Buchel).

**ANSWER:**  Paragraph 160 contains Plaintiffs' characterization of their claims to which no response is required.  To the extent a response is required, Individual Defendants deny the allegations in Paragraph 160, except admit that Plaintiffs purport to describe the Exchange Act claims asserted in the Second Amended Complaint.  The allegations in Paragraph 160 are not directed at NAPCO and therefore no response is required.  To the extent a response is required, NAPCO incorporates Individual Defendants' response to Paragraph 160.

161.     The Individual Defendants acted as controlling persons of NAPCO within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of NAPCO, the Individual Defendants had, and exercised, power and authority to cause NAPCO to engage in the wrongful conduct complained of herein.

- 73 -

**ANSWER:**  Paragraph 161 purports to state legal conclusions to which no response is required.  To the extent a response is required, Individual Defendants deny the allegations in Paragraph 161.  The allegations in Paragraph 161 are not directed at NAPCO and therefore no response is required.  To the extent a response is required, NAPCO incorporates Individual Defendants' response to Paragraph 161.

162.   As set forth above, NAPCO and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for NAPCO's Section 10(b) and Rule 10b-5 violations. To the extent necessary, each of the Individual Defendants culpably participated in the underlying violations given their knowledge of and/or involvement in the wrongful conduct alleged herein.

**ANSWER:**  Paragraph 162 purports to state legal conclusions to which no response is required.  To the extent a response is required, Individual Defendants deny the allegations in Paragraph 162.  The allegations in Paragraph 162 are not directed at NAPCO and therefore no response is required.  To the extent a response is required, NAPCO incorporates Individual Defendants' response to Paragraph 162.

163.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**ANSWER:**  Paragraph 163 purports to state legal conclusions to which no response is required.  To the extent a response is required, Individual Defendants deny the allegations in Paragraph 163.  The allegations in Paragraph 163 are not directed at NAPCO and therefore no response is required.  To the extent a response is required, NAPCO incorporate Individual Defendants' response to Paragraph 163.

## XII.   RESPONSE TO PLAINTIFFS' PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to the relief requested at the conclusion of the Second Amended Complaint or to any relief.

## AFFIRMATIVE DEFENSES

The fact that Defendants have responded to all allegations set forth herein should not be construed as a waiver of any argument that Plaintiffs' claims are barred, in whole or in part, by the Court's Order granting Defendants' Motion to Dismiss in part, and Defendants expressly reserve all rights thereunder.

### FIRST AFFIRMATIVE DEFENSE

The Second Amended Complaint fails to state a claim upon which relief may be granted, and fails to establish a legally cognizable injury.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they cannot demonstrate any damages, including to the extent that any damages asserted are too speculative to be recoverable at law and because of the impossibility of the ascertainment and allocation of alleged damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that the alleged misstatements or omissions were not material to the investment decisions of a reasonable investor in view of the total mix of information available to investors.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that Defendants' alleged misstatements are inactionable statements containing publicly available information, forward-looking statements, statements accompanied by meaningful cautionary language, statements of opinion, statements of puffery, inactionable statements under the bespeaks caution doctrine, and/or inactionable statements that otherwise fall within the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995, including without limitation 15 U.S.C. §§ 78u-4 and 78u-5.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, for lack of loss causation to the extent that an act or omission attributed to Defendants in the Second Amended Complaint was not the actual or proximate cause of any alleged injury suffered by Plaintiffs and the class as alleged, or did not cause the alleged loss for which Plaintiffs and the class as alleged seek damages. Moreover, Defendants are not liable for any alleged damages suffered by Plaintiffs and the class as alleged to the extent that (i) the negligent, reckless, or willful acts of others constituted independent, intervening, and superseding causes, (ii) Plaintiffs' and the class's purported injuries and damages, if any, were caused or contributed to, in whole or in part, by Plaintiffs and the class themselves, or (iii) Plaintiffs' and the class's purported injuries and damages, if any, were caused or contributed to, in whole or in part, by the policies, practices, acts, or omissions of independent persons or entities other than Defendants and over which Defendants have no control. The liability of all parties, named or unnamed, if any, should be apportioned according to their relative degrees of fault and Defendants' alleged liability, if any, should be reduced accordingly. Defendants may recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations, omissions, and conduct alleged in the Second Amended Complaint, to the extent Defendants are permitted to do so under the law.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they did not rely on the market price of NAPCO's securities in making their investment decisions, and to the extent that the market price of NAPCO's securities was not inflated as a result of any alleged representation or omission made by Defendants, thus making the "fraud on the market" presumption inappropriate in this case.

- 76 -

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that there was no actual and/or justifiable reliance on Defendants' alleged misstatements and omissions.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that Plaintiffs and the class relied exclusively upon their own reasonable judgment and decisions, independent investigations, and the advice of their professional investment advisors in making their alleged purchase or sale of NAPCO securities during the Class Period.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that Defendants neither owed nor breached any duty to Plaintiffs and the class to disclose information allegedly omitted in any relevant public disclosure, and to the extent that Defendants were under no duty to revise, update, or correct any previously made statements.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that the Individual Defendants did not have "control" over any person or entity primarily liable, as the term "control" is defined in the federal securities law.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendants acted, at all times, in good faith and had no knowledge of, or reasonable grounds, to believe that any alleged statement or omission made by any person over whom they allegedly exercised control was false or misleading.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, because Plaintiffs and the class have failed to establish a primary violation of the '34 Act as required by Section 20.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that  Plaintiffs and the class failed to establish any strong inference of scienter or actual knowledge on the part of any Defendant and as to each alleged misstatement with the particularity required by the PSLRA, Federal Rule of Civil Procedure 9(b), or otherwise.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that Defendants acted with reasonable care and due diligence, and/or relied on the authority of experts retained to assist Defendants, with respect to the matters alleged in the Second Amended Complaint to have been misrepresented in or misleadingly omitted from any relevant public disclosures.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent  that Defendants at all times acted in good faith conformity with applicable rules, statutes, regulations, orders, or other laws in effect at the time of the conduct alleged in the Second Amended Complaint, and therefore are not subject to liability under the federal securities laws.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that the doctrines of laches, waiver, unclean hands, estoppel, ratification, or any other related equitable doctrines apply.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs had a duty to take reasonable action to minimize any damage allegedly sustained as a result of the conduct alleged in the Second Amended Complaint, and to the extent Plaintiffs and the class as alleged failed to minimize, or otherwise mitigate any damage they allege to have suffered, they are barred, in whole or in part, from recovering damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE

To the extent that any injuries to Plaintiffs and the class as alleged were caused by any action on the part of Defendants, which Defendants expressly deny, such action was not intentional or willful.

## NINETEENTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs and the class as alleged attempt to seek equitable relief, they are not entitled to such relief because they have an adequate remedy at law.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged against Defendants are barred, in whole or in part, to the extent that the relief sought by Plaintiffs and the class as alleged is broader than what is necessary to remedy the alleged harm.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that Defendants did not engage in acts, practices, or a course of business that operated as a fraud or deceit upon Plaintiffs and the class.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent the claims asserted in the Second Amended Complaint are contradicted by documentary evidence.

- 79 -

**TWENTY- THIRD AFFIRMATIVE DEFENSE**

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they are beyond the applicable statute(s) of limitations and/or repose.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

Plaintiffs and the class as alleged are limited to those damages, if any, that are authorized by the PSLRA, the Exchange Act, and/or any other applicable laws, and therefore may not recover damages in excess of those authorized by the statutes or regulations promulgated pursuant to these statutes and/or laws.  Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they held, disposed of, or could have disposed of the securities at issue at a price in excess of the offering price.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they were not purchasers of NAPCO stock during the Class Period, thus lacking standing.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent the purchases at issue were not domestic transactions as required by *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent they knew or should have known the risk associated with their securities investments, including but not limited to the stock market, industry and business factors, and assumed those risks when they purchased stock.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims and those of the class as alleged are barred, in whole or in part, to the extent that they failed to use due diligence to protect their own interests.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs and the class as alleged are not entitled to recovery to the extent that they would have acquired NAPCO stock, even if, when they acquired their stock, they had known of the allegedly untrue statements of material fact, omissions of material fact, misleading statements, or other wrongful conduct upon which Plaintiffs and the class purport liability rests.

## THIRTIETH AFFIRMATIVE DEFENSE

This case cannot be maintained as a class action because the class as alleged by Plaintiffs does not satisfy the requirements of Federal Rule of Civil Procedure 23.

## ADDITIONAL DEFENSES RESERVED

In addition to the defenses described above, Defendants specifically reserves all rights to all other defenses that become known through the course of discovery or further investigation in this action or that they may otherwise be entitled to assert by law for any reason whatsoever.

## PRAYER FOR RELIEF

WHEREFORE, Defendants demands judgment dismissing the Second Amended Complaint in its entirety, together with costs and disbursements of this action, and for any expenses incurred in the defense thereof, including attorneys' fees. Defendants further demand such other relief, both general and specific, at law or in equity, to which it is justly entitled.

Dated: February 23, 2026     Respectfully submitted,
      New York, New York

                                            **SIMPSON THACHER & BARTLETT LLP**

                                             */s/ Jonathan Youngwood*
                                            Jonathan K. Youngwood
                                            Janet Gochman

425 Lexington Avenue
New York, NY 10017
Tel: 212-455-3539
Fax: 212-455-2502
jyoungwood@stblaw.com
j.gochman@stblaw.com

*Counsel for Defendants*